1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   PATRICK BRUCE GORDON,              Case No.  2:91-cv-0882-DC-JDP

11                Petitioner,           **DEATH PENALTY CASE ORDER;**

12        v.                            **FINDINGS & RECOMMENDATIONS**

13   ERIC MEJIA,[1]

14                Respondent.

15

16        Petitioner is a state prisoner under sentence of death who challenges through writ of

17   habeas corpus his conviction for first-degree murder and his death sentence.  Pending before the

18   court is petitioner's brief on the merits and for partial summary judgment, filed pursuant to the

19   court's October 6, 2015 order.  ECF Nos. 396, 421, 441, & 454.  After careful consideration of

20   both parties' briefs and of the record, the undersigned concludes that petitioner has shown his

21   entitlement to an evidentiary hearing on portions of claim S of the Third Amended Petition.  The

22   undersigned recommends that all other claims of the Third Amended Petition be denied for the

23   reasons set forth herein.

24

25                              **FACTS**

26        The California Supreme Court described the evidence presented at trial in its 1990 opinion

27   ───────────────────

28        [1] The undersigned substitutes Acting Warden Eric Mejia as respondent in place of Kevin
     Chappell pursuant to Federal Rule of Civil Procedure 25(d).

                                        1

in which it affirmed petitioner's convictions and sentences on direct appeal.  *People v. Gordon*, 50 Cal. 3d 1223, 1233-38 (1990).  Neither party disputes the accuracy of the trial record as described by the California Supreme Court, *see* ECF Nos. 421 at 1-5, 441 at 7-11, 454 at 1-2, and upon review of the trial record, the undersigned concludes that it accurately summarizes the evidence presented at trial.  *See Mejia v. Garcia*, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008).

### A. Guilt Phase

At the guilt phase the prosecution's theory was that defendant was responsible with his brothers for the crimes charged—specifically, he was liable for the robbery and murder by aiding and abetting them as their getaway driver, or at least by conspiring with them to commit the offenses.  The issues subject to greatest dispute were identity, intent, and degree of participation.  To support its theory, the prosecution presented evidence in its case-in-chief relating directly to the crimes charged and also to certain prior uncharged offenses.  The tale told is in substance as follows.

On November 15, 1982—about 13 months before the commission of the crimes for which defendant was standing trial—Mark Allen Freed, a courier for an armored-car service, was robbed and murdered in the sales area of a K mart store in Riverside after he picked up the business's receipts for deposit to its bank account.  Freed was carrying the receipts and was armed with a .38-caliber revolver.  He was accosted by two men with handguns and without masks.  Soon shots rang out.  One of the men fired two rounds of Winchester Western .45-caliber automatic ammunition from a .45-caliber automatic or semiautomatic pistol possibly manufactured by Star; both bullets went through Freed, and one apparently lodged in the shooter's partner.  That man fired one round of 9-mm. Luger ammunition from a 9-mm. Luger pistol; the bullet went through Freed and apparently lodged in the shooter's partner.  Freed fired his revolver and hit the man who was armed with the .45-caliber pistol.  Freed was shot through the chest, behind the left ear, and in the upper left arm, and died as a result of the chest wound.  The perpetrators fled through a fire exit at the rear of the store, taking with them Freed's gun as well as the business's receipts.

Evidence connected defendant and his brothers to the Riverside K mart incident.  For example, at the scene of the shooting was found a hat; it matched one to which defendant and his brothers evidently had access.  Also discovered was a trail of blood leading from the scene to the fire exit; the blood could have come from about 7 percent of the Caucasian population in the state, including defendant but not his brothers.  Moreover, some time before the incident, defendant had purchased a Star .45-caliber semiautomatic pistol from a firearms dealer; he had sought, and received, a "powerful and concealable" weapon.

Further, some time before November 25, 1982, Bernard left California with defendant and Michael, driving a red pickup truck with a camper shell; defendant and Michael had recently sustained gunshot wounds, the former to his hip and arm, the latter to his stomach.  The trio set out for the house of their uncle, Dennis Rauch, who lived in Hinesville, Georgia.  Rauch was a sergeant in the

2

Army, had served in Vietnam, and was quite familiar with gunshot wounds. Bernard had evidently informed Rauch of the injuries suffered by defendant and Michael, and Rauch told Bernard to bring them to him for treatment.

On November 26 the trio arrived at Rauch's house. Rauch checked the wounds sustained by defendant and Michael. He determined defendant's arm was broken; he recommended a hospital visit, but it was decided that such a visit should take place only after the gunshot wounds had healed. Rauch began to treat the injuries. At Bernard's request, and with his offer of a sum between $1,000 and $2,000, Clark Pace traveled from California to Hinesville and, once there, assisted Rauch in the treatment. Bernard stayed about three days. Rauch took him to the Savannah airport for a flight back to California, and received $2,000. After defendant's gunshot wounds had healed sufficiently, Rauch took him to a hospital in Hinesville and from there to a hospital in Savannah. Defendant and Michael eventually returned to California. They bore scars and other indications of the wounds they had suffered.

Finally, after a physical lineup conducted on February 3, 1984, defendant was identified as one of the perpetrators by Beverly Gomez, a K mart employee who had witnessed the incident. (Gomez, however, did not identify defendant at trial.)

On December 18, 1983, William Camp Wiley, a courier for an armored car service, was robbed and murdered in the sales area of a K mart store in Stockton after he picked up the business's receipts for deposit to its bank account. Wiley was carrying the receipts and was armed with a .38-caliber revolver. He was accosted by two men with handguns and without masks. Soon shots rang out. One of the men fired three rounds of Remington Peters 9-mm. Luger ammunition from a 9-mm. Browning Luger pistol. The other fired one round of Winchester Western .38-caliber Super Plus P automatic ammunition, apparently from a .38-caliber automatic or semiautomatic pistol. Both hit their mark: Wiley was shot three times in the chest and once in the abdomen, and died as a result of his wounds. The perpetrators fled through a fire exit at the rear of the store, taking with them Wiley's gun as well as the business's receipts.

Evidence connected defendant and his brothers to the incident at the Stockton K mart as well as that at the Riverside store. For example, at and around defendant's residence in Chino the following items, among others, were found: a police call radio directory for states including California, bearing defendant's fingerprints, with marks at several frequencies used by the Stockton Police Department; a similar directory, with marks at several frequencies apparently used by the Riverside Police Department; two portable programmable scanning radios capable of monitoring police broadcasts; two handheld transceivers or "walkie-talkies" with clip-on microphones; ten rounds of Remington Peters 9-mm. Luger ammunition; two Browning 9-mm. barrels, which had been sent to Michael in care of defendant; more than $1,000 in cash; and a map of Tucson, Arizona, bearing defendant's fingerprints, with marks indicating, among other things, the location of certain K mart and similar stores.

At and around Bernard's residence in Upland the following items, among others, were discovered: the Browning 9-mm. Luger pistol used in the crimes committed at the Stockton K mart, fitted with a different barrel; a portable programmable scanning radio capable of monitoring police broadcasts, which had

3

in fact been tuned to one of the main channels used by the Stockton Police Department; a registration slip and other title documents relating to a beige Chevrolet station wagon, purchased by defendant in San Diego under an assumed name for cash, which was evidently used in the Stockton crimes and then abandoned; more than $13,000 in cash; a police call radio directory for states including Arizona, with marks at several frequencies apparently used by law enforcement authorities in Phoenix; and a map of Phoenix, bearing defendant's left palm print, with marks indicating, among other things, the location of certain K mart stores.

At Michael's residence in Upland was found, among other items, Winchester Western .38-caliber Super Plus P automatic ammunition—the kind of ammunition used by one of the perpetrators at the Stockton K mart.

Further, while they were in custody after their arrest, defendant and Bernard passed coded notes which were intercepted, and partially decoded, by the jailers. Defendant sent a note that read in part: "Talked to said wife, worried about Denny [i.e., Dennis Rauch] cracking. I agree with you pizza [?] would stop. If not I'll tell your story. Biggest thing against me is marks on call book for here. I saw the reg. slip on wagon . . . , that's scary." Bernard responded with a note, "Were you talking about the station wagon?" Defendant replied with a note that read in part: "Yes, on station wagon . . . , it's a registration slip." The station wagon was subsequently found abandoned about a block from the Stockton K mart.

Finally, at trial Bernard and Michael were named as the shooters at the Stockton K mart by several witnesses who had observed the incident. Defendant had been seen by one witness shortly before the event: he was sitting in the driver's seat of what was apparently the beige Chevrolet station wagon, which was parked near the store; with him in the vehicle were two other men. One witness testified she had seen Bernard and possibly defendant acting suspiciously in the store during the week preceding the incident, the former twice and the latter once.

The theory of the defense was that defendant was not involved at all in the charged crimes committed at the Stockton K mart or in the uncharged offenses relating to the Riverside K mart—or that at most he may have been an accessory to the former. The defense took the position that defendant was not at either store at any time pertinent here. As to both Stockton and Riverside, it presented a defense of mistaken identity. As to Stockton alone, it offered a defense of alibi: on the day in question, defendant was not in Stockton but rather several hundred miles away in Southern California. In support, it introduced various evidence in its case-in-chief. For example, Professor Elizabeth Loftus gave expert opinion on eyewitness testimony and its unreliability under certain circumstances. And Romelia Popkins, defendant's mother-in-law, stated defendant was in Southern California on the day of the Stockton crimes. The defense also introduced character evidence. Colonel Michael J. McGowan of the United States Marine Corps testified that defendant had been a member of the corps; he had served under him between 1977 and 1979; he was reputed to be honest and nonviolent, and in his opinion he was actually so; and he was not the type of man to have committed the crimes charged.

In rebuttal, the prosecution called a jailhouse informer named Billy Ray

4

Colbert. Colbert testified that he had been in custody with defendant and had talked to him: defendant, he said, admitted involvement in both the charged crimes committed at the Stockton K mart and the uncharged offenses relating to the Riverside K mart. The prosecution also introduced evidence showing that shortly after the Stockton crimes, defendant and his wife engaged in several large cash transactions—even though defendant was evidently unemployed and his wife was definitely so. For example, they opened a joint checking account with a deposit of $1,000 in cash and $127.91 in checks. (On the signature card defendant stated he was employed by U.S. Rooter, a sewer and drain cleaning service; in actuality, he had left the firm almost two years earlier.) Around the same time, defendant's wife opened trust accounts for their children with cash deposits totaling $1,000.

In surrebuttal, the defense called witnesses including a jailhouse informer named William Tiller. Tiller testified that he had been in custody with Billy Ray Colbert and had talked to him: Colbert, he said, admitted that defendant had made no admissions in his presence.

### B. Penalty Phase

At the penalty phase, the prosecution relied on the evidence offered at the guilt phase and did not introduce any evidence in aggravation.

The defense presented evidence in mitigation. It was in substance as follows.

Deprivation and neglect shadowed defendant's early life. His father, Robert Gordon, and his mother, Denise Rauch, married in 1954 after she became pregnant; he was 19 years old and she was 16. Evidently Bernard was born in 1954, and defendant in 1957. The marriage was stormy and family life troubled. When Bernard was about five and defendant about two, Denise abandoned the home. At that time she was pregnant with Robert's child. The marriage was dissolved. She soon married Jerry Caputo, delivered Michael, and gave the child "Caputo" as his surname. Robert had custody of Bernard and defendant, but provided them with inadequate care. When Bernard was about seven and defendant about four, dependency proceedings were initiated; subsequently, the boys were removed from Robert's home, committed to an orphanage, placed in foster care, and eventually—when they were about thirteen and ten respectively—returned to Robert. The following years in Robert's home were not without trouble: for example, Robert drank to excess, and he favored Bernard and disfavored defendant.

At 17 years of age defendant joined the Marines. He served honorably for six years and was honorably discharged. At age 26—between the incidents at the Riverside and Stockton K mart stores—he married Carlene Popkins; they have three children, one of their own and two brought by Carlene from a previous marriage. Carlene testified that she loved defendant and had no plans to dissolve their marriage.

Also, testimony was presented about the nature of prisons and imprisonment and the contributions life prisoners could make to the institution and to themselves. It was stipulated that defendant had no prior criminal record.

1    *Gordon*, 50 Cal. 3d at 1233-38.

2                              **PROCEDURAL HISTORY**

3         On May 22, 1984, the San Joaquin County District Attorney filed an information charging

4    petitioner, Patrick Bruce Gordon, and his two brothers, Bernard Patrick Gordon and

5    Michael Caputo, with the following: conspiring to commit murder and robbery (count

6    1; Cal. Penal Code §§ 182, 187, & 211); murdering William Camp Wiley (count 2; § 187); and

7    robbery (§ 211).  1 CT 37-39.[2]  As a special circumstance for count 2, it was alleged that the

8    murder occurred during the commission of a robbery, under California Penal Code section

9    190.2(a)(17).  1 CT 39.  Before trial, petitioner moved for a change of venue and to sever his trial

10   from his co-defendants' trial.  1 CT 64-98.  The court granted the motion to sever, 2 CT 334, and,

11   later, the change of venue motion, resulting in the transfer of petitioner's case to Sacramento

12   County.  2 CT 466, 470.

13        Petitioner's trial began in November 1984.  3 CT 710-11.  The guilt phase concluded on

14   February 14, 1985, with the jury instructed on both guilt and special circumstances issues.  4 CT

15   806-08, 931.  After approximately four hours of deliberation, the jury found petitioner guilty on

16   all counts and found the special circumstance true.  4 CT 921-33; 53 RT 8977, 8999.  At the

17   penalty phase, the prosecution presented no evidence in aggravation.  5 CT 943.  The defense

18   presented evidence in mitigation and the jury was instructed on March 12, 1985.  5 CT 944-45,

19   1070.  The following day, the jury delivered a death verdict.  5 CT 1071, 1075-76.  On May 3,

20   1985, the court denied petitioner's motion for new trial and imposed a sentence of death for count

21   2, while staying the sentences on the remaining counts.  5 CT 1113-25.

22        Petitioner sought direct review to the California Supreme Court, which affirmed the

23   judgments and sentence.  LD AOB, LD RB, LD ARB, LD 3-K, LD 3-L, LD 3-M; *People v.*

24   *Gordon*, 50 Cal. 3d 1223 (1990).  Petitioner filed a petition for rehearing, LD 3-N, which the

25   _____

          [2] Respondent lodged the state court record on August 7, 1991, and September 6, 1991.
26   ECF Nos. 5 & 7.  Herein, the lodged documents are cited consistent with the numbering and
     naming convention respondent utilized in his *Index of Lodged Records Pursuant to Local Rule*
27   *191(i)(c) and Notice of Lodging of Additional Records*, *see* ECF No. 7, except for citations to the
     trial record, which are cited simply as "RT" (Reporter's Transcript) and "CT" (Clerk's
28   Transcript), with the volume number preceding the abbreviation and the page number following.

1    California Supreme Court denied on August 29, 1990.  LD 3-O.  He filed a petition for writ of

2    certiorari to the United States Supreme Court, which was denied on March 4, 1991.  LD 4-Q, LD

3    4-R; *Gordon v. California*, 499 U.S. 913 (1991).

4         Following his direct appeal, petitioner did not file a habeas corpus petition in state court

5    challenging his convictions or sentence.  *See* ECF Nos. 203 at 3, 441 at 6.[3]

6         Petitioner filed a petition for writ of habeas corpus in this court on July 5, 1991, ECF No.

7    1, and, on October 23, 1992, filed an amended petition.  ECF No. 25.  Respondent moved for

8    dismissal of the petition or, in the alternative, of unexhausted claims, which petitioner opposed.

9    ECF Nos. 31, 34.  On May 5, 1993, the court ordered the case stayed to permit petitioner to

10   exhaust his claims in state court.  ECF No. 46.  The court vacated that order on October 19, 1994,

11   as well as struck without prejudice the amended petition and granted petitioner leave to file a

12   discovery motion and to utilize investigative funds for the purpose of filing a second amended

13   petition.  ECF Nos. 77, 82.

14        On August 24, 1999, petitioner filed a second amended petition, a notice of unexhausted

15   claims, and a motion for stay and abeyance pending his exhaustion of state remedies, ECF Nos.

16   196-99.  On September 9, 1999, respondent opposed petitioner's motion to stay and hold in

17   abeyance the proceedings, representing that respondent waived exhaustion "in these

18   proceedings."  ECF No. 200.  As a result, petitioner withdrew his motion for stay and abeyance

19   for exhaustion purposes.  ECF Nos. 201, 202.  Petitioner filed a third amended petition (hereafter,

20   "petition") on October 26, 1999.  ECF No. 203.

21        Respondent moved for an introductory section of the petition to be struck and for a more

22   definite statement of certain claims, on November 19, 1999, ECF Nos. 205, 206, which the court

23

24        [3] Respondent represents that petitioner filed a pro se habeas corpus petition in the
25   California Supreme Court during the pendency of his appeal, in which he challenged the
     adequacy of the representation that he was receiving from his appellate counsel, which the court
26   denied.  ECF No. 441 at 6 n.9.  Those pleadings are not part of the record before this court,
     although the California Supreme Court's docket shows that petitioner filed a pro se petition for
27   writ of habeas corpus in that court on June 3, 1987, and that the court denied it summarily on
     September 23, 1987, citing *In re Swain*, 34 Cal. 2d 300 (1949).  *In re Patrick B. Gordon*, Cal.
28   Supreme Court No. S001094, Docket Nos. 1-3.

1    denied on June 19, 2000.  ECF No. 236.  Respondent filed an answer, on October 25, 2000, ECF

2    No. 240, and petitioner filed a traverse on January 12, 2001, ECF No. 246.  The parties engaged

3    in discovery, and, on March 31, 2015, the court ordered petitioner to file a motion for evidentiary

4    hearing by October 6, 2015.  ECF No. 384.  Instead, on September 15, 2015, the parties filed a

5    stipulation asking that that order be vacated and that petitioner file a brief setting forth (1) his

6    entitlement for relief on those claims that do not require evidentiary development and (2) his

7    entitlement to evidentiary hearings on those claims he identified as requiring further evidentiary

8    development.  ECF No. 393.  On October 6, 2015, the court issued an order consistent with this

9    stipulation and set a briefing schedule.  ECF No. 396.

10   　　　　Shortly thereafter, on November 17, 2015, petitioner filed a motion for partial summary

11   judgment.  ECF No. 397.  The previously assigned magistrate judge construed this a motion for

12   reconsideration of the October 6, 2015 order and denied it, directing petitioner to file a brief

13   consistent with the October 6, 2015 order.  ECF No. 404.  On November 15, 2017, petitioner filed

14   a brief captioned as a brief on all claims for relief and a motion to apply Federal Rule of Civil

15   Procedure 56 to claim B and for summary judgment.  ECF No. 421.  Respondent filed a

16   responsive brief on November 4, 2020, ECF No. 441, and petitioner filed a reply brief on July 6,

17   2021, ECF No. 454.

18   　　　　On July 6, 2021, petitioner moved for a settlement conference, which respondent opposed.

19   ECF Nos. 456, 458.  The undersigned denied the request on March 31, 2022.  ECF No. 462.

20   **ANALYSIS**

21   　　　　In his briefing, petitioner argues that he is entitled to relief on the merits on all claims,

22   save for claims S, T, X, and Z, or portions thereof, for which he requests evidentiary hearings.

23   ECF Nos. 421, 454; *see* ECF Nos. 396, 404.  He also asks that the court apply Federal Rule of

24   Civil Procedure 56 to claim B.  ECF No. 421 at 1.  Respondent argues that certain claims should

25   be dismissed as not exhausted; certain claims should be dismissed as otherwise procedurally

26   barred; and some should be dismissed on the merits.  Respondent also argues that petitioner has

27   not shown his entitlement to evidentiary hearings on the claims and subclaims for which he

28   requests them, and disputes the application of Rule 56 to petitioner's claim B.  ECF No. 441.  The

1    court considers each argument in turn.

2         As a preliminary matter, because petitioner filed his petition in this court before the

3    effective date of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), its provisions

4    do not apply to the adjudication of his petition.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997);

5    *Webster v. Woodford*, 369 F.3d 1062, 1066 (9th Cir. 2004).  Respondent does not dispute this.

6    ECF No. 441 at 12.

7    **I.    EXHAUSTION OF CLAIMS**

8         In service of interjurisdictional comity, federal law generally requires a habeas corpus

9    petitioner to fairly present the substance of his federal constitutional claim to the state courts prior

10   to seeking habeas corpus relief in federal court.  *Castille v. Peoples*, 489 U.S. 346, 349 (1989);

11   *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Ex parte*

12   *Hawk*, 321 U.S. 114, 116-17 (1943); 28 U.S.C. § 2254(b) (1948).  In his brief, respondent argues

13   that several of the petition's claims and subclaims should be dismissed due to petitioner's failure

14   to exhaust them in state court; respondent identifies these as: claims E, K, Q, Y, DD, and EE;

15   certain allegations contained in claims F, H, J, N, O, R, S, W, X, and FF; and an unlabeled claim

16   alleging constitutional error from the prosecution's capital charging discretion.  ECF No. 441 at

17   111, 126, 135-39, 161, 191-93, 231-34, 248, 256, 260-61, 266, 268, 274-75, 290-91, 303, 317,

18   324, 334-36, 378, 380, 391, 398, 402, 422-23, 428-30, 432; ECF No. 448 at 12, n.9.  Petitioner

19   argues that respondent waived this defense in a prior pleading.  ECF No. 454 at 4, 51-52, 63, 72,

20   100, 110, 112, 116.  The undersigned agrees with petitioner.

21        **A. Legal Standard**

22        To satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the

23   substance of his constitutional claim to the state courts.  *Harless*, 459 U.S. at 6; *Picard*, 404 U.S.

24   at 275.  This rule predates AEDPA.  *See id.*; *Rose v. Lundy*, 455 U.S. 509, 515-18 (1982)

25   (detailing history of the doctrine).  A petitioner fairly presents the "substance of his federal

26   habeas corpus claim" when he has afforded the state courts sufficient notice and a fair opportunity

27   to apply controlling legal principles to the facts bearing upon the constitutional claim.  *Harless*,

28   459 U.S. at 6.

1  The exhaustion requirement is not jurisdictional, *see Castille*, 489 U.S. 346, 349 (1989);

2  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999), but rather is an affirmative defense that may

3  be raised by the respondent. *Granberry v. Greer*, 481 U.S. 129, 135 (1987). As such, it can be

4  waived by the state either expressly or impliedly, the latter including situations in which the

5  respondent has waited until an advanced stage in the proceeding to raise the defense. *Id.* at 135-

6  36; *see Brown v. Maass*, 11 F.3d 914 (9th Cir. 1993) (per curiam). Nevertheless, federal courts

7  have authority to order that a claim be exhausted even if respondent has not raised the issue or, on

8  the other side of the coin, to dismiss as meritless an unexhausted claim. *Granberry*, 481 U.S. at

9  133-35; *Rose*, 455 U.S. at 515; *Marino v. Ragen*, 332 U.S. 561, 564 (1947) (Rutledge, J.,

10 concurring) (exhaustion should be required "whenever it may become clear that the alleged

11 state remedy is nothing but a procedural morass offering no substantial hope of relief").

12 **B. Discussion**

13 Here, respondent has expressly waived exhaustion for the entire pending proceeding, thus

14 making this defense unavailable to be asserted at the present stage. A "waiver is the 'intentional

15 relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733

16 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A waiver of exhaustion as a

17 defense may be made expressly, which occurs when it is articulated clearly, explicitly, and

18 unambiguously. *See Wood v. Milyard*, 566 U.S. 463, 474 (2012); *see also Sharrieff v. Cathel*,

19 574 F.3d 225, 229 (3d Cir. 2009) (collecting cases); *Pike v. Guarino*, 492 F.3d 61, 72-73 (1st Cir.

20 2007) (holding an express waiver of exhaustion occurs where it has been "clear and explicit");

21 *D'Ambrosio v. Bagley*, 527 F.3d 489, 495 (6th Cir. 2008) ("Courts . . . generally agree that

22 'express' [waiver of exhaustion] is synonymous with 'clear' or 'unambiguous.'"); *Eichwedel v.

23 Chandler*, 696 F.3d 660, 671 (7th Cir. 2012) ("[A] State expressly waives exhaustion for

24 purposes of § 2254(b)(3) where, as here, it concedes clearly and expressly that the claim has been

25 exhausted, regardless of whether that concession is correct."); *Dorsey v. Chapman*, 262 F.3d

26 1181, 1187 (11th Cir. 2001) (holding state waived exhaustion defense by "explicit[ly]" forgoing it

27 in its answer); *see also Black's Law Dictionary* (6th ed. 1990) (defining "express" as "[c]lear;

28 definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set

10

1    forth in words.  Directly and distinctly stated . . .").

2            Here, respondent expressly waived exhaustion in its September 9, 1999 filing in this court.

3    On August 24, 1999, petitioner filed a second amended complaint and, the same day, a motion to

4    stay and hold in abeyance the proceedings pending exhaustion of state remedies, accompanied by

5    a notice of unexhausted claims.  ECF Nos. 196-99.  Respondent then filed "Respondent's

6    Opposition To Motion For Abeyance of Proceedings And Respondent's Waiver of Exhaustion,"

7    which reads, almost in its entirety: "Please be advised that after due consideration Respondent

8    waives exhaustion in these proceedings and, therefore, opposes the motion for abeyance."  ECF

9    No. 200 at 1-2.  This language was clear, direct, and unambiguous in communicating an intention

10    to relinquish this defense in the present proceeding; as such, it constituted an express waiver of

11    exhaustion.  *See Wood*, 566 U.S. at 474; *Olano*, 507 U.S. at 733; *see Carty v. Thaler*, 583 F.3d

12    244, 257 (5th Cir. 2009) (holding that the government's assertion that "[a]ll but one of

13    [petitioner's] claims appear to be exhausted," constituted an express waiver of the exhaustion

14    defense to all but one claim because it conveyed that the "state clearly considered exhaustion as a

15    defense and chose not to exercise that defense"); *Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir.

16    1999) (holding that the respondent had waived exhaustion defense by stating in its original

17    answer that the petitioner had "sufficiently exhausted his state remedies as required by" statute);

18    *cf. Wood*, 566 U.S. at 474 (holding that the state expressly waived procedurally defense of

19    untimeliness by stating in responsive pleading that "[r]espondents will not challenge, but are not

20    conceding" the timeliness of the petition).

21            Respondent argues that his waiver was limited.  In some instances, respondent argues that

22    the waiver was meant only to encompass the theories and allegations contained in the "Amended

23    Petition operative at that time," i.e., the second amended petition.  ECF No. 441 at 136, 138-39,

24    191.  Elsewhere, respondent argues that the waiver only encompassed those allegations petitioner

25    had set forth in the third amended petition.  ECF No. 441 at 161 n.76, 193, 231, 248, 256, 260-61,

26    266, 268, 275, 290-91, 303-04, 317, 324, 334-36, 378, 380, 391, 398, 402, 422-23, 428, 430, 432.

27    The unambiguous text of the waiver, however, did not communicate either of these limitations;

28    rather, respondent made plain that he was waiving the defense for the entirety of "these

proceedings." ECF No. 200. Respondent is a sophisticated legal entity and is bound by the words selected in communicating with the court and petitioner, particularly about issues as critical as the assertion and relinquishment of available defenses. *See generally Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982), *abrogated on other grounds by Granberry*, 481 U.S. 129 (1987) ("Sound policy reasons support the view that the states should bear the responsibility of asserting state procedural issues. If a federal habeas petitioner has failed to comply with state procedures, the state's representative is in the best position to identify the procedural default and argue in federal court that the state has an interest in barring federal review of the merits."); *In re Cargill, Inc.*, 66 F.3d 1256, 1261 (1st Cir. 1995) (declining to allow retraction of waiver, observing that "litigants ordinarily are bound by their attorneys' tactical judgments"); *see, e.g.*, *Sharrieff*, 574 F.3d at 229 ("The fact that the State based its concession on a flawed legal conclusion is of no consequence; its concession clearly, explicitly, and unambiguously relinquished and abandoned its right to assert the nonexhaustion defense. That is enough to expressly waive the exhaustion requirement . . . ."); *Eichwedel*, 696 F.3d at 671 (holding the state bound by its express waiver of exhaustion, even if it was premised on factual error); *Kerns v. Ault*, 408 F.3d 447, 449 n.3 (8th Cir. 2005) (holding that the state expressly waived the exhaustion requirement with a concession in its district court briefing, even though the concession was made in error); *Dorsey*, 262 F.3d at 1187 (concluding that the state expressly waived the exhaustion defense where the state, based on a mistaken belief, expressly declined to raise the defense in its answer to the federal habeas petition). Because respondent expressly waived exhaustion for the entirety of the pending proceeding, respondent is precluded from relying on it as a defense at this stage of the case.

Accordingly, the undersigned rejects respondent's argument that certain claims, subclaims, or allegations propounded by petitioner should be dismissed at this time as unexhausted.

## II.     PROCEDURALLY BARRED CLAIMS

### A. Claims Held Defaulted by State Court

Respondent argues that petitioner is precluded from relief on claim G; claim J; claim O,

1    subclaims 1 and 13; claim V, subclaim 2; and claim W, subclaim 1(c) of the petition because

2    those claims and subclaims were denied in state court on independent and adequate state law

3    grounds, namely, application of California's contemporaneous objection rule.  The undersigned

4    considers each in turn.

5         **1.  Legal Standard**

6         Prompted by the same concerns about comity that underlie the exhaustion requirement,

7    the federal courts "will not review a question of federal law decided by a state court if the

8    decision of that court rests on a state law ground that is independent of the federal question and

9    adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *superseded*

10   *on other grounds by* 28 U.S.C. § 2254(b) and *overruled on other grounds by Martinez v. Ryan*,

11   566 U.S. 1 (2012).  For a state procedural rule to be found "independent of the federal question,"

12   *Coleman*, 501 U.S. at 729, the state law basis for the decision must not be interwoven with federal

13   law.  *Cooper v. Neven*, 641 F.3d 322, 332 (9th Cir. 2011); *Bennett v. Mueller*, 322 F.3d 573, 581

14   (9th Cir. 2003); *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  To be "adequate to

15   support the judgment," *Coleman*, 501 U.S. at 729, the rule must be "firmly established and

16   regularly followed" at the time of the purported default.  *Beard v. Kindler*, 558 U.S. 53, 60 (2009)

17   (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)); *see Fields v. Calderon*, 125 F.3d 757, 760

18   (9th Cir. 1997) (holding that the question of whether a state procedural bar is clear, consistently

19   applied, and well-established is determined as of the time the purported default occurred, not

20   when a state court applied the bar to a claim).

21        In federal habeas corpus proceedings, the state bears the initial burden of pleading that the

22   claim at issue had been denied by the state court on an independent and adequate state procedural

23   ground.  *Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018); *Bennett*, 322 F.3d at 585-86.  If

24   the state makes this initial showing, the burden shifts to the petitioner to demonstrate that the

25   procedural ground is not adequate, for example because it was not consistently applied at the time

26   of the state court adjudication.  *Williams*, 908 F.3d at 577.  If the petitioner makes such a

27   showing, the burden shifts back to the state to make a showing in rebuttal.  *Id.*

28        A federal court may elect not to apply an otherwise-valid procedural bar in two narrow

1    circumstances: if the petitioner can demonstrate cause for the default and prejudice as a result of

2    the alleged violation of federal law, or if the petitioner can show that failure to consider the claim

3    will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *see also Martinez*,

4    566 U.S. at 9-10; *Maples v. Thomas*, 565 U.S. 266, 280 (2012). Ineffective assistance of counsel,

5    violating a petitioner's Sixth Amendment rights in the state direct appeal or habeas corpus

6    litigation, may constitute cause for the federal court excusing an otherwise valid procedural

7    default. *See Martinez*, 566 U.S. 1.

8         If the federal court finds a state's procedural default inapplicable, then the federal court

9    reviews the claim de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Pirtle v. Morgan*, 313 F.3d

10   1160, 1167 (9th Cir. 2002). Correspondingly, where a claim is meritless, the federal court may

11   deny it on that basis without first determining the adequacy, independence, and applicability of

12   any procedural bars asserted. *See, e.g.*, *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do

13   not mean to suggest that the procedural-bar issue must invariably be resolved first . . . . It is

14   wasteful of both our resources and that of the litigants to remand to the district court a case in

15   which that court improperly found a procedural bar, if the ultimate dismissal of the petition is a

16   foregone conclusion."); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals

17   courts are empowered to, and in some cases should, reach the merits of habeas petitions if they

18   are, on their face and without regard to any facts that could be developed below, clearly not

19   meritorious despite an asserted procedural bar."); *see also Bell v. Cone*, 543 U.S. 447, 451 n.3

20   (2005) (holding that an application for habeas corpus may be denied on the merits even if

21   unexhausted in state court).

22        **2.  Discussion**

23        **a.  Claim G**

24        In claim G, petitioner alleges that the court erroneously admitted evidence of petitioner's

25   participation in an alleged robbery-shooting in Riverside County, in violation of California statute

26   and his federal constitutional rights to due process. ECF No. 203 at 36-39; ECF No. 421 at 77-

27

28

86.[4]  Respondent argues that the California Supreme Court denied the due process allegations of this claim on direct appeal as defaulted due to petitioner's failure to object contemporaneously, and that this court should defer to that independent and adequate state law grounds for the denial. ECF No. 441 at 119-25.  Petitioner argues that, if the state court defaulted the due process claim, the default should be disregarded because trial counsel's ineffectiveness constituted cause and prejudice or, alternatively, because failing to reach the merits of the claim would result in a fundamental miscarriage of justice.  ECF No. 454 at 29-35.  In the interest of judicial economy, the undersigned recommends that this claim be denied as meritless.  *See Lambrix*, 520 U.S. at 525; *Franklin*, 290 F.3d at 1232.

In his petition, petitioner alleges that "[a]s a matter of state evidence law," evidence relating to the Riverside crimes should have been excluded and "the erroneous admission of this evidence" effectuated a violation of his constitutional rights to due process and a fundamentally fair trial.  ECF No. 203 at 37, 39.  Petitioner urges this theory in his merits briefing as well, arguing that the evidence was wrongly admitted as a matter of state law under California Evidence Code sections 352 and 1101, ECF No. 421 at 77-78, 81-84, and, in turn, that "these erroneous state evidentiary rulings violated the federal Constitution."  *Id*. at 78.  Petitioner, however, had argued on direct appeal to the California Supreme Court that the admission of this evidence was error under Evidence Code sections 1101 and 352, and the California Supreme Court rejected this argument, holding that the admission was proper under the California Evidence Code.  *Gordon*, 50 Cal. 3d at 1239-40.

This court is bound by that determination.  The Supreme Court has explained, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76, (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), and *Mullaney v. Wilbur*, 421 U.S.

---

[4] In his petition, petitioner had also alleged that the erroneous admission of this evidence violated his rights under the Sixth and Eighth Amendments, although in his merits briefing appears to have abandoned these allegations, as he makes no argument in their support.  *See* ECF No. 203 at 36-39; ECF No. 421 at 77-86; *see generally Kates v. Crocker Nat. Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985); ECF No. 404.

1    684, 691 (1975)).  As such, this court cannot revisit the question of whether the evidence at issue

2    was properly admitted as a matter of state law.  Because petitioner's constitutional claim is

3    premised on the evidence having been wrongly admitted under state law, *see* ECF No. 203 at 37,

4    39; ECF No. 421 at 77-78, 81-84, it necessarily fails.  *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502

5    U.S. at 67-70; *see also Reno v. Davis*, 46 F.4th 821, 833-35 (9th Cir. 2022).  The undersigned

6    therefore recommends that claim G be denied.

7        **b.  Claim J**

8        In claim J, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

9    Amendments were violated by the introduction of an out-of-court statement attributed to

10   petitioner's uncle, Dennis Rauch, ECF No. 203 at 50-52, although in his briefing he abandons all

11   but the Sixth and Fourteenth Amendment bases of this claim, arguing that his federal

12   constitutional rights to confrontation were violated by the statement's introduction.[5]  ECF No.

13   421 at 126-27.  Respondent argues that the California Supreme Court properly applied the

14   contemporaneous objection rule in denying this claim on direct appeal.  ECF No. 441 at 185-90.

15   Petitioner counters that the court should decline to defer to the California Supreme Court's denial

16   because it was made in error, as petitioner had preserved the constitutional allegations at trial;

17   because it was applied as a subterfuge to the vindication of his federal rights; because it was

18   caused by his trial counsel's ineffectiveness; and, alternatively, because deference to the denial

19   would effect a manifest injustice.  ECF No. 421 at 135, 147-49; ECF No. 454 at 46, 48.  The

20   undersigned concludes that, irrespective of the applicability of the procedural bars, claim J should

21   be denied as meritless.  *See Bell*, 543 U.S. at 451 n.3; *Lambrix*, 520 U.S. at 525; *Franklin*, 290

22   F.3d at 1232.

23   _____

24       [5] Petitioner also briefly argues that the admission of Mr. Rauch's statement violated his
     rights to confrontation under *Bruton v. United States*, 391 U.S. 123, 125 (1968).  ECF No. 421 at
25   135-36.  In *Bruton*, 391 U.S. at 125, the Supreme Court held that a defendant's Confrontation
     Clause rights are violated if, in a joint trial of two or more co-defendants, the trial court admits
26   the statement or confession of a non-testifying co-defendant that inculpates the other.  Here, Mr.
     Rauch and petitioner were not tried together as co-defendants, and petitioner fails to address how,
27   given that fact, he is entitled to relief under *Bruton*.  *See* ECF No. 421 at 135-36.  To the extent
     that claim J asserts a violation of petitioner's Confrontation Clause rights under *Bruton*, the
28   undersigned recommends that the claim be denied on the merits.

1          **i.     Background**

2          At the guilt phase, the prosecution sought to call petitioner's uncle, Dennis Rauch, as a

3  witness. *Gordon*, 50 Cal. 3d at 1248.  At a hearing outside the presence of the jury, Mr. Rauch

4  claimed a privilege against self-incrimination under the Fifth Amendment and refused to testify.

5  *Id*.  The prosecution then sought to introduce a statement Mr. Rauch had made to police

6  investigators on November 15, 1982, to which the defense objected on hearsay grounds.  *Id.* at

7  1249.  The prosecutor argued that the statement constituted a declaration against penal interest

8  and, as such, was admissible under an exception to the hearsay rule, codified in California

9  Evidence Code section 1230.  *Id.* at 1249-50.  The court agreed with the prosecution and admitted

10 the statement under section 1230.  *Id.* at 1250.

11         On direct appeal, petitioner argued that the trial court erred under state law in admitting

12 the statement, since the statement did not satisfy section 1230's requirements for admission as a

13 declaration against penal interest.  LD AOB at 49-59.  The state court rejected this, finding "no

14 error" in the trial court's determinations that Mr. Rauch was unavailable, that the statement was

15 against his penal interest, and that the statement bore indicia of trustworthiness.  *Gordon*, 50 Cal.

16 3d at 1251-53.  To the extent petitioner argued that the erroneous admission of the statement

17 effectuated a violation of his federal constitutional rights to confrontation, the California Supreme

18 Court held that petitioner had forfeited this argument by failing to object on these grounds

19 contemporaneously.  *Id.* at 1254 n.6.

20         **ii.     Claim J Fails on the Merits**

21         Respondent and petitioner dispute at length the appropriateness of application of the state

22 court's procedural bar to this claim, but this claim is one where disposal on the merits better

23 serves judicial economy.  *See Lambrix*, 520 U.S. at 525; *Franklin*, 290 F.3d at 1232.  The crux of

24 petitioner's argument is that Mr. Rauch's statement did not meet the criteria for a statement

25 against penal interest under California's Evidence Code and, for that reason, its admission

26 violated petitioner's rights under the Confrontation Clause of the Fifth Amendment.[6]  ECF No.

27 _____

28         [6] At the time of petitioner's trial, the Confrontation Clause was not violated by the
admission of a declarant's out-of-court statement against a criminal defendant where the declarant

17

1   421 at 127, 135, 137-49.  As above, however, this court cannot revisit the state court's

2   determination that Mr. Rauch's statement constituted a declaration against penal interest under

3   California law.  *See Estelle*, 502 U.S. at 67-68, 70-72 ("[I]t is not the province of a federal habeas

4   court to reexamine state-court determinations on state law questions."); *see also Lilly v. Virginia*,

5   527 U.S. 116, 125 (1999) (plurality opinion) (whether statements qualified as statements against

6   penal interest for purposes of state hearsay rule is "matter of state law").  Thus, because

7   petitioner's claim of constitutional error relies on this court overruling the state court's

8   determination that the statement was properly admitted as a matter of state law, petitioner's

9   federal constitutional claim necessarily must fail.  *See Bradshaw*, 546 U.S. at 76.  Accordingly,

10  the undersigned recommends claim J be denied.

11      **c.  Claim O, subclaim 1**

12          In subclaim 1 of claim O, petitioner alleges that the prosecutor committed misconduct in

13  his guilt-phase closing argument by referencing defense alibi witnesses Romelia Popkins' and

14  Jerry Caputo's failures to have voluntarily shared their testimonies with police investigators

15  before trial.  ECF No. 203 at 64.  Respondent argues that a portion of this subclaim—the

16  allegation addressing the argument concerning Ms. Popkins—was held defaulted by the

17  California Supreme Court due to petitioner's failure to object contemporaneously.  ECF No. 441

18  at 244.  The California Supreme Court did deny relief on this allegation due to petitioner's failure

19  to raise a contemporaneous objection.  *Gordon*, 50 Cal. 3d at 1255.  Petitioner does not dispute

20  this but asserts that his trial counsel's ineffectiveness constitutes cause and prejudice to excuse

21  the default.  ECF No. 421 at 232 n.79, 234.  Upon review of the record, the undersigned

22  concludes that this subclaim is meritless and recommends that it be denied.

23          Both Ms. Popkins and Mr. Caputo were called as defense witnesses and their testimonies

24  supported petitioner's alibi defense to the instant case and to the Riverside crimes, respectively.

25  _____

26  was unavailable and the statement possessed "indicia of reliability."  *Ohio v. Roberts*, 448 U.S.
    56, 65 (1980); *see generally Whorton v. Bockting*, 549 U.S. 406 (2007) (holding that *Crawford v.*
27  *Washington*, 541 U.S. 36 (2004), which overruled *Roberts*, was not retroactive to cases in
    collateral review).  "Indicia of reliability" could be shown by the statement having been made
28  against the declarant's penal interests.  *Williamson v. United States*, 512 U.S. 594, 605 (1994).

1  46 RT 7415-80, 7487-7535.  On cross-examination, the prosecutor elicited from Ms. Popkins and

2  Mr. Caputo testimony that each had known that petitioner was facing prosecution but nonetheless

3  had failed to inform police investigators of the exculpatory alibi information before trial.  46 RT

4  7467-68, 7496-97, 9525-26.  In the prosecutor's closing argument, he argued that the alibi

5  evidence was not credible and wondered, rhetorically, why neither witness had come forward

6  earlier.  51 RT 8622-23; 52 RT 8907-08.  The prosecutor stated that, had either of the witnesses

7  come forward earlier, the contents of their testimonies could have been investigated for

8  corroboration.  51 RT 8622-23 ("If [Mr. Caputo] had said this to the police earlier that could be

9  checked to see whether or not in fact she was off work during that period of time."); 52 RT 8849

10  ("[O]f course that's exactly why Romelia Popkins didn't tell the police way back in February of

11  1984 when she says she realized that her son-in-law was innocent, the reason she didn't is

12  because given some time we could have checked that out.").  Petitioner argues that this argument

13  was improper to the extent that it implied the prosecution's investigation actually had been

14  stymied, because no evidence on this point had been presented at trial.  ECF No. 421 at 207-13.

15      A habeas corpus petitioner is entitled to a new trial where prosecutorial misconduct "so

16  infected the trial with unfairness as to make the resulting conviction a denial of due

17  process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation

18  omitted).  In *Darden*, for example, in closing argument the prosecutor described the defendant as

19  an "animal," opined that the defendant should only be allowed out of a jail cell if he were on a

20  leash, and shared his wish that the defendant was "sitting here with no face, blown away by a

21  shotgun."  477 U.S. at 181-83 nn.11 & 12.  The Supreme Court held that these statements,

22  although improper, did not deprive the defendant of a fair trial, in light of the instruction by the

23  court that the arguments made by counsel were not evidence and in light of the substantial

24  evidence of the defendant's culpability.  *Id.* at 181-83; *see also Donnelly v. DeChristoforo*, 416

25  U.S. 637, 647 (1974) (holding no due process violation by prosecutor's improper closing

26  argument, because court instructed the jury that the remark was not evidence and in light of the

27  substantial evidence of guilt).

28      Here, petitioner has not shown that the prosecutor's comments were misconduct, let alone

1   that they were so egregious as to have infected the trial with unfairness, depriving him of due

2   process.  Under California law, a prosecutor may argue that the evidence suggests defense

3   witnesses were not credible, or even that they were lying in their testimony, and may impeach a

4   defense witness on his or her failure to have gone to the authorities with exculpatory information

5   before trial.  *People v. Tauber*, 49 Cal. App. 4th 518 (1996); *People v. Ratliff*, 189 Cal. App. 3d

6   696 (1987).  In such cases, the prosecutor may argue that a reasonable deduction from such a

7   failure is that the witness fabricated the alibi information.  *See Ratliff*, 189 Cal. App. 3d at 702.

8   Indeed, one court has observed that a defense witness presents the prosecutor with a "credibility

9   gold mine" by testifying to an "eleventh-hour alibi [for the defendant] . . . [that] suddenly

10  surface[d]—like Botticelli's Venus emerging fully formed from the sea," which "no prosecutor

11  would fail to exploit" in closing argument.  *People v. Saucedo*, 121 Cal. App. 4th 937, 944

12  (2004).  As a matter of federal constitutional law, too, it is not misconduct for a prosecutor to

13  argue that a witness lied in their testimony, if such argument is a reasonable deduction from the

14  evidence.  *See Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds

15  by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).  Here, the totality of the prosecutor's argument

16  was that the alibi testimonies of Ms. Popkins and Mr. Caputo were not credible by virtue of their

17  last-minute disclosure; one basis of this inference, per the persecutor, was that the witnesses

18  would have had reason to withhold their respective statements until trial to attempt to evade

19  detection of the falsehood.  *See* 51 RT 8622-23; 52 RT 8849, 8907-08.  This is a reasonable

20  deduction from the evidence presented and was within the bounds of proper argument.  *See

21  Turner*, 63 F.3d at 818; *Saucedo*, 121 Cal. App. 4th at 944; *Ratliff*, 189 Cal. App. 3d at 702.

22  Petitioner therefore has not shown either that these portions of the prosecutor's argument were

23  misconduct or that they rendered his trial fundamentally unfair.  *See Darden*, 477 U.S. at 181.

24  The undersigned recommends that subclaim 1 of claim O be denied on the merits.

25         **d.  Claim O, subclaim 13**

26         In subclaim 13 of claim O, petitioner alleges that the prosecutor committed misconduct in

27  the guilt phase by eliciting testimony from Mr. Colbert that petitioner had told him that "some

28  woman that was supposed to have identified him over the telephone . . . and he got that throwed

20

out through some kind of technicality in the courts." ECF No. 203 at 67 (citing 48 RT 7861). Petitioner raised this subclaim in his direct appeal, however, and the California Supreme Court denied it on the basis that petitioner failed to object contemporaneously. *Gordon*, 50 Cal. 3d at 1256-57. Petitioner neither disputes this nor argues that the default was erroneously applied or that it otherwise does not deserve deference from this court. *See* ECF No. 454. Accordingly, the undersigned recommends that subclaim 13 of claim O be dismissed.

**e. Claim V, subclaim 2**

In claim V, petitioner alleges that his rights under the Eighth and Fourteenth Amendments were violated by the trial court's wrongful exclusion of relevant evidence at the penalty phase. ECF No. 203 at 100-03. In subclaim 2 of this claim, petitioner alleges that the trial court erroneously excluded petitioner's childhood orphanage records, which the defense had sought to introduce as mitigation. ECF No. 203 at 101-02; *see* ECF No. 421 at 318-37; *see also* ECF No. 454 at 87-92. Respondent argues that this subclaim was held procedurally defaulted by the California Supreme Court for failing to have been preserved at trial. ECF No. 441 at 355-57. Petitioner counters that the state court did not apply default and denied the subclaim on the merits or, alternatively, did apply the default but did so in error. ECF No. 421 at 328; ECF No. 454 at 87-89. The undersigned concludes that the state court's denial of this subclaim is entitled to deference and recommends that it be dismissed.

First, the record indicates that the state court held that this subclaim had been procedurally defaulted. In denying it on direct appeal, the California Supreme Court held:

> Outside the presence of the jury, defendant moved the court to allow the introduction of certain documents. The documents were referred to below as the "orphanage records." They were prepared by various persons for various purposes, and relate to the dependency proceedings involving defendant as a child and his subsequent removal from his father's home, commitment to an orphanage, placement in foster care, and eventual return to his father's home. They were obtained by defense counsel—in their own words—"via [a] rather circuitous route": counsel received the records from an investigator for Bernard's counsel, who had received them from an institution, which had apparently received them from the orphanage. The prosecution opposed the motion.
> At a hearing, defense counsel and the prosecutor disputed the question of the admissibility of the orphanage records. The prosecutor argued, inter alia, that

the records could not be received because they had not been authenticated as required by the Evidence Code.  Counsel conceded they had not complied with the statutory requirements.  But they represented they had made a "good faith effort" to do so.  The prosecutor also argued that the records could not be received because they comprised hearsay and hence were barred by the hearsay rule.  Counsel conceded the records comprised hearsay.  But they argued they came within the business records exception.  The prosecution argued they did not.

The court denied the motion.  It rested its ruling on a determination that defense counsel had not laid a sufficient foundation for introduction of the orphanage records under the business-records exception to the hearsay rule.

Defendant contends that the court erred by denying his motion.  His sole argument is in substance as follows.  Regardless of whether the orphanage records were generally admissible pursuant to state law, they were admissible here, at the penalty phase of a capital trial, under the United States Constitution: they were relevant to the constitutionally material issue of background and character; and under the facts of this case, their exclusion amounted to a violation of defendant's right to a fair trial on the issue of penalty under the due process clause of the Fourteenth Amendment and also a violation of his right to a reliable determination as to that issue under the cruel and unusual punishments clause of the Eighth Amendment.

We are inclined to reject the claim of error on procedural grounds.  As noted, defendant's sole argument in support is based on the asserted violation of certain federal constitutional rights.  But he "offered no such argument at [the] hearing and may not do so for the first time on appeal."  (*Lorenzana v. Superior Court*, *supra*, 9 Cal. 3d at p. 640 [dealing specifically with a motion to suppress under Pen. Code, § 1538.5].)

In any case, we reject the claim on the merits.  We recognize the relevance of the orphanage records to the constitutionally material issue of background and character.  But we are not persuaded their exclusion violated defendant's federal constitutional rights to a fair trial and a reliable determination, as to penalty.  It is true that the records, which were not admitted, portrayed deprivation and neglect shadowing defendant's early life.  But evidence that *was* admitted presented substantially the same theme.  Defendant argues that the records were constitutionally admissible under what the plurality in *People v. Harris* (1984) 36 Cal. 3d 36 [201 Cal.Rptr. 782, 679 P.2d 433] called the "rule" of *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] (*per curiam*): "in the punishment phase of a capital case, a defendant's proffered evidence must be admitted if it is highly relevant and substantial reasons exist to assume its reliability, despite the fact that the evidence is inadmissible hearsay under state law" (*People v. Harris, supra*, at p. 70).  We shall assume for argument's sake only that the records were in fact highly relevant.  But on this record we simply cannot conclude that substantial reasons existed to assume their reliability.

*Gordon*, 50 Cal. 3d at 1264-65.

As noted above, the federal courts will not reach the merits of a claim of violation of

22

1    federal law if the claim was denied in state court on a state-law ground that were both

2    independent of the merits of the federal claim and an adequate basis for the court's decision.

3    *Harris*, 489 U.S. at 260.  At the time of the California Supreme Court's direct appeal decision in

4    1990, the federal courts would reach the merits of the federal question if "it fairly appear[ed] that

5    the state court rested its decision primarily on federal law," but, if the state court had stated

6    "plain[ly] . . . that [its] decision rest[ed] upon adequate and independent state grounds," then the

7    federal court should defer to the state court's denial.  *Id.* at 261-62, citing *Michigan v. Long*, 463

8    U.S. 1032 (1983).  Thus, "a procedural default does not bar consideration of a federal claim on

9    either direct or habeas review unless the last state court rendering a judgment in the case 'clearly

10   and expressly' states that its judgment rests on a state procedural bar."  *Id*. at 263, citing *Caldwell*

11   *v. Mississippi*, 472 U.S. 320, 327 (1985), and *Long*, 463 U.S. at 1041.

12        Here, the totality of the language used by the California Supreme Court in denying

13   petitioner's claim on direct appeal indicates that it was, clearly and expressly, denying the claim

14   through the application of a procedural bar—namely, petitioner's failure to have asserted the

15   constitutional grounds for the claimed error at the time of trial.  *Gordon*, 50 Cal. 3d at 1264-65.

16   The court described the constitutional claim as presented in petitioner's opening brief, explained

17   that it had not been preserved at trial, and concluded that it was "inclined to reject the claim of

18   error on procedural grounds," but "in any event, [the court] reject[s] the claim on the merits."  *Id*.

19   The state court's use of the word "inclined" when discussing its decision on the procedural

20   default question does not render that discussion dicta, since such language is routinely used by

21   courts in communicating their holdings and the reasons therefor.  *See Wright v. Bell*, 619 F.3d

22   586, 603 (6th Cir. 2010); *see, e.g.*, *Standefer v. United States*, 447 U.S. 10, 25 (1980); *Carney v.*

23   *Chapman*, 247 U.S. 102, 103 (1918); *Folsom v. Poteet*, 235 F.2d 937, 938 (9th Cir. 1956); *People*

24   *v. Arias*, 193 Cal. App. 4th 1428, 1435 (2011).  Rather, the overall construction of the court's

25   analysis indicates that the state court denied this claim on procedural grounds and, in the

26   alternative, held it to be meritless.  *See Sochor v. Florida*, 504 U.S. 527, 534 (1992); *see, e.g.*,

27   *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996) (describing "in any event" as a "talismanic

28   phrase" indicating an alternative holding).  In such circumstances—where the state court has held

23

1    that the claim should, in the alternative, be denied on the merits and on state-law procedural

2    grounds—the denial on procedural grounds is entitled to deference.  *See Sochor*, 504 U.S. at 534.

3         Petitioner alternatively argues that, even if the California Supreme Court denied this

4    subclaim on independent and adequate state law grounds, this court should nevertheless decline to

5    defer to that denial because the state-law default was applied in error.  ECF No. 454 at 87-88.

6    Petitioner argues that the federal constitutional grounds for the claim were adequately placed

7    before the trial court, so as to preserve the claim as a matter of state law.  *Id*.  Petitioner has not

8    shown that the state court applied the state-law procedural bar in error.  Review of the record

9    supports the California Supreme Court's finding that petitioner did not interpose any objection or

10   make any argument in the trial court that admission of the records was required under the

11   Constitution or that the records' exclusion would violate his constitutional rights.  *See* 53 RT

12   9045-47, 9068-84; 55 RT 9379-83.  In denying this claim, the California Supreme Court cited a

13   longstanding state rule that, when a party seeks to have particular evidence admitted and

14   admission is denied by the trial court, that party cannot raise for the first time on appeal a novel

15   argument for the evidence's admissibility.  *Gordon*, 50 Cal. 3d at 1264-65, citing *Lorenzana v.*

16   *Superior Ct.*, 9 Cal. 3d 626, 640 (1973).  In light of this, petitioner has not shown that the

17   California Supreme Court erroneously applied the relevant state-law procedural rule when

18   holding that petitioner failed to preserve the claim.

19        Accordingly, the state court's denial of claim V, subclaim 2, is entitled to deference, and

20   the undersigned recommends it be dismissed.

21        **f.  Claim W, subclaim 1(c)**

22        In subclaim 1(c) of claim W, petitioner alleges that the prosecutor committed misconduct

23   by improperly arguing that petitioner would likely be a danger in the future due to his particular

24   character.  ECF No. 203 at 103.  Respondent argues that this claim was held defaulted by the

25   California Supreme Court due to petitioner's failure object on this basis at trial.  ECF No. 441 at

26   376-78.  Petitioner makes no argument in response.  *See* ECF No. 454 at 92-96.  The undersigned

27   concludes that respondent has carried his burden to show that this subclaim is procedurally

28   defaulted.

1    The record shows that, before closing arguments commenced at the end of the penalty

2    phase, defense counsel requested a ruling that the prosecutor could not argue that petitioner would

3    continue to be dangerous in prison if given a life sentence.  The trial court denied the request to

4    make this ruling in advance, but indicated to defense counsel that the court would entertain

5    objections should the prosecutor's argument become improper.  56 RT 9476-82.  Shortly

6    thereafter, during his penalty phase closing argument, the prosecutor argued that the evidence

7    showed that petitioner's innate, "particular character" was violent and that he likely would be

8    undeterred from violence even in prison.  56 RT 5489-90.  Defense counsel lodged no

9    contemporaneous objection.  *Id.*  On direct appeal, petitioner argued that this portion of the

10   prosecutor's argument was misconduct and that the issue was preserved by defense counsel's pre-

11   argument request to the court.  LD AOB at 125-26.

12       The California Supreme Court rejected this, holding that the claim was unpreserved and

13   was, in any event, meritless.  *Gordon*, 50 Cal. 3d at 1269-70.  As such, its denial on state-law

14   procedural grounds is presumptively entitled to deference from this court.  *See Coleman*, 501 U.S.

15   at 729.  Petitioner has not rebutted this with any showing.  *See Sochor*, 504 U.S. at 534; ECF No.

16   454 at 92-96.  This subclaim, therefore, must be dismissed.

17       **B.  Claims Unpreserved in State Court**

18       Respondent also argues that certain of petitioner's claims should be denied because they

19   allege errors that occurred at trial to which petitioner did not object contemporaneously or for

20   which he invited error, although the claims were not held defaulted on either basis by the

21   California Supreme Court because petitioner did not raise them as assignments of error on direct

22   appeal.  Specifically, respondent raises this argument to urge dismissal of claim H, subclaim 5

23   (concerning voir dire of defense expert Dr. Loftus); a portion of claim I, subclaim 5 (to the extent

24   it alleges error in admission of redacted notes between petitioner and Bernard Gordon); claim N,

25   subclaim 2 (alleging error in instructing jury with CALJIC 3.00 and 6.11); claim O, subclaims 6

26   (concerning references to petitioner's failure to testify), 10 (concerning victim impact argument),

27   and 11 (concerning future dangerousness argument); a portion of claim W, subclaim 1.b

28   (concerning argument that petitioner lacked remorse); an unnumbered subclaim of claim X

25

1    (alleging that the court should have given clarifying instruction on the minor participant factor at

2    the penalty phase, in light of the instructions on aiding and abetting); claim X, subclaims 3

3    (concerning deletion of factors listed in CALJIC 8.84.1) and 17 (concerning instruction

4    addressing petitioner's failure to testify); and claim Y.  ECF No. 441 at 163, 172, 232, 258, 262,

5    263, 375, 386-88, 398, 400, 405.  Petitioner does not dispute any of these instances, *see* ECF No.

6    454 at 35-44, 62-69, 97-102, excepting the portion of claim W, subclaim 1.b, and claim X,

7    subclaim 3.  *Id.* at 93, 97.

8           For the reasons set forth below, the undersigned recommends dismissal of all of the claims

9    and subclaims at issue except claim Y.

10          **1.  Legal Standard**

11          In *Wainwright v. Sykes*, 433 U.S. 72 (1977), the Supreme Court held that if a federal

12   habeas corpus petitioner failed to raise an issue in state court and if state procedural rules would

13   have caused the state court to have denied relief on independent and adequate grounds had the

14   issue been raised, the federal habeas court must deny the claim unless petitioner can show cause

15   and prejudice.  In *Wainwright*, the defendant failed to object at trial to the admissibility of

16   inculpatory statements under *Miranda v. Arizona*, 384 U.S. 486 (1966), and, after he was

17   convicted, he failed to raise the issue as an assignment of error on direct appeal to the state court.

18   433 U.S. at 75 & n.3.  He later filed a section 2254 petition challenging the admissibility of his

19   statements under *Miranda*.  *Id.* at 75.  The Supreme Court held that federal habeas corpus review

20   of the admission of the confession was barred absent of a showing of "cause" and "actual

21   prejudice," if a section 2254 petitioner failed to make a timely objection at trial—as required by

22   state law to preserve the issue on direct appeal.  *Id.* at 86-87.  Because state law there required a

23   contemporaneous objection to preserve the error, the state court would have denied relief on this

24   basis had petitioner raised it on direct appeal.  *Id.* at 85-86.  As such, petitioner's claim was

25   barred from federal habeas review, unless he could show cause and prejudice to disregard the

26   default.  *Id.* at 90-91.  This approach, the Supreme Court explained, would have "the salutary

27   effect of making the state trial on the merits the 'main event,' so to speak, rather than a 'tryout on

28   the road' for what will later be the determinative federal habeas hearing," so that "[i]f a criminal

1    defendant thinks that an action of the state trial court is about to deprive him of a federal

2    constitutional right there [would be] every reason for his following state procedure in making

3    known his objection." *Id.* at 90.  The Supreme Court has reaffirmed this rule in numerous cases

4    since *Wainwright*.  *See Coleman*, 501 U.S. at 735 n.1; *Teague v. Lane,* 489 U.S. 288, 297-99

5    (1989); *Engle v. Isaac*, 456 U.S. 107, 113-18, 124-29 (1982); *see also Harris v. Reed*, 489 U.S.

6    255, 269-70 (1989) (O'Connor, J., concurring).

7        **2.  Discussion**

8        As a threshold matter, review of the state court record confirms that petitioner did not

9    raise any of these claims as assignments of error on direct appeal, *see* LD AOB, LD 3-L, and the

10    California Supreme Court did not deny any as procedurally defaulted.  *See Gordon*, 50 Cal. 3d at

11    1223.

12        **a.  Dismissal Is Proper for Subclaim 5 of Claim H; Part of Subclaim 5 of Claim**

13            **I; and Subclaim 3 of Claim N**

14        Respondent argues that subclaim 5 of claim H; a portion of subclaim 5 of claim I; and

15    subclaim 3 of claim N should be denied because petitioner invited these errors at trial by

16    suggesting or acceding to the action he now claims to be error.  *See* ECF No. 441 at 163-64, 172,

17    232.  The record supports respondent.

18        Under California law, an appellant may not challenge on appeal an action of the trial court

19    that he invited.  *See People v. Miller*, 185 Cal. App. 2d 59, 75 (1960).  This rule is independent

20    and adequate under *Coleman*.  *See Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004).

21    Petitioner offers no opposition to these propositions.  *See* ECF No. 454 at 35-41, 62-65.

22        The portions of the claims identified by respondent fail under the invited-error doctrine.

23    In subclaim 5 of claim H, petitioner alleges that the trial court erred in permitting the prosecutor

24    to ask defense expert Dr. Loftus certain questions on voir dire, ECF No. 421 at 118-19, but the

25    record demonstrates that defense counsel suggested that the prosecutor ask the question.  44 RT

26    7042.

27        In subclaim 5 of claim I, petitioner alleges, in part, that the trial court erred in admitting

28    redacted notes attributed to him and Bernard Gordon.  ECF No. 203 at 48-49.  As respondent

1    observes, petitioner had represented to the trial court that some portions of these notes were

2    admissible.  3 CT 488 n.6.  Therefore, to the extent that claim seeks to challenge the admission of

3    those portions, petitioner invited the error.

4         In subclaim 2 of claim N, petitioner alleges that the trial court erred in instructing the jury

5    with CALJIC 3.00 and 6.11, ECF No. 203 at 62, but petitioner requested these instructions.  *See* 4

6    CT 915; *see also* 50 RT 8331-34, 6342.

7         The undersigned therefore recommends that these subclaims be dismissed on the grounds

8    that the invited-error rule would have barred their consideration on appeal had petitioner raised

9    them in that proceeding.  *See Wainwright*, 433 U.S. 72

10        **b.  Dismissal Is Proper for Subclaims 6, 10, and 11 of Claim O**

11        In subclaims 6, 10, and 11 of claim O, petitioner alleges that the prosecutor committed

12   various forms of misconduct in his closing argument.  The record demonstrates that petitioner

13   lodged no contemporaneous objection to any of these instances.  *See* 51 RT 8503, 8541, 8551-52,

14   8565, 8579, 8583-84, 8611, 8622; 52 RT 8661, 8841-42, 8850, 8876, 8908, 8916-17.

15   California's contemporaneous objection rule was adequate and independent of federal law at the

16   time of petitioner's trial, *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011), which he does

17   not dispute.  *See generally* ECF No. 454.  The undersigned therefore recommends that these

18   subclaims be dismissed pursuant to *Wainwright*.

19        **c.  Dismissal Is Proper for Portions of Claim X**

20        The errors alleged in the unnumbered subclaim of claim X (alleging that the trial court

21   should have given clarifying instruction on the minor participant factor at the penalty phase) and

22   in subclaim 17 of claim X were also unpreserved under California law.  Both of these subclaims

23   allege that the trial court should have, sua sponte, given additional instructions to clarify for the

24   jury the meaning of other instructions or should otherwise have modified the instructions in some

25   way.  *See* ECF No. 421 at 359-60; ECF No. 454 at 99-100.  Under California law, however, the

26   "trial court has no sua sponte duty to revise or improve upon an accurate statement of law without

27   a request from counsel, and failure to request clarification of an otherwise correct instruction

28   forfeits the claim of error for purposes of appeal."  *People v. Lee*, 51 Cal. 4th 620, 638 (2011)

1    (internal citations omitted).  Here, the record demonstrates that petitioner did not ask that the trial

2    court give the additional instructions, or modifications to instructions, that he now maintains the

3    jury should have heard.  *See* 55 RT 9397 (conference regarding CALJIC Nos. 260 and 261),

4    9405-09 (conference regarding aiding and abetting / minor participant instruction).  As such, the

5    errors alleged in these subclaims were unpreserved under California law, and petitioner makes no

6    argument to the contrary.  *See* ECF No. 454 at 99-100.  Petitioner failed to raise these allegations

7    on direct appeal, *see* LD AOB, LD 3-L, and therefore these portions of claim X should be

8    dismissed under *Wainwright*.

9              **d.  Dismissal Is Proper for Part of Subclaim 1(b) of Claim W**

10            Petitioner disputes that a portion of his subclaim 1(b) of claim W should be dismissed due

11   to his failure to have objected at trial.  ECF No. 454 at 93.  In subclaim 1(b) of claim W,

12   petitioner alleges that the prosecutor committed misconduct in his penalty phase closing argument

13   by improperly arguing that a jail note written by petitioner indicated that he lacked remorse.  ECF

14   No. 203 at 103.  Petitioner did not raise this subclaim on direct appeal.  S*ee* LD AOB at 119-32.

15   In his merits brief, petitioner argues that the prosecutor committed misconduct in his closing

16   argument by arguing petitioner's remorselessness in two instances: first, asking rhetorically if the

17   jury thought that the petitioner and his co-defendants felt sorry for the victim after the crime and,

18   second, urging that the post-arrest note attributed to petitioner showed that petitioner had only

19   worried about his own fate.  ECF No. 421 at 340-41; *see also* ECF No. 454 at 93.  Respondent

20   argues that petitioner only objected to the second instance, not the first.  ECF No. 441 at 375.

21   Petitioner argues that he objected to both instances and that the trial court overruled the objection.

22   ECF No. 454 at 93 (citing RT 9495).  Review of the record supports respondent.  *See* 56 RT

23   9494-95, 9516-17.  Thus, to the extent this claim alleges that the prosecutor committed

24   misconduct by inviting the jury to speculate on whether the defendant felt sorry for the victim,

25   those allegations should be dismissed under *Wainwright*.

26            **e.  Dismissal Is Proper for Subclaim 3 of Claim X**

27            Petitioner also disputes that subclaim 3 of claim X should be dismissed under *Wainwright*,

28   433 U.S. 72.  In subclaim 3 of claim X, petitioner alleges that the trial court committed error by

                                              29

1  deleting some of the factors in CALJIC 8.84.1 before giving the instruction to the jury.  ECF No.

2  203 at 110-11.  Respondent argues that this claim is barred because petitioner invited the error by

3  agreeing to the deletions at trial.  ECF No. 441 at 386-88 (citing 55 RT 9414-20).  Petitioner

4  counters that the California invited-error doctrine does not apply because it was "not mentioned

5  by the California Supreme Court on direct review" and because, although petitioner agreed to the

6  instruction's modification, he is nevertheless entitled to relief because the prosecution agreed to

7  the modifications as well.  ECF No. 454 at 97.

8      Petitioner's first argument is unavailing.  While it is true that the California Supreme

9  Court did "not mention[]" on direct review the subclaim or whether it reflected invited error, *see*

10  ECF No. 454 at 97, that is because petitioner did not raise the subclaim on direct review.  *See* LD

11  AOB, LD 3-L.  Under *Wainwright*, 433 U.S. 72, dismissal is proper if the state court would have

12  denied the claim on state-law procedural grounds had it been raised in that court; ergo the state

13  court's failure to rule on the issue implicates dismissal under *Wainwright*, not the contrary.

14      Petitioner's second argument, that the invited error doctrine does not apply, is also

15  unavailing.  Although California law requires the trial court to instruct the jury "fully and

16  correctly," even absent a specific request by a criminal defendant, *People v. Avalos*, 37 Cal. 3d

17  216, 229 (1984), an appellant is barred from challenging on appeal an instruction given to the jury

18  where the appellant expressly agreed to the instruction.  *See People v. Davis*, 36 Cal. 4th 510, 539

19  (2005).  Here, petitioner alleges that the trial court violated his rights by instructing the jury with

20  a modified version of CALJIC 8.84.1.  ECF No. 203 at 110-11; ECF No. 421 at 352-54; ECF No.

21  454 at 97-98.  The trial record demonstrates, however, that defense counsel expressly agreed to

22  the modifications for which petitioner claims error.  55 RT 9414-20; *see* 55 RT 9387.  Under

23  California law, therefore, the purported error alleged in this subclaim would have been held

24  waived had it been raised in state court, such that dismissal of claim X, subclaim 3, is proper

25  under *Wainwright*.

26          **f.  Dismissal Is Not Proper for Claim Y**

27      Although petitioner does not dispute the dismissal of claim Y pursuant to *Wainwright*, *see*

28  ECF No. 454 at 100-02, the undersigned finds that respondent has not met his burden to show

1   that the error alleged in this claim was required to be preserved via objection at the time of

2   petitioner's trial, such that, had petitioner raised it as an assignment of error on direct appeal, the

3   state court would have held it procedurally barred.  In claim Y, petitioner alleges that the trial

4   court erred in its approach to adjudicating petitioner's post-trial motion to modify the death

5   verdict under California Penal Code section 190.4, constituting a violation of his federal due

6   process rights.  ECF No. 203 at 118-21.  Respondent argues that petitioner failed to object on

7   these bases at the time of the trial court's ruling, thus failing to preserve the error under California

8   law, citing *People v. Landry*, 2 Cal. 5th 52 (2016).  ECF No. 441 at 405.  In *Landry*, the

9   California Supreme Court held that the appellant had forfeited a similar claim for failing to object

10  contemporaneously, citing *People v. Carasi*, 44 Cal. 4th 1263 (2008).  In *Carasi*, however, the

11  California Supreme Court acknowledged that it had only begun applying the contemporaneous

12  objection rule to this type of claim in 1992, when it decided *People v. Hill*, 3 Cal. 4th 959 (1992).

13  *Carasi*, 44 Cal. 4th at 1316.  "[B]efore [the court's] decision in *People v. Hill*, . . . became final,"

14  however, "defense counsel [did not have] adequate notice that they were required to object at the

15  modification hearing in order to preserve challenges to the court's ruling."  *People v. Riel*, 22 Cal.

16  4th 1153, 1220 (2000); *see also People v. Lewis & Oliver*, 39 Cal. 4th 970, 1064 (2006).

17  Accordingly, respondent has not met his burden to show that, had petitioner raised this on direct

18  appeal as an asserted error in his 1982 trial proceedings, the California Supreme Court would

19  have held the claim forfeited through application of the contemporaneous objection rule.  As

20  such, claim Y should not be dismissed on this basis.

21         **3.  Conclusion**

22         Accordingly, for the reasons set forth above, the undersigned recommends dismissal of

23  claim H, subclaim 5; a portion of claim I, subclaim 5 (to the extent that it alleges error in

24  admission of redacted notes between petitioner and Bernard Gordon that petitioner had

25  represented were admissible); claim N, subclaim 2; claim O, subclaims 6, 10, and 11; a portion of

26  claim W, subclaim 1.b (to the extent that it alleges error in the prosecutor's statement concerning

27  petitioner's post-crime remorse); an unnumbered subclaim of claim X (alleging that the court

28  should have given clarifying instruction on the minor participant factor at the penalty phase); and

31

1   claim X, subclaims 3 and 17, pursuant to *Wainwright*, 433 U.S. 72.

2   **III.    REQUEST FOR EVIDENTIARY HEARING**

3         In his briefing, petitioner requests evidentiary hearings on four claims: claims S, T, X, and

4   Z of the petition.  ECF No. 421 at 260, 271, 299, 312, 362-63; ECF No. 454 at 78-80, 82, 100,

5   107; *see* ECF No. 396.  The undersigned concludes that petitioner has shown his entitlement to

6   evidentiary hearings on subclaims 2, 5, 6, 9, 10, 16, 24, and 30 of claim S, but has not met this

7   standard for the remaining subclaims of claim S; claim T; subclaim 17 of claim X; or claim Z.

8   The undersigned therefore recommends that subclaims 1, 3, 4, 7, 8, 11, 12, 13, 14, 15, 17, 18, 19,

9   20, 21, 22, 23, 25, 26, 27, 28, 29, and 32 of claim S; claim T; claim Z; and subclaim 17 of claim

10   X of the petition be dismissed.

11    **A. Legal Standard**

12         In cases not subject to AEDPA, a federal court must grant an evidentiary hearing where

13   the petitioner has presented a colorable claim of a constitutional violation and the state court did

14   not reliably find the facts that are relevant for the claim.  *Townsend v. Sain*, 372 U.S. 293, 308-09,

15   312-18 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *see also*

16   *Siripongs v. Calderon*, 35 F.3d 1308, 1314 (9th Cir. 1994), *cert. denied*, 513 U.S. 1183 (1995);

17   *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005).  A colorable claim is presented if the

18   petitioner alleges facts that, if shown to be true, would entitle the petitioner to relief.  *Earp*, 431

19   F.3d at 1167; *Turner v. Marshall*, 63 F.3d 807, 815 (9th Cir. 1995), *overruled on other grounds*

20   *by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).  Although this standard is a "low bar," a

21   petitioner cannot meet it with allegations that are conclusory, inherently incredible, or refuted by

22   the existing record.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Earp*, 431 F.3d at 1167,

23   1170; *see, e.g.*, *Hibbler v. Benedetti*, 693 F.3d 1140, 1149 (9th Cir. 2012); *Phillips v. Woodford*,

24   267 F.3d 966, 983 (9th Cir. 2001); *Tolbert*, 182 F.3d at 815; *Rich v. Calderon*, 187 F.3d 1064,

25   1067 (9th Cir. 1999); *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *Smith v.*

26   *McCormick*, 914 F.2d 1153, 1170 (9th Cir. 1990); *Coleman v. McCormick*, 874 F.2d 1280, 1283-

27   84 (9th Cir. 1989).  Moreover, the court may deny the request for an evidentiary hearing if "there

28   are no disputed facts and the claim presents a purely legal question."  *Hendricks v. Vasquez*, 974

1  F.2d 1099, 1103 (9th Cir. 1992), *as amended on denial of reh'g* (Oct. 29, 1992) (citing *Harris v.*

2  *Pulley*, 885 F.2d 1354, 1378 (9th Cir. 1988)).

3      In cases not governed by AEDPA, where an evidentiary hearing is not required, the

4  federal courts possess *sui generis* authority to order evidentiary hearings at their discretion, if the

5  court determines that the evidence considered at the hearing would be relevant to resolution of the

6  habeas corpus petition before it.  *Seidel v. Merkle*, 146 F.3d 750, 754 (9th Cir. 1998), *cert. denied*,

7  525 U.S. 1093 (1999); *see Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) (describing AEDPA's

8  alteration of this process).

9      **B.  Discussion**

10      **1.  Claim S**

11      In claim S, petitioner alleges that defense counsel performed ineffectively, prejudicing

12  him at the guilt and penalty phases.  ECF No. 203 at 75-96.  Specifically, he alleges twenty-eight

13  ways that counsel's performance was deficient and alleges that, standing alone or cumulatively,

14  these errors and omissions prejudiced him.  *Id.*  In his briefing, he requests an evidentiary hearing

15  to prove his entitlement to relief.  ECF No. 421 at 260, 271, 299; ECF No. 454 at 78-80.  The

16  undersigned concludes that petitioner is entitled to evidentiary development on certain of his

17  allegations.

18      **a.  Legal Standard**

19      The Sixth Amendment guarantees criminal defendants the right to effective counsel and a

20  habeas corpus petitioner is entitled to a new trial where he shows that his trial counsel's

21  performance "fell below an objective standard of reasonableness" and that "there is a reasonable

22  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

23  been different."  *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

24      Under the first prong of the *Strickland* test, a petitioner must show that counsel's conduct

25  failed to meet an objective standard of reasonableness.  *Id.* at 687.  There is "a 'strong

26  presumption' that counsel's representation was within the 'wide range' of reasonable professional

27  assistance."  *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at

28  689).  Petitioner must rebut this presumption by demonstrating that his counsel's performance

1    was unreasonable under prevailing professional norms and was not the product of "sound trial

2    strategy." *Strickland*, 466 U.S. at 688-89.  Where a petitioner alleges that counsel unreasonably

3    failed to investigate, the court must consider whether the limited investigation was itself

4    reasonable under objective standards, as "strategic choices made after thorough investigation of

5    law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices

6    made after less than complete investigation are reasonable precisely to the extent that reasonable

7    professional judgment supports limitations on investigation."  *Id.* at 690-91; *see also Wiggins v.*

8    *Smith*, 539 U.S. 510, 522-23 (2003).

9         The second prong of the *Strickland* test requires a petitioner to show that counsel's

10   conduct prejudiced him.  466 U.S. at 691-92.  Prejudice is found where "there is a reasonable

11   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

12   been different."  *Id.* at 694.  A reasonable probability is one "sufficient to undermine confidence

13   in the outcome."  *Id.* at 693.  "This does not require a showing that counsel's actions 'more likely

14   than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a

15   more-probable-than-not standard is slight and matters 'only in the rarest case.'"  *Richter*, 562 U.S.

16   at 112 (quoting *Strickland*, 466 U.S. at 693).  "The likelihood of a different result must be

17   substantial, not just conceivable."  *Id.*

18        In considering whether it is reasonably probable that counsel's deficient performance

19   affected the jury's verdict, the prejudice from individual instances of deficient performance

20   should be considered cumulatively.  *Strickland*, 466 U.S. at 695-96 ("Taking the unaffected

21   findings as a given, and taking due account of the effect of the errors on the remaining findings, a

22   court making the prejudice inquiry must ask if the defendant has met the burden of showing that

23   the decision reached would reasonably likely have been different absent the errors.").  Thus, the

24   court "must analyze each of [petitioner's] claims separately to determine whether his counsel was

25   deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'"  *Boyde*

26   *v. Brown*, 404 F.3d 1159, 1175 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325,

27   1333 (9th Cir. 1978) (en banc)); *see also Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022);

28   *Lang v. Cullen*, 725 F. Supp. 2d 925, 970-71 (C.D. Cal. 2010).

### b. Discussion

As noted, petitioner argues that defense counsel were deficient on twenty-eight bases, in their representation of petitioner in pretrial proceedings, the guilt and penalty phases, and post-trial proceedings, and that petitioner was prejudiced singly and cumulatively by these deficiencies. Petitioner has abandoned subclaim 4 of claim S by making no argument to advance it. *See* ECF No. 203 at 79-80; ECF No. 421 at 259-99. Of the remaining subclaims, several fail as a matter of law, but petitioner has shown his entitlement to evidentiary development on the allegations contained in subclaims 2, 5, 6, 9, 10, 16, 24, 26, and 30 of claim S.

### i. Allegations of Deficient Performance That Fail as a Matter of Law

Of petitioner's twenty-eight allegations of deficient performance, some fail as a matter of law and thus fail to support a colorable showing of a constitutional violation. *Landrigan*, 550 U.S. at 474; *Strickland*, 466 U.S. at 687. On this basis, the undersigned recommends dismissal of the following subclaims of claim S:

In subclaim 1 of claim S, petitioner alleges that he was prejudiced by counsel's conflict of interest at the time of his trial, because he was represented by the Riverside County Public Defender on the case in that county that was pending at the time of the instant trial and that entity had represented prosecution witness Billy Colbert in prior proceedings. ECF No. 203 at 75-77; ECF No. 421 at 273-74. He argues that he was prejudiced by this conflict because it caused the Riverside County Public Defender to not alert petitioner's counsel to the agency relationship between Mr. Colbert and law enforcement, which knowledgeable defense counsel could have used to impeach Mr. Colbert and "discredit the prosecution's efforts to bolster his testimony by vouching for him," incorporating by reference his arguments for claims B and O. The undersigned concludes *post*, however, that petitioner fails to prove the existence of such an agency relationship and fails to show that the prosecutor vouched for his credibility. *See post*. Consequently, petitioner fails to make a colorable showing of his entitlement to relief on subclaim 1 of claim S.

In subclaim 3 of claim S, petitioner argues that defense counsel performed deficiently in jury selection by failing to take reasonable steps to rehabilitate prospective jurors E.S. and P.R.

35

1  who were ultimately excused under *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), and

2  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  ECF No. 203 at 79; ECF No. 421 at 275-77.

3  Petitioner fails to make a colorable showing that his counsel performed deficiently, as he fails to

4  identify any particular questions that counsel should have asked that they did not, *see id.*, which is

5  particularly notable given that defense counsel engaged in extensive voir dire with these

6  prospective jurors, inquiring into their respective views of the death penalty and ability to impose

7  it as jurors.  *See* 28 RT 3432A-38A; 29 RT 3572A-80A, 3597A-3601A.  Petitioner also fails to

8  make any showing that such questions would have resulted in responses from the prospective

9  jurors indicating that they did not hold views that rendered them excludable.  *See* ECF No. 421 at

10 275-77.  As a result of these omissions, petitioner fails as a matter of law to make a colorable

11 showing that trial counsel performed deficiently.  *See Ochoa v. Davis*, 50 F.4th 865, 889-90 (9th

12 Cir. 2022); *see generally Landrigan*, 550 U.S. at 474.

13        **ii.        Allegations of Deficient Performance That Rely Entirely on the Record**

14         For several of petitioner's allegations of deficient performance, he relies wholly on the

15 record or otherwise fails to indicate how any evidence outside of the record could be developed to

16 support his claim.  On these allegations, petitioner's request for an evidentiary hearing is denied.

17 *See Hendricks*, 974 F.2d at 1103; *Harris*, 885 F.2d at 1378.  For purposes of the court's

18 consideration of the cumulative prejudice of all of counsel's deficiencies, *see post*, the

19 undersigned concludes that most of these allegations also fail on the merits, for the reasons set

20 forth below.

21         In subclaim 7 of claim S, petitioner argues that trial counsel performed deficiently in their

22 investigation and presentation of evidence concerning eyewitness identifications—incorporating

23 petitioner's arguments made in support of claim H, which itself relies entirely on the record.  ECF

24 No. 203 at 83-84; ECF No. 421 at 86-121, 280.  The undersigned concludes *post*, however, that

25 petitioner failed to prove any error in claim H.  Consequently, his allegations of deficient

26 performance on this basis necessarily fail as well.[7]

27 _____

28     [7] The undersigned has concluded that subclaim 5 of claim H is procedurally barred under
   the invited error doctrine.  *See ante*.  In that subclaim, petitioner argues that the prosecutor

1          In subclaim 8 of claim S, petitioner argues that trial counsel performed deficiently in

2    failing to investigate and take appropriate action concerning petitioner's medication during trial,

3    incorporating his arguments made in support of claim Q, which rely solely on the record.  ECF

4    No. 203 at 84; ECF No. 421 at 240-49, 280-81.  The undersigned concludes post, however, that

5    petitioner fails to show that he was nonconsensually medicated before or during his trial, and

6    therefore this claim of deficient performance fails on the merits, as well.  *See generally Ochoa*, 50

7    F.4th at 889; *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (counsel not deficient for failing

8    to make futile motions).

9          In subclaim 11 of claim S, petitioner argues that defense counsel performed deficiently in

10   failing to object to inadmissible evidence; failing to litigate the admission of defense evidence

11   reasonably; failing to reasonably impeach prosecution witnesses; and failing to object to the

12   introduction of petitioner's probation report at the hearing on his motion to modify the verdict.

13   ECF No. 203 at 86.  All of petitioner's allegations rely entirely on the record, *see* ECF No. 203 at

14   86-88, and therefore an evidentiary hearing is denied on this subclaim.  *See Hendricks*, 974 F.2d

15   at 1103; *Harris*, 885 F.2d at 1378.  Most of the allegations comprising this subclaim are meritless.

16   In this subclaim, petitioner argues that defense counsel performed deficiently by failing to seek

17   admission of certain records at the penalty phase on the bases he sets forth in claim V, but in

18   claim V he fails to show that there existed arguments for the admissibility of the records that

19   counsel failed to propound.  ECF No. 421 at 283, 320-32; *see post*.  He argues that counsel

20   performed deficiently by failing to reasonably argue for the admission of method-of-execution

21   evidence at the penalty phase, relying on his arguments in claim V, ECF No. 421 at 284, but as

22   the undersigned explains *post*, petitioner has not shown that such evidence was admissible.  He

23   argues that counsel failed to "bring to the trial court's attention its duties under Penal Code

24   § 190.4(e)," incorporating his arguments in support of claims V and Y, but the undersigned below

25   _____

26   improperly questioned defense expert witness Dr. Loftus on whether she had personally
     interviewed any of the witnesses in petitioner's case.  ECF No. 421 at 118-19.  Review of the

27   portions of the record cited by petitioner demonstrate that the prosecutor's questions to Dr. Loftus
     were not improper.  *See* 44 RT 7042-44.  Ergo, defense counsel was not deficient in failing to

28   object to these questions.  *See Rupe*, 93 F.3d at 1445.

1    concludes that the trial court did not err in its approach to adjudicating the 190.4(e) motion. *See*

2    *post*. Petitioner argues that defense counsel failed to object to the instances of misconduct he

3    argues in claims O and W, ECF No. 421 at 286, but petitioner fails to prove that any misconduct

4    occurred in his discussion of those claims. *See post*. Petitioner argues that defense counsel

5    performed deficiently in their litigation of jury instructions, incorporating his arguments made for

6    claims N and X, ECF No. 421 at 286, but the undersigned explains *post* that petitioner fails to

7    show that the instructions as given were erroneous.[8] Petitioner argues that counsel performed

8    deficiently in failing to seek the medical records of prosecution witness Beverly Gomez in

9    support of a motion for her to be medically examined, relying on his argument in support of claim

10   H, ECF No. 421 at 286, but he makes no argument as to under what authority counsel could have

11   obtained her medical records and, as explained *post*, fails to show that reasonable counsel would

12   have made this request. Finally, also in subclaim 11, petitioner briefly argues that defense

13   counsel performed deficiently in failing to object to various items of prosecution evidence and to

14   move to strike certain testimony but makes no showing either that these were meritorious

15   objections and motions or that reasonable counsel would have raised them in the circumstances.

16   *See* ECF No. 421 at 284-86; *see generally United States v. Shwayder*, 312 F.3d 1109, 1122 (9th

17   Cir. 2002), *opinion amended on denial of reh'g*, 320 F.3d 889 (9th Cir. 2003) (recognizing that

18   defense counsel may have a tactical reason not to raise a meritorious objection); *see also Jones v.*

19   *Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations are not grounds for habeas

20   corpus relief). One exception to this is petitioner's allegation that defense counsel unreasonably

21   failed to object to the prosecutor's elicitation of testimony describing petitioner's restraints, as the

22   failure to object to this evidence was unreasonable at the time of petitioner's trial. *See* Claim R,

23   *post*; *see also Walker v. Martel*, 709 F.3d 925, 939-44 & n.7 (9th Cir. 2013).

24         In subclaim 12 of claim S, he argues that defense counsel was deficient for not seeking a

25   mistrial based upon the prosecutor referencing in closing argument a desire not to bankrupt the

26

27         [8] Petitioner makes no argument explaining his theory of deficient performance concerning
     those instructions he had sought to have given, which the trial court denied. *See* ECF No. 421 at
28   286.

1    county by calling additional witnesses.  ECF No. 203 at 89; ECF No. 421 at 286; *see* 52 RT 8657,

2    8707.  He also argues that defense counsel should have moved for a mistrial due to the

3    prosecutor's argument concerning the second-degree murder instruction.  ECF No. 421 at 286

4    (citing 52 RT 8875).  He incorporates by reference his arguments in claim O in support of these

5    allegations, but his arguments in claim O address neither of these allegations.  *See* ECF No. 421

6    at 202-34.  He makes no other argument in support of his assertion that defense counsel was

7    unreasonable in failing to move for a mistrial on either basis.  This allegation of deficient

8    performance, therefore, fails.  *See Jones*, 66 F.3d at 204-05.

9         In subclaim 13, petitioner briefly argues that defense counsel performed deficiently by

10   presenting the testimony of the defense investigator without knowledge of the law and failing to

11   move for a mistrial when the prosecutor asked questions outside the scope of direct examination.

12   ECF No. 203 at 89; ECF No. 421 at 287.  Petitioner makes no argument to substantiate that

13   counsel were unreasonable in either regard, and his conclusory allegations do not suffice to meet

14   his burden of showing deficient performance for this subclaim.  *See Jones*, 66 F.3d at 204-05.

15        In subclaim 14 of claim S, petitioner argues that his trial counsel performed deficiently by

16   failing to object to prosecutorial misconduct that he alleges in claims B, C, O, and W.  ECF No.

17   203 at 89; ECF No. 421 at 287.  As explained *post*, however, petitioner fails to show that these

18   instances reflect misconduct, and defense counsel are not deficient for failing to raise meritless

19   objections or motions.  *See Rupe*, 93 F.3d at 1445.

20        In subclaim 15 of claim S, petitioner argues that his trial counsel performed deficiently in

21   failing to object to the prosecutor's improper examination of Romelia Popkins, incorporating his

22   arguments made in claim O.  ECF No. 203 at 98; ECF No. 421 at 287.  As explained *ante*,

23   however, the prosecutor's questions to Ms. Popkins were not improper; ergo, petitioner's claim

24   that counsel was deficient for failing to object must fail.

25        In subclaim 17, petitioner argues that defense counsel performed deficiently by eliciting

26   unhelpful testimony in two ways.  First, he argues that counsel unreasonably elicited testimony

27   from Ms. Gomez indicating her certainty of her identification of petitioner after she spoke to her

28   husband about it.  ECF No. 203 at 90; ECF No. 421 at 288-89 (citing 39 RT 5870).  The record

1    does not support the claim of deficient performance, since the testimony that defense counsel

2    elicited was not significantly more inculpatory of petitioner than was her testimony on direct

3    examination.  *See* 39 RT 5810-13, 5832-39, 5858-60, 5891-96.  Petitioner next argues that

4    counsel unreasonably elicited testimony at the penalty phase that the Governor may commute

5    death sentences.  ECF No. 421 at 289-90.  Petitioner makes no argument either identifying what

6    portions of the witness's testimony were improper in this regard or establishing that trial

7    counsel's conduct was unreasonable.  *See id.*; *Jones*, 66 F.3d at 204-05.  Petitioner therefore fails

8    to prove his allegations of deficient performance asserted in subclaim 17 of claim S.

9        In subclaim 18, petitioner argues that defense counsel unreasonably failed to request

10   appropriate instructions.  ECF No. 203 at 90-91; ECF No. 421 at 290.  He relies on his arguments

11   raised in claims N and X, ECF No. 421 at 290, but the undersigned concludes *post* that petitioner

12   has not proven error for those claims.  Petitioner briefly argues additionally that the trial court

13   should have instructed with CALJIC 2.92 at the close of the penalty phase, ECF No. 421 at 290,

14   but in light of the trial court having given this instruction at the guilt phase, 4 CT 840-41, and the

15   prosecutor relying on no additional evidence in aggravation at the penalty phase beyond that

16   which had been introduced at the guilt phase, 5 CT 943, petitioner fails to prove that counsel was

17   unreasonable in failing to request the instruction at the penalty phase.  *See Jones*, 66 F.3d at 204-

18   05.

19       In subclaim 19, petitioner argues that defense counsel performed deficiently by failing to

20   request bifurcation of the guilt and special-circumstances determinations "on the grounds that

21   evidence of the unadjudicated Riverside offense, if relevant at all, was only relevant to the intent-

22   to-kill elements of the special circumstances."  ECF No. 203 at 19; ECF No. 421 at 291.

23   Petitioner's argument is conclusory and unsupported by any discussion of law or facts, *see* ECF

24   No. 421 at 291, and therefore fails to sustain petitioner's burden to prove that his counsel was

25   deficient.  *See Jones*, 66 F.3d at 204-05.  Moreover, it is contradicted by the record, since

26   evidence of the petitioner's involvement in the Riverside robbery-homicide was admitted to prove

27   intent on count 2.  *See generally Gordon*, 50 Cal. 3d at 1238-50.

28        In subclaim 20, petitioner argues that his counsel was deficient in litigation of the motion

40

1   for separate guilt- and penalty-phase juries. ECF No. 203 at 91; ECF No. 421 at 291. The only

2   specific argument petitioner makes in support of this allegation, however, is the simple

3   observation that counsel did not re-raise the request before the penalty phase. ECF No. 421 at

4   291. Petitioner fails to show that, given the court's prior ruling on the issue, counsel's decision

5   not to renew the request was unreasonable. *See* 19 RT 1693A-94A; *see generally Rupe*, 93 F.3d

6   at 1445 (counsel not deficient for failing to make futile motions).

7          In subclaim 21, petitioner argues that defense counsel were deficient in failing to join a

8   motion to recuse the prosecutor brought by his co-defendants. ECF No. 203 at 92; ECF No. 421

9   at 291-92. As petitioner observes, however, that motion was denied by the trial court, and

10  petitioner represents that the ruling was upheld on appeal. *See* ECF No. 421 at 292; 3 RT 435-36;

11  9 RT 1695-1701. Counsel is not unreasonable for failing to make meritless motions. *See*

12  *generally Ochoa*, 50 F.4th at 889; *Rupe*, 93 F.3d at 1445.

13         In subclaim 22, petitioner argues that the trial court unreasonably presented evidence of

14  contradictory theories of Bernard Gordon's role in the Stockton robbery-homicide and

15  unreasonably relied on eyewitness evidence for the defense while also endeavoring to impugn the

16  identifications made by prosecution witnesses. ECF No. 203 at 92-93; ECF No. 421 at 292-93.

17  Petitioner makes no argument either identifying which particular evidence defense counsel was

18  unreasonable in propounding, or explaining why it was unreasonable under the law and

19  contemporaneous norms. *Strickland*, 466 U.S. at 688-89. He therefore has not met his burden to

20  show as a prima facie matter that counsel's performance in this regard was deficient. *See id.*;

21  *Jones*, 66 F.3d at 204-05.

22         In subclaim 23 of claim S, petitioner argues that his counsel performed deficiently by

23  making unreasonable concessions in the guilt-phase closing argument by acknowledging that

24  petitioner knew of some of the preparations for the Stockton robbery-homicide in advance. ECF

25  No. 203 at 93-94; ECF No. 421 at 293-94 (citing RT 8375-76, 8733-34, 8820-21). The record

26  fails to support petitioner's argument. Review of the entirety of the argument indicates that

27  counsel did not make any unreasonable concessions in the portions cited by petitioner but rather

28  acknowledged certain evidence that the jury had heard and explained why, nonetheless, the

1    prosecution had not met its burden of proof on counts 1 or 2.  *See* 52 RT 8678-8695, 8710-8780,

2    8790-8827.  Petitioner fails to show that his counsel's performance was unreasonable in this

3    regard.

4         In subclaim 25, petitioner argues that defense counsel performed unreasonably in the

5    penalty-phase closing argument.  ECF No. 203 at 94, citing RT 9520, 9528, 9531.  The record,

6    however, fails to substantiate petitioner's assertions that counsel's argument was "unfocused,"

7    premised on counsel's misunderstanding of the law, or without strategic basis.  *See id.*; *see*

8    *generally* 56 RT 9519-9543.  Petitioner therefore fails to prove that counsel's performance in this

9    regard was deficient.  *See Strickland*, 466 U.S. at 688-89.

10        In subclaim 27 of claim S, petitioner argues that trial counsel unreasonably failed to

11   support the motion for a new trial with evidence.  ECF No. 203 at 95-96; ECF No. 421 at 297.

12   Petitioner fails to make any showing that such evidence was available, or that counsel's failure

13   was unreasonable under the law.  *See* ECF No. 421 at 297.  He therefore has not made a

14   colorable, non-conclusory allegation of deficient performance.  *See Jones*, 66 F.3d at 204-05.

15        In subclaim 28 of claim S, petitioner argues that his defense counsel were unreasonable in

16   failing to preserve "any of the constitutional claims raised in this petition."  ECF No. 203 at 96;

17   ECF No. 421 at 297.  The undersigned has found that defense counsel defaulted the claims of

18   constitutional error that petitioner raises in the following subclaims: part of subclaim 5 of claim I;

19   subclaim 2 of claim N; subclaims 6, 10, 11, and 13 of claim O; subclaim 2 of claim V; subclaim

20   1(c) and part of subclaim 1(b) of claim W; and an unnumbered subclaim and subclaims 3 and 17

21   of claim X.  *See ante*.  The undersigned has reviewed the record relevant to these claims of error,

22   as well as petitioner's arguments in support thereof, ECF Nos. 421, 454, and concludes that none

23   show error of constitutional magnitude.  Hence, for these subclaims, petitioner fails to prove

24   counsel's deficient performance.  For claims G, J, and subclaim 1 of claim O, the undersigned has

25   concluded that, even if these claims were defaulted, petitioner has not proven constitutional error.

26   *See ante*.  Accordingly, petitioner fails to prove his counsel were deficient on grounds asserted in

27   subclaim 28.  *See Ochoa*, 50 F.4th at 889; *Rupe*, 93 F.3d at 1445.

28

1          **iii.**    **Colorable Allegations of Deficient Performance and Prejudice**

2          In the remaining subclaims of claim S, petitioner has set forth allegations that, if true,

3  would entitle him to relief and which rely on facts that have not been determined by the state

4  court.  *See Rich*, 187 F. 3d at 1067; *Hendricks*, 974 F.2d at 1103.  Respondent does not dispute

5  that none of the subclaims at issue were factually developed in the state court proceedings.  ECF

6  No. 441 at 293-340; *see* LD AOB, LD RB, LD ARB, LD 3-K, LD 3-L, LD 3-M.  Rather,

7  respondent primarily argues that petitioner's allegations and materials offered in support of the

8  same do not establish counsels' deficient performance and prejudice.  *See* ECF No. 441 at 293-

9  340.  At this stage of the proceeding, however, petitioner's burden is much more minimal: he

10  need only show that his allegations set forth a prima facie case of a violation of his rights,

11  entitling him to relief.  *Williams*, 52 F.3d at 1484.  For the subclaims discussed below, petitioner

12  has met this low bar, with allegations that are neither plainly contradicted by the record, *see*

13  *Totten*, 137 F.3d at 1176, nor so vague and speculative as to suggest that petitioner is merely

14  seeking to use the evidentiary hearing process to "explore [his] case in search of its existence."

15  *See Calderon v. U.S.D.C. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996) (internal quotation

16  omitted).  For the reasons detailed below, petitioner has shown his entitlement to an evidentiary

17  hearing for subclaims 2, 5, 6, 9, 10, 16, 24, 26, and 30 of claim S.

18          **a)  Subclaim 2**

19          In subclaim 2 of claim S, petitioner alleges that his trial counsel labored under an actual

20  conflict of interest, prejudicing him.  The Sixth Amendment right to counsel includes the right "to

21  representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271

22  (1981); *see Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc); *Lewis v. Mayle*, 391

23  F.3d 989, 995 (9th Cir. 2004).  To prove an ineffective assistance of counsel claim premised on

24  an alleged conflict of interest, a petitioner must "establish that an actual conflict of interest

25  adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see*

26  *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007); *Washington v. Lampert*, 422 F.3d 864,

27  872 (9th Cir. 2005); *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *Rich*, 187 F.3d at 1069.

28          Here, petitioner has pled facts that, if true, would entitle him to relief.  Petitioner argues

1    that his counsel were appointed through San Joaquin County's conflict panel, by which counsel

2    were paid by the county for their representation of him.  Counsel felt pressure to minimize the

3    expenses incurred for petitioner's trial, out of concern that the county would be disinclined to

4    contract with counsel in the future.  As a result, counsel elected not to pursue certain lines of

5    investigation in petitioner's trial, including subpoenaing relevant witnesses, in order to keep costs

6    low, resulting in a less compelling trial presentation at both the guilt and penalty phases.  ECF

7    No. 421 at 274-75.

8           These allegations set forth a prima facie case that counsel labored under an actual conflict

9    of interest, to petitioner's detriment.  *See Cuyler*, 446 U.S. at 350.  The Court of Appeals has

10   recognized that an attorney acts under a conflict of interest when he has an ongoing financial

11   relationship with another entity that creates a personal incentive to keep costs low in a particular

12   client's case, as the attorney's loyalties in that situation are torn between his obligations to his

13   client and his personal interest in the on-going financial viability of his practice.  *See, e.g.*, *Demer*

14   *v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016); *cf. Rich*, 187 F.3d at 1069 (assuming

15   but not holding that a criminal defense attorney's flat-fee contract with a county could create an

16   actual conflict); *cf. United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980) (recognizing that an

17   attorney's personal interest in future profit from a book publication can create an actual conflict in

18   his representation of the client whose case would be the subject of the book).  Here, petitioner

19   alleges that his counsels' ongoing contractual relationship with San Joaquin County created an

20   incentive in them to minimize the costs they expended in petitioner's case, thus depriving him of

21   the effective assistance of counsel guaranteed by the Sixth Amendment.  He alleges that this

22   conflict resulted in actions taken by counsel that were adverse to his defense, namely, failing to

23   conduct a reasonable investigation into guilt- and penalty-phase defenses, failing to subpoena

24   witnesses, and, as a result, failing present as powerful a defense at both the guilt and penalty

25   phases as the available evidence could support.  ECF No. 421 at 274-75.  This suffices to make a

26   colorable showing of entitlement to relief on this theory.  *See Cuyler*, 446 U.S. at 350; *Rich*, 187

27   F.3d at 1069.

28           **b)  Subclaim 5**

In subclaim 5 of claim S, petitioner alleges that trial counsel unreasonably failed to investigate prosecution witness Billy Colbert and failed to adduce the fruits of that investigation to petitioner's benefit at trial.  ECF No. 203 at 81-82; ECF No. 421 at 277-78.  Where a petitioner alleges that counsel unreasonably failed to investigate his case, in violation of his Sixth Amendment rights, the habeas court consider at *Strickland*'s first step whether the limited investigation was itself reasonable under objective standards, as "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports limitations on investigation."  *Strickland*, 466 U.S. at 690-91; *see also Wiggins*, 539 U.S. at 522-23 (where trial counsel is alleged to have failed to introduce favorable evidence due to his failure to uncover it through reasonable investigation, the operative inquiry into deficient performance under *Strickland* is "not whether counsel should have presented" the evidence they could have found, but rather "whether the investigation supporting counsel's decision not to introduce [the] evidence [at issue] *was itself reasonable*.") (italics in original).  Certain investigative obligations exist in all criminal trials: defense counsel must seek and review the evidence on which the prosecution intends to rely, *Rompilla v. Beard*, 545 U.S. 374, 378-88 (2005); must know the law governing access to investigative resources and information, *Hinton v. Alabama*, 571 U.S. 263, 273 (2014); *Williams v. Taylor*, 529 U.S. 362, 39 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); and must make appropriate motions to facilitate the development of the defense.  *Hinton*, 571 U.S. 263.  Otherwise, the reasonable scope of defense counsels' investigation will be defined by prevailing professional norms at the time and in light of what counsel knew at the time of the investigation.  *Wiggins*, 539 U.S. at 523.  Counsel are unreasonable if they fail to pursue investigative leads apparent in the information they do have, unless they have reason to believe such pursuit would be "counterproductive" or "fruitless."  *Id.* at 525; *see also Andrus v. Texas*, 590 U.S. 806, 814-17 (2020).

Here, petitioner has made a colorable allegation that defense counsel were deficient in their investigation into prosecution witness Billy Colbert, resulting in their failure to impeach or

to challenge his testimony effectively.  The record indicates that, near the end of the prosecution's

presentation at the guilt phase, the prosecutor produced to the defense a statement by Mr. Colbert

conveying that petitioner had made inculpatory statements to him, and the prosecutor indicated

his intention to call Mr. Colbert as a witness.  44 RT 8691-92.  Although defense counsel argued

forcefully against the admission of Mr. Colbert's testimony on the grounds that the prosecutor

had violated the court's discovery order and had unfairly surprised the defense with this witness,

per petitioner, counsel did not also "attempt, through investigation and discovery, to obtain all the

information relating to the interviews of Colbert by federal and state law enforcement authorities,

relating to his credibility, his agency relationship with Riverside County and other law

enforcement agencies, and the circumstances surrounding his encounter with Petitioner."  ECF

No. 421 at 277-78.  Counsel also did not investigate the terms of Mr. Colbert's plea agreement on

the charges he was facing at the time of his conversation with petitioner, which may have borne

on his credibility and motive to fabricate.  *Id*.  Petitioner alleges that defense counsel were

additionally unreasonable in failing to seek a continuance to undertake these investigative tasks.

*Id*.

These allegations set forth a colorable theory of counsels' deficient performance.  Counsel

had a duty to conduct reasonable investigations into the strength of the evidence the prosecutor

sought to admit against petitioner, *see Hinton*, 571 U.S. at 273; *Rompilla*, 545 U.S. at 378-88, and

counsel should have known that the evidence to which Mr. Colbert was to testify—that petitioner

made inculpatory statements to him—could be tremendously damaging to his defense of actual

innocence on counts 1 and 2.  *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A

confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the

most probative and damaging evidence that can be admitted against him.'") (quoting *Bruton*, 391

U.S. at 139-40 (White, J., dissenting)).  For this reason, trial counsel had a sui generis duty to

investigate Mr. Colbert's credibility and to take reasonable steps, such as requesting a

continuance, to effectuate such investigation.  Moreover, the record indicates that, at the time Mr.

Colbert's statement was produced to the defense or shortly thereafter, defense counsel were aware

that Mr. Colbert was in jail on pending charges and had a robust criminal history.  44 RT 6904-

13, 47 RT 7675-76, 7700; 48 RT 7874, 7878-79; 49 RT 7957-61. Counsel were unreasonable if they did not follow these obvious leads by investigating Mr. Colbert's criminal history and relationship with law enforcement, as these areas implicated his credibility and willingness to dissemble about petitioner for his own benefit. *See, e.g.*, *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002). Accordingly, petitioner has set forth allegations that make a colorable claim of deficient performance for counsels' failure to investigate Mr. Colbert for the purpose of impeaching his testimony at trial.[9]

### c) Subclaims 6 and 16

In subclaims 6 and 16 of claim S, petitioner argues that trial counsel performed deficiently in failing to conduct reasonable investigations into petitioner's culpability for the Stockton robbery-homicide and his involvement in the Riverside robbery-homicide that was admitted at the guilt phase as evidence of intent and identity. ECF No. 203 at 82-83, 90. Specifically, he argues that trial counsel unreasonably failed to investigate whether persons other than petitioner had been the driver for the Stockton robbery-homicide, despite having knowledge that law enforcement had investigated other robberies that they believed to have been similar, for which petitioner had not been charged. ECF No. 203 at 90. Petitioner also argues that counsel unreasonably failed to interview persons, including Timothy Williams, who identified someone

---

[9] Some of the additional allegations in this subclaim fail as a matter of law. In addition to the investigative failures alleged, petitioner also argues that trial counsel unreasonably failed to move to exclude Mr. Colbert's testimony on the bases set forth in claims B, C, D, and F, ECF No. 421 at 277-78, but the undersigned concludes, however, that petitioner has not shown that Mr. Colbert's testimony should have been excluded on any of those bases, *see post*, and defense counsel is not deficient for failing to make futile arguments, motions, or objections. *See, e.g.*, *Ochoa*, 50 F.4th at 889; *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996). Petitioner argues that trial counsel performed deficiently for failing to seek criminal history information on Mr. Colbert, ECF No. 421 at 278, but that allegation is refuted by the record. *See* Claim D, *post*; *Landrigan*, 550 U.S. at 474. Petitioner argues that defense counsel were deficient for failing to investigate Mr. Colbert's agreements with the prosecutor in his case, ECF No. 421 at 278, but petitioner elsewhere fails to show that such any such agreement existed. *See* Claim B, *post*. Petitioner argues that defense counsel should have introduced evidence of Mr. Colbert's sentences in the penalty phase of petitioner's trial or in support of his motion for new trial, ECF No. 421 at 278, but fails to argue any basis for such evidence's admissibility or relevance. *See generally Rupe*, 93 F.3d at 1445 (defense counsel has no professional responsibility to undertake actions without support in the law).

1    other than petitioner at the physical line-ups in which petitioner participated.  ECF No. 421 at

2    279.  Relative to the Stockton robbery-homicide, he also argues that counsel unreasonably failed

3    to obtain and to offer available evidence that petitioner had been employed shortly before that

4    crime to rebut the evidence offered by the prosecution suggesting that petitioner engaged in

5    unusual spending patterns after the crime.  *Id*., citing ECF No. 421-14; *see* 49 RT 7995-8049,

6    8075-85, 8117-19, 8141.

7        These allegations make a prima facie case of deficient performance.  Counsel are

8    unreasonable for failing to undertake reasonable investigations into evidence on which the

9    prosecution intends to rely.  *Rompilla*, 545 U.S. at 390-91.  Here, petitioner's identity as the

10   driver of the car at the Stockton robbery-homicide and as the triggerman in the Riverside robbery-

11   homicide was the central factual dispute at trial.  *See generally Gordon*, 50 Cal. 3d at 1233

12   (summarizing the evidence as reflecting that "[t]he issues subject to greatest dispute were

13   identity, intent, and degree of participation").  Petitioner identifies specific areas of investigation

14   that defense counsel failed to conduct, which would have supported his defense that he was

15   misidentified at the Riverside robbery-homicide and not involved in the Stockton robbery-

16   homicide.  These lapses in investigation, per petitioner, were not reasonable, given the specific

17   information counsel possessed, viz., the charging document that referenced investigation into acts

18   for which petitioner had not been charged, discovery that revealed exculpatory eyewitness

19   identifications, and notice that the prosecutor intended to present evidence that that petitioner was

20   financially flush after the Stockton robbery-homicide.  ECF No. 421 at 279-80, 287-88.  In

21   similar cases, courts have found counsel's performance deficient.  *See, e.g*., *Hinton*, 571 U.S. at

22   264-66 (holding that counsel performed deficiently by failing to thoroughly investigate, including

23   seeking expert consultation, on the evidence comprising the prosecution's central theory of guilt);

24   *Rompilla*, 545 U.S. at 390-91 (holding that counsel performed ineffectively by failing to

25   investigate the records of their client's prior convictions, on which counsel knew the prosecution

26   would rely as aggravation in the penalty phase); *Alcala v. Woodford*, 334 F.3d 862, 870-71 (9th

27   Cir. 2003) (holding trial counsel deficient for failing to investigate and then present at trial a

28   business record that would have corroborated defendant's alibi, which was the lynchpin of his

48

1    defense); *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) (holding counsel performed

2    deficiently for failing to seek out business records that would have corroborated a key witness's

3    recollections).  Petitioner's allegations therefore state a prima facie case of deficient performance.

4    *See Williams*, 52 F.3d at 1484.

5              **d)  Subclaim 9**

6              In subclaim 9, petitioner alleges that his counsel performed unreasonably in their

7    investigation into petitioner's mental state, which would have been relevant to both the guilt and

8    penalty phases.  ECF No. 203 at 84-85.  Petitioner argues that, despite having reason to believe

9    that petitioner might have a mental health problem, counsel conducted only an unreasonably brief

10    investigation into his mental functioning.  ECF No. 421 at 281-82.  This included retaining an

11    expert, who examined petitioner one time, shortly before trial began.  ECF No. 423, Ex. S-6.

12    There is no indication that counsel either sought or provided to the expert any materials relevant

13    to his assessment.  *See id*.  Additionally, it appears that counsel only asked that the expert assess

14    petitioner for the narrow questions of whether he exhibited psychotic thinking or a personality

15    disorder; indications of depression; and "his ability to deal with reality."  *Id*.

16              These allegations suffice to state a prima facie case that counsel performed deficiently in

17    investigating petitioner's mental health issues, which would have been relevant to both guilt-

18    phase defenses and the penalty-phase mitigation presentation.  At the time of petitioner's trial in

19    California, reasonable defense counsel in a capital case knew to conduct a thorough investigation

20    into their client's mental functioning if there were any indications of mental health or cognitive

21    issues.  This was true even where the defense was also investigating an alibi defense.  *Jennings v.*

22    *Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002).  A reasonable investigation into a defendant's

23    mental functioning included a comprehensive search for relevant records and interviews with

24    relevant witnesses.  *See, e.g.*, *Correll v. Ryan*, 465 F.3d 1006 (9th Cir. 2006); *Summerlin v.*

25    *Schriro*, 427 F.3d 623, 630 (9th Cir. 2005); *Douglas v. Woodford*, 316 F.3d 1079, 1086 (9th Cir.

26    2003); *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998); *Evans v. Lewis*, 855 F.2d 631, 637

27    (9th Cir. 1988); *see also People v. Monzingo*, 34 Cal. 3d 926 (1983) (holding trial counsel was

28    unreasonable in failing to review the defendant's mental health and incarceration records in

1    investigating possibility of diminished capacity defense, where counsel knew the defendant had

2    received past mental health treatment, at 1980 California trial); *see generally Brown v. Sternes*,

3    304 F.3d 677, 694 (7th Cir. 2002) (holding that "where a defense attorney has received

4    information from a reliable source that his client has had a history of psychiatric problems, but

5    failed to adequately investigate this history, counsel failed to provide effective assistance" and

6    observing that "at least six of our sister circuits have arrived at the same conclusion," including

7    the Ninth Circuit).

8        Petitioner's allegations that counsel failed to obtain a reliable assessment from their

9    consulting expert also states a prima facie case of deficient performance.  Reasonable trial

10   preparations require not simply talking to an expert but taking steps that enable counsel to obtain

11   a reliable opinion from the expert.  *See Hinton*, 571 U.S. at 273-74.  In the case of a mental health

12   expert, reasonable defense counsel should provide some basic life history information to the

13   expert, including any information that the defense has about the defendant's traumas or other risk

14   factors for the development of mental illness.  *See Raley v. Ylst*, 444 F.3d 1085, 1092-93 (9th Cir.

15   2006), *opinion amended and superseded on denial of reh'g*, 470 F.3d 792 (9th Cir. 2006);

16   *Hendricks v. Calderon*, 70 F.3d 1032, 1038-39 (9th Cir. 1995).  Depending on the facts, counsel

17   may be unreasonable in the referral question they give to their expert—for example, if counsel

18   unreasonably do not seek an opinion on a defense that may be available or unreasonably fail to

19   inform the expert of the legal standard for which her assessment would be relevant.  *See Silva v.

20   Woodford*, 279 F.3d 825, 829-30, 837 (9th Cir. 2002); *Lang v. Cullen*, 725 F. Supp. 2d 925, 1009

21   (C.D. Cal. 2010).  Here, petitioner alleges that counsel failed to conduct a reasonable

22   investigation into their client's mental health functioning, despite having indications of his mental

23   health problems, and failed to consult with their expert in a reasonable manner, by unduly

24   narrowing the focus of the expert's inquiry.  If true, these allegations would demonstrate that

25   counsel performed deficiently under governing law, thereby entitling petitioner to factual

26   development on this subclaim.  *See Cuyler*, 446 U.S. at 350; *Rich*, 187 F.3d at 1069.

27        **e)  Subclaims 10, 24, and 26**

28        In subclaims 10, 24, and 26, petitioner alleges that trial counsel performed deficiently in

50

1    failing to conduct a reasonable investigation into mitigation evidence and failing to present the

2    fruits of that investigation at the penalty phase of petitioner's trial.  ECF No. 203 at 85.

3    Specifically, petitioner argues that counsel failed to investigate and present evidence of

4    petitioner's positive qualities and relationships, ECF No. 421 at 283; evidence of his upbringing,

5    including the portion of his childhood spent in an orphanage, *id*. at 295-96; and evidence of his

6    commendable military service.  *Id*. at 296.  Petitioner argues that this failure was due to counsels'

7    misunderstanding of the law governing the penalty phase.  ECF No. 421 at 294-95.

8         Petitioner's allegations state a prima facie case that counsel performed deficiently in their

9    investigation and presentation of mitigation evidence.  At the time of petitioner's trial, "prevailing

10   professional norms imposed a duty on counsel to adequately investigate, develop, and present

11   mitigating evidence in capital sentencing proceedings."  *Robinson v. Schriro*, 595 F.3d 1086,

12   1108 (9th Cir. 2010); *see Wiggins*, 539 U.S. at 524 (holding counsel had a duty to "discover all

13   reasonably available mitigating evidence" to prepare for penalty phase of capital trial, considering

14   1989 trial); *Summerlin*, 427 F.3d at 630 (holding same regarding 1982 Arizona trial); *Ainsworth*

15   *v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) ("[Investigation] was as crucial in 1980 as it is

16   today in order to assure individualized sentencing and the defendant's right to a fair and reliable

17   capital penalty proceeding."); ABA Guidelines for the Appointment and Performance of Counsel

18   in Death Penalty Cases, Guideline 11.4.1(A), (C) (1989) ("Counsel should conduct independent

19   investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both

20   investigations should begin immediately upon counsel's entry into the case and should be pursued

21   expeditiously . . . . The investigation for preparation of the sentencing phase should be conducted

22   regardless of any initial assertion by the client that mitigation is not to be offered.  This

23   investigation should comprise efforts to discover all reasonably available mitigating evidence . . .

24   ."); ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("It is the duty of the lawyer to

25   conduct a prompt investigation of the circumstances of the case and to explore all avenues leading

26   to facts relevant to the penalty [phase]."); *see also Strickland*, 466 U.S. at 690-91.

27        Such mitigation investigation included, as its starting point, "a thorough investigation of

28   the defendant's background" and "unique personal circumstances."  *Williams v. Taylor*, 529 U.S.

1    362, 396, 415 (2000) (considering 1986 trial); *Wiggins*, 539 U.S. at 524 (under professional

2    norms in 1989, defense counsel must investigate capital defendant's medical, educational,

3    employment, incarceration, family and social history, citing Am. Bar Ass'n, Standards for

4    Criminal Justice Providing Defense Services, Standard 4-4.1 (2d ed. 1982 Supp.)); *People v.*

5    *Deere*, 41 Cal. 3d 353, 366-67 (1985) (at the time of the petitioner's trial, California defense

6    counsel had a duty to investigate for mitigation purposes the defendant's "past history and the

7    unique circumstances affecting his formative development," including his "upbringing,"

8    childhood traumas, "and other formative influences," citing Gary Goodpaster, *The Trial for Life:*

9    *Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 335-36 (1983));

10   Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58

11   N.Y.U. L. Rev. at 323-24 (To prepare for the penalty phase, "[t]rial counsel has a duty to

12   investigate the client's life history, and emotional and psychological make-up, as well as the

13   substantive case and defenses.  There must be an inquiry into the client's childhood, upbringing,

14   education, relationships, friendships, formative and traumatic experiences, personal psychology,

15   and present feelings."); ABA Guidelines for the Appointment and Performance of Counsel in

16   Death Penalty Cases, Guideline 11.4.1.D.2-3 (1989) (investigation into mitigation evidence for

17   the penalty phase should include investigation, from documentary sources and knowledgeable

18   witnesses, into the defendant's "medical history, (mental and physical illness or injury of alcohol

19   and drug use, birth trauma and developmental delays); educational history (achievement,

20   performance, and behavior) special educational needs including cognitive limitations and learning

21   disabilities); military history (type and length of service, conduct, special training); employment

22   and training history (including skills and performance, and barriers to employability); family and

23   social history (including physical, sexual or emotional abuse); prior adult and Juvenile record;

24   prior correctional experience (including conduct or supervision and in the institution/education or

25   training/clinical services); and religious and cultural influences"); Russell Stetler, *The Past,*

26   *Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of*

27   *Individualized Sentencing in Capital Cases*, 46 Hofstra L. Rev. 1161, 1170-76 (2018) (describing

28   that, by the late-1980s, defense lawyers typically conducted an expansive investigation into their

1    clients' lives and functioning to develop mitigation evidence to present at the penalty phase of a

2    capital trial); Russell Stetler & Aurélie Tabuteau, *The ABA Guidelines: A Historical Perspective*,

3    43 Hofstra L. Rev. 731, 738-43 (2015) (same).

4         Many courts have underscored the importance of counsel investigating the defendant's

5    trauma history specifically.  *See, e.g.*, *Boyde v. California*, 494 U.S. 370, 382 (1990) ("[E]vidence

6    about the defendant's background and character is relevant because of the belief, long held by this

7    society, that defendants who commit criminal acts that are attributable to a disadvantaged

8    background, or to emotional and mental problems, may be less culpable than defendants who

9    have no such excuse."  (internal quotation and citation omitted)); *Eddings v. Oklahoma*, 455 U.S.

10   104, 115 (1982) ("[T]here can be no doubt that evidence of a turbulent family history, of beatings

11   by a harsh father, and of severe emotional disturbance is particularly relevant" to the capital

12   sentencer); *Apelt v. Ryan*, 878 F.3d 800, 830 (9th Cir. 2017) ("[I]t is difficult to imagine any

13   rational basis for not investigating [the defendant's] mental health and childhood[,] [given that the

14   defendant] was facing the death penalty for committing a horrendous, cold-blooded murder.");

15   *see also Porter v. McCollum*, 558 U.S. 30, 33, 41 (2009); *Williams*, 529 U.S. at 373, 395;

16   *Summerlin*, 427 F.3d at 630; *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005); *Ainsworth v.*

17   *Woodford*, 268 F.3d 868, 877 (9th Cir. 2001); *Deere*, 41 Cal. 3d at 366-67; ABA Guidelines for

18   the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1.D.2

19   (1989).  For purposes of preparing a mitigation case, a reasonable investigation into the

20   defendant's personal history must also specifically encompass the defendant's history of

21   experiencing any symptomology of mental illness or cognitive deficit, or treatment therefor.

22   *Porter*, 558 U.S. at 40-41; *Williams*, 529 U.S. at 395-96; *Lambright*, 490 F.3d at 1117;

23   *Summerlin*, 427 F.3d at 630; ABA Guidelines for the Appointment and Performance of Counsel

24   in Death Penalty Cases, Guideline 11.4.1.D.2 (1989).

25        Here, petitioner's allegations squarely align with these authorities.  Petitioner's allegation

26   that defense counsel unreasonably failed to investigate and present evidence of petitioner's

27   experiences while in an orphanage is governed by counsels' responsibility, generally, to

28   investigate and present evidence of the defendant's upbringing and formative experiences, as well

as counsels' specific responsibility to investigate and present evidence of traumatic or difficult

life experiences the defendant endured, particularly in his formative years. *See Williams*, 529

U.S. at 396, 415; *Wiggins*, 539 U.S. at 524; *Boyde,* 494 U.S. at 382; *Eddings*, 455 U.S. at 115;

*Apelt*, 878 F.3d at 830; *Deere*, 41 Cal. 3d at 366-67. Petitioner's allegation that counsel

unreasonably failed to investigate and present evidence of petitioner's positive characteristics and

loving relationships also amounts to a colorable allegation of deficient performance. *See Deere*,

41 Cal. 3d at 366-67 (At the time of petitioner's trial in California, defense counsel's obligation in

the penalty phase was to "'portray the defendant as a human being with positive qualities'" and

"'to show that the defendant's capital crimes are humanly understandable in light of his past

history and the unique circumstances affecting his formative development . . . .'" (quoting

Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58

N.Y.U. L. Rev. at 335-36)); *see also People v. Pensinger*, 52 Cal. 3d 1210, 1279-80 (1991). This

specifically encompasses evidence of the defendant's commendable past military service. *See*

*Porter*, 558 U.S. at 38-40. Accordingly, governing authority establishes that petitioner's

allegations—that defense counsels' investigation into and resultant presentation of available

mitigation evidence was deficient—are colorable, such that he is entitled to further evidentiary

development on these allegations.

   **f) Prejudice**

   Petitioner makes little argument in the way of prejudice. ECF No. 421 at 298-99; ECF

No. 454 at 80-81; *see* ECF No. 203 at 96 (alleging prejudice as subclaim 30). Nonetheless, the

nature of petitioner's deficient performance arguments supply a colorable showing of prejudice

or, at least, are sufficient to show that evidentiary development on this prong of the *Strickland* test

would be relevant and useful to the disposition of the habeas petition. *See Seidel*, 146 F.3d at

754. Petitioner's claim of actual conflict, if found true, would entitle him to habeas relief on his

guilt and penalty judgments on that basis alone. *See Cuyler*, 446 U.S. 335. The allegations of

deficient performance at the guilt phase go to the heart of the prosecution's case: whether

petitioner was the person who was in the car during the Stockton robbery-homicide and whether

he was the triggerman at the Riverside robbery-homicide, and, if involved in the Stockton events,

1    whether he had specific intent to kill Mr. Wiley.  *See generally Gordon*, 50 Cal. 3d at 1233-38.

2    The investigations identified in petitioner's deficient-performance allegations relate wholly to

3    these issues, and thus petitioner makes a colorable allegation that, had the jury had greater reason

4    to question the prosecution's case on both the issues of identity and intent, there is a reasonable

5    probability that they would have reached a more favorable verdict at the guilt phase.  *See Hinton*,

6    571 U.S. at 264-66.  Whether the fruits of petitioner's evidentiary development yield a showing

7    of entitlement to relief is a different matter, but, at this stage, the allegations before the court

8    make out a colorable claim that petitioner was prejudiced at the guilt phase.

9        Petitioner also makes a colorable allegation of prejudice for the penalty phase.  At the

10   penalty phase, the jury heard limited evidence in mitigation, with the defense presenting only the

11   testimonies of two persons who personally knew petitioner and entering as an exhibit his military

12   records.  53 RT 9093-9157; 54 RT 9215-48; 55 RT 9365-75.  From this, the jury learned only

13   minimal information outlining some features of petitioner's life and upbringing, his positive

14   qualities, and his military service.  *See id*.  Had the jury heard more, including evidence of

15   petitioner possessing mental health impairments and further evidence to substantiate the defense's

16   lingering doubt argument, *see* 56 RT 9519-9543, the jury's assessment of petitioner's moral

17   worth might have swayed at least one juror toward a life sentence.  This is particularly true in

18   light of the prosecutor's penalty-phase closing argument, which maintained that the mitigation

19   evidence presented demonstrated that petitioner had not had a particularly challenging upbringing

20   and that his claims of military heroism may have been fabrications.  56 RT 9483-9513.  Petitioner

21   further advances his prejudice allegations by arguing that his co-defendant Bernard Gordon was

22   sentenced to life incarceration, rather than death, after having presented some of the evidence

23   about their joint upbringing that petitioner argues counsel should have uncovered and presented in

24   his case.  ECF No. 421 at 296-97.  In sum, petitioner's allegations of prejudice are colorable, *see*

25   *Townsend*, 372 U.S. at 308-09, 312-18, or, at the very least, sufficient to persuade the

26   undersigned that evidentiary development on the issue of prejudice would assist the court by

27   providing evidence relevant to the resolution of the petition.  *See Seidel*, 146 F.3d 750, 754.

28       For these reasons, the court grants petitioner's motion for evidentiary hearing on

1  subclaims 2, 5, 6, 9, 10, 16, 24, 26, and 30 of claim S of the Third Amended Petition.

2  **2. Claim T**

3  In claim T, petitioner alleges that the trial court denied him his rights under the Fifth,

4  Sixth, Eighth, and Fourteenth Amendments by denying his motion for separate juries for the

5  penalty and guilt phases and for denying his request for an in-camera hearing to present evidence

6  in support of that motion. ECF No. 203 at 96-98. Petitioner moves for an evidentiary hearing in

7  order to show that he was prejudiced by the trial court's denial of his motion for separate juries.

8  ECF No. 421 at 311-12; ECF No. 454 at 82. The undersigned recommends that this claim be

9  denied for failing to set forth a colorable claim of constitutional violation. *See Townsend*, 372

10  U.S. at 308-09; *Insyxiengmay*, 403 F.3d at 670.

11  **a. Relevant Procedural History**

12  Before trial, the defense moved orally for empanelment of separate juries for the guilt and

13  penalty phases and requested an in-camera hearing to argue the motion. 19 RT 1680A-94A. The

14  court denied the motion and the request for an in-camera hearing without prejudice. 19 RT

15  1693A-94A. After petitioner was found guilty, defense, in a written motion, renewed the request

16  for empanelment of a second penalty-phase jury, although he did not renew the request for an in-

17  camera hearing. 5 CT 934-41. The court held a hearing on the motion at which the prosecutor

18  was present and offered opposition; defense counsel argued the motion and did not request, at that

19  time, to be heard in camera. 53 RT 9015-21. The court concluded that petitioner had not shown

20  good cause to empanel a new jury for the penalty phase and denied the motion. 53 RT 9020-21.

21  **b. Discussion**

22  Petitioner argues that this claim is governed by *Matthews v. Eldridge*, 424 U.S. 319, 333

23  (1976), and *Hicks v. Oklahoma*, 447 U.S. 343, 346-47 (1980), ECF No. 454 at 81-82, but his

24  allegations do not make a colorable showing of a due process violation under either authority. In

25  *Matthews*, the Supreme Court held that due process requires a meaningful opportunity to be heard

26  before deprivation of life, liberty, or property, 424 U.S. at 333, and petitioner argues that the trial

27  court violated that right by denying his request for an in-camera hearing and, subsequently,

28  denying his motion for separate juries for lack of good cause. ECF No. 421 at 299, 303-04; ECF

56

1    No. 454 at 81-82.  Petitioner's position is unpersuasive.  It does not offend due process for a trial

2    court to require a party to make a threshold showing before granting him his requested hearing,

3    particularly when the request includes excluding the opposition from the hearing.  *Franks v.*

4    *Delaware*, 438 U.S. 154, 170 (1978); *United States v. Thompson*, 827 F.2d 1254, 1257 (9th Cir.

5    1987).  Here, petitioner's counsel made his request for an in-camera hearing, the trial court

6    considered the request, and the trial court concluded that petitioner had not shown that such a

7    hearing was warranted.  19 RT 1680A-94A.  Nothing in the trial court's approach or in its ruling,

8    given the record before it, was improper, or deprived petitioner of a meaningful opportunity to be

9    heard so as to reflect a denial of his rights to due process of law.

10        Petitioner has also failed to set forth a colorable claim of constitutional violation under

11    *Hicks*.  In *Hicks*, 447 U.S. at 346-47, the Supreme Court recognized that a criminal defendant has

12    a federal constitutional due process interest in the state following its statutes and established

13    procedures prior to depriving him of life of liberty.  Here, petitioner alleges that the trial court

14    violated California law in denying him an in-camera hearing and denying his motion for separate

15    juries, and that these violations deprived him of his due process rights as set forth in *Hicks*.  ECF

16    No. 454 at 81-82; ECF No. 421 at 299-300, 303-11.  Petitioner's allegations concerning the denial

17    of an in-camera hearing must fail, however, out of deference to the state court's prior

18    determination on this issue.  On direct appeal, petitioner argued that the trial court abused its

19    discretion as a matter of state law in failing to hold the requested in-camera hearing.  LD AOB at

20    97-102.  The California Supreme Court rejected this, holding that the record showed no such

21    abuse of discretion.  *Gordon*, 50 Cal. 3d at 1244.  This court must defer to the California Supreme

22    Court's assessments of whether California law was violated, *Estelle*, 502 U.S. at 67-68, and,

23    consequently, petitioner's *Hicks* claim must fail to the extent it alleges that the trial court abused

24    its discretion under California law in denying petitioner's request for an in-camera hearing.  *See*

25    *Hicks*, 447 U.S. at 346-47.

26        Finally, petitioner has failed to show that the trial court's denial of his motion for separate

27    juries was contrary to California law so as to also constitute a violation of his due process rights.

28    California statute provides that the same jury that determined guilt shall determine the penalty,

1     "unless for good cause shown, the court discharges that jury in which case a new jury shall be

2     drawn."  Cal. Penal Code § 190.4(c).  Petitioner argues that the admission of the other crimes

3     evidence in the guilt phase constituted good cause for separate juries, given "the confusion to the

4     jury and the strategy to which counsel could and could not challenge evidence of another robbery

5     under different burdens of proof required at the guilt/innocence and sentencing stages."  ECF No.

6     454 at 82; *see also* ECF No. 421 at 310-11, 312 (arguing that defense counsel showed good cause

7     for the trial court to grant the motion).  Petitioner fails to show that the trial court erred under

8     California law; notably, petitioner fails to identify any California case in which it has been held

9     that such circumstances constitute good cause under Penal Code section 190.4(c).  In fact,

10    California jurisprudence appears contrary to petitioner's position, as the California Supreme

11    Court has held that empanelment of separate guilt- and penalty-phase juries is not required by

12    virtue of the jury having heard disparate evidence and instructions in the two trial phases about

13    past bad acts attributed to the defendant.  *See, e.g.*, *People v. Pride*, 3 Cal. 4th 195, 252 (1992), *as*

14    *modified on denial of reh'g* (Sept. 30, 1992); *cf. People v. Balderas*, 41 Cal. 3d 144, 204-05

15    (1985).  Neither, more generally, is good cause shown by there being inconsistent defense

16    strategies in the two phases.  *People v. Taylor*, 52 Cal. 3d 719, 737-38 (1990).  On the record

17    before the trial court, petitioner has not shown that the trial court erred under California law by

18    failing to grant the motion for separate juries under Penal Code section 190.4(e).  Accordingly, he

19    has not shown that the trial court's ruling effectuated a deprivation of his due process rights,

20    either.

21            Because petitioner fails to make a colorable claim that his due process rights were

22    violated, his request for an evidentiary hearing on the question of prejudice must be denied, *see*

23    *Townsend*, 372 U.S. at 308-09; *Insyxiengmay*, 403 F.3d at 670, and the undersigned recommends

24    that this claim be dismissed.

25        **3.  Claim X**

26            Petitioner seeks an evidentiary hearing on subclaim 17 of claim X, to develop evidence

27    relative to the prejudice prong of this subclaim.  ECF No. 421 at 362-63; ECF No. 454 at 100.

28    This subclaim, however, was defaulted and is procedurally barred under *Wainwright*, 433 U.S.

72.  *See ante*.  Petitioner's request for an evidentiary hearing on this subclaim is therefore denied.

### 4.  Claim Z

In claim Z, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by juror misconduct wherein (1) one juror read newspaper articles about the case between the guilt and penalty phases; (2) the jurors misunderstood the court's instructions during their deliberations, including considering information not in evidence; and (3) the jurors were permitted to examine exhibits outside the presence of the court, counsel, and petitioner.  ECF No. 203 at 122-23.  In his merits brief and request for evidentiary hearing, he abandons the last subclaim, *see* ECF No. 421 at 372-77, ECF No. 454 at 102-08, and seeks an evidentiary hearing to prove that the misconduct alleged in subclaim 2 occurred.  ECF No. 454 at 106.  The undersigned finds that petitioner has not shown his entitlement to relief or to an evidentiary hearing on this claim, and recommends it be dismissed.

The Sixth Amendment and Fourteenth Amendment guarantee a criminal defendant the right to trial by an impartial jury, which is "capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  Thus, "[w]hen the jury breaches this duty by considering extraneous facts not introduced in evidence, 'a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence.'"  *Hughes v. Borg*, 898 F.2d 695, 700 (9th Cir. 1990) (quoting *Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980)); *see Mattox v. United States*, 146 U.S. 140 (1892).

#### a. Trial Court's Inquiry into Jurors' Exposure to News Media

Petitioner has failed to make a colorable claim of a constitutional violation for his first subclaim, in which he alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's failure to make inquiries of other jurors after learning that one juror had read a newspaper article about the case between the guilt and penalty phases.  ECF No. 203 at 122-23.  The record indicates that, after the guilty verdict was entered but before the penalty phase began, one juror—Juror Number 5—notified the court that she had read a newspaper article about the case.  53 RT 9052.  The trial court held a hearing at which

1    petitioner was present with counsel, and the court questioned the juror, who testified that she had

2    read a portion of a *Sacramento Bee* article that had been published on the Saturday or Sunday

3    following the guilty verdict.  53 RT 9060-63.  Defense counsel showed Juror Number 5 a copy of

4    an article that had been printed in the Sunday version of the newspaper, and she identified it as

5    the one she had read.  53 RT 6062-63; *see also* 55 RT 9386.  Defense counsel informed the court,

6    "if that's all it was, there is nothing in [the article] other than what appeared in this courtroom" as

7    evidence during the guilt phase of the trial.  53 RT 9062.  There was no evidence presented or

8    otherwise extant in the record indicating that the juror had been mistaken in her recollection or

9    had been exposed to additional materials.  *See* 53 RT 9060-63.  Juror Number 5 testified that

10   when she realized the article was about the trial for which she was a juror, she stopped reading,

11   and there is nothing in the record indicating that she communicated about the article to other

12   jurors.  *See id.*  Based on the trial court's review of the proffered article and Juror Number 5's

13   testimony, the court concluded that Juror Number 5 had not been exposed to any information that

14   had not already been in evidence and ergo was not biased or improperly influenced so as to

15   warrant her dismissal.  53 RT 9063.

16        Petitioner argues that his federal constitutional rights were violated by the inadequacy of

17   the trial court's inquiry, because, per petitioner, the trial court should have examined every single

18   juror about possible exposure to newspaper articles after Juror Number 5 reported having read an

19   article.  ECF No. 421 at 374-75; *see also* ECF No. 454 at 103-05.  Petitioner fails to show that the

20   trial court's ruling deprived him of his federal constitutional rights.  A trial court has a "great

21   responsibility" to guarantee a criminal defendant's Sixth Amendment rights to an impartial jury,

22   including excluding from the jury any member who may be tainted by bias, prejudice, or

23   improper influence.  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).  Nonetheless,

24   the trial court possesses "wide discretion" in effectuating this guarantee, including in determining

25   both whether to hold a hearing on allegations of juror bias or misconduct and the scope of any

26   such hearing.  *Id.* at 1227-28.  Thus, when there are allegations that one juror has been exposed to

27   outside influences, the trial court has discretion to limit its inquiries to those persons it had reason

28   to believe were exposed to such influences and to limit its questions about the nature of the

1   exposure. *See, e.g.*, *United States v. Berry*, 627 F.2d 193, 197 (9th Cir. 1980); *Hendrix*, 549 F.2d

2   at 1227-29. Here, the record reflects a proper exercise of such discretion, as the trial court

3   conducted an inquiry of the only juror whom it had factual, non-speculative reason to believe was

4   exposed to news media about the case.[10] *See* 53 RT 9060-63. Accordingly, petitioner has not

5   made a colorable showing that his constitutional rights were violated by the trial court's action in

6   responding to Juror Number 5's admission of exposure to an extrinsic influence.

7                         **b. Improper Penalty Phase Deliberations**

8          In his second subclaim, petitioner alleges that his rights under the Fifth and Eighth

9   Amendments were violated by the jurors' improper deliberations at the penalty phase,

10  specifically, their considering defendant's failure to testify, discounting mitigating evidence, and

11  misapplication of the penalty-phase instructions. ECF No. 421 at 375-77; ECF No. 454 at 105-

12  08. Petitioner seeks evidentiary development so that he may have admitted the declaration of

13  attorney Ann K. Tria, in which Ms. Tria declares that she read reports generated by petitioner's

14  appellate investigator, who stated that he interviewed several jurors who, purportedly, reported

15  the facts that form the basis of this claim. ECF No. 421 at 375-76; ECF No. 454 at 106-07; ECF

16  No. 421-15 ¶¶ 3-9. This evidence, however, is inadmissible, and thus petitioner has not borne his

17  burden to show his entitlement to an evidentiary hearing on this subclaim.

18         First, the underlying statements that petitioner seeks to establish at an evidentiary

19  hearing—those of the jurors purporting to describe misconduct during penalty-phase

20  deliberations—are inadmissible under Federal Rule of Evidence 606(b). That rule provides,

21  _____

22         [10] Petitioner does not specifically argue that the trial court's approach was error under
    California law and, consequently, deprived him of his constitutional due process rights under
23  *Hicks*, 447 U.S. at 346-47, although such a theory is perhaps implied by petitioner's repeated
    reliance on California authority. *See* ECF No. 421 at 374-75; ECF No. 454 at 103-04. To the
24  extent that petitioner's claim encompasses this theory, it also fails, since petitioner has not shown
    that the trial court's failure to inquire of all of the jurors about the possibility of their exposure to
25  news media was required under California law. *See, e.g.*, *People v. Avila*, 38 Cal. 4th 491, 604
    (2006) ("The hearing [into suspected juror misconduct] should not be used as a 'fishing
26  expedition' to search for possible misconduct, but should be held only when the defense has come
    forward with evidence demonstrating a strong possibility that prejudicial misconduct has
27  occurred."); *People v. DeSantis*, 2 Cal. 4th 1198, 1235 (1992) (no hearing required where
    "nothing in the record to suggest that any material matter was overheard" by another juror).
28

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

This rule "flatly prohibit[s]" the admission of juror testimony to impeach a verdict except where an "extraneous influence" affected the verdict. *Tanner v. United States*, 483 U.S. 107, 117 (1987). An "extraneous influence" in this context is construed narrowly to only encompass information or pressure brought to the jurors outside of the trial or outside of the deliberation process; it does not include jurors' speculations, misunderstandings, beliefs, or opinions about the evidence, instructions, or argument they received during the trial. *Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008); *United States v. Decoud*, 456 F.3d 996, 1019 n.11 (9th Cir. 2006); *United States v. Bussell*, 414 F.3d 1048, 1055 (9th Cir. 2005); *Hard v. Burlington N. R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989). It also does not encompass any juror's disclosures of their own subjective reasoning processes concerning their verdict, the evidence, or even any extrinsic information to which they were exposed, and it does not make admissible their discussions with one another forming deliberations. *Estrada*, 512 F.3d at 1237-38. Here, the statements attributed to the jurors in petitioner's case, which petitioner seeks to have admitted to prove his claim, plainly reflect the jury's deliberations and individual jurors' mental processes rather than influence by actors outside the jury, as they purport to describe jurors' individual beliefs about petitioner's failure to testify and about the aggravation and mitigation evidence they heard, as well as the jury's discussions about the aggravation and mitigation evidence and the court's instructions concerning same. ECF No. 421-15 ¶¶ 3-9. As such, the statements are inadmissible under Rule of Evidence 606(b) and, consequently, cannot provide a basis for the court to hold an evidentiary hearing. *Morgan v. Woessner*, 997 F.2d 1244, 1261 (9th Cir. 1993); *Hard*, 870 F.2d at 1461.

1    Moreover, the evidence petitioner seeks to have admitted is also inadmissible as hearsay,

2    and for this additional reason petitioner has not borne his burden to show his entitlement to

3    evidentiary hearing.  In support of his request for evidentiary hearing, petitioner has only

4    proffered the declaration of Ms. Tria, not the declarant jurors themselves, and Ms. Tria represents

5    that, at an evidentiary hearing, she could testify that she reviewed the record of an appellate

6    investigator who purportedly recorded the statements attributed to the jurors forming the basis of

7    this claim.  ECF No. 421-15 ¶¶ 3-9.  Thus, the statements that petitioner seeks to have admitted

8    for their truth—those of the jurors—are only proffered via two layers of hearsay in the testimony

9    of Ms. Tria.  As the Court of Appeals has explained, inadmissible hearsay evidence does not

10    suffice to meet petitioner's modest burden to show that an evidentiary hearing is warranted on his

11    habeas corpus allegations.  *Pavao v. Cardwell*, 583 F.2d 1075, 1077 (9th Cir. 1978).

12    For these reasons, petitioner has not shown his entitlement to an evidentiary hearing on

13    claim Z, and, because petitioner fails to make a colorable showing of a constitutional violation,

14    the undersigned recommends that the claim be dismissed.

15    **IV.    MERITS DETERMINATION**

16    As noted, the previously assigned magistrate judge had ordered that, for those claims for

17    which petitioner does not seek an evidentiary hearing or can be resolved on the record, petitioner

18    brief his entitlement to relief as a matter of law.  ECF No. 396.  Under pre-AEDPA standards, a

19    writ of habeas corpus is available under 28 U.S.C. § 2254 for transgressions of federal law

20    binding on the state courts.  *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Engle v. Isaac*, 456

21    U.S. 107, 119 (1982); *Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1994).  A writ is not available

22    for alleged error in the interpretation or application of state law.  *Estelle*, 502 U.S. at 67-68.  The

23    petitioner bears the burden of proving that his detention violates the federal Constitution or other

24    federal law.  *Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled on other grounds by Keeney*

25    *v. Tamayo-Reyes*, 504 U.S. 1 (1992); *Snook v. Wood*, 89 F.3d 605, 609 (9th Cir. 1996).  To

26    prevail on a claim of constitutional error, the petitioner must "convince the district court 'by a

27    preponderance of evidence' of the facts underlying the alleged constitutional error."  *McKenzie v.*

28    *McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 469

1    (1938)); *see also Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

2         Although less deference to state court factual findings is required under the pre-AEDPA

3    law than it is under AEDPA, state court factual findings are still entitled to a presumption of

4    correctness unless the petitioner shows that one of eight enumerated exceptions apply.  *See* 28

5    U.S.C. § 2254(d); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see also Bean v.*

6    *Calderon*, 163 F.3d 1073, 1087 (9th Cir. 1998).  The state courts' application of law to historical

7    facts is reviewed by the federal habeas court *de novo*, as are other mixed questions of law and

8    fact.  *Thompson v. Keohane*, 516 U.S. 99, 110 (1995); *Thompson v. Borg*, 74 F.3d 1571, 1573

9    (9th Cir. 1996); *Powell v. Gomez*, 33 F.3d 39, 41 (9th Cir. 1994).

10         Where petitioner proves that constitutional error occurred, he typically is not entitled to

11    habeas corpus relief unless he also shows that the errors "had substantial and injurious effect or

12    influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993);

13    *see Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006).  Applying this standard, for the reasons set

14    forth below, the undersigned finds that petitioner has not shown his entitlement to relief on the

15    remaining claims of the Third Amended Petition and recommends that they be denied.

16    **Claim A**

17         In claim A, petitioner alleges that he was deprived of his rights under the Sixth, Eighth,

18    and Fourteenth Amendments by the trial court's errors during jury selection.  ECF Nos. 203 at 8-

19    12, 421 at 6-25.  In his merits brief, he argues that he is entitled to reversal of his guilt convictions

20    and death sentence, first, because the trial court erroneously excused for cause prospective jurors

21    E.S. and P.R. and, second, because the trial court denied the defense's challenges for cause to

22    prospective jurors C.B., R.K., R.F., and C.M.  ECF No. 421 at 6-25.[11]  After reviewing the record,

23    the undersigned concludes that petitioner has not proven his entitlement to relief on this claim and

24    recommends that it be denied.

25         **1.  Excusals of Prospective Jurors E.S. and P.R.**

26

27    _____

         [11] By making no argument concerning them in his brief, *see* ECF No. 421 at 6-25,
28    petitioner has abandoned the subclaims 3, 4, and 5, and portions of subclaim 1, of claim A.  *See*
     *Kates*, 776 F.2d at 1397.

1          **a.  Legal Standard**

2          "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of

3   impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Skilling v.*

4   *United States*, 561 U.S. 358, 377-78 (2010); *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  A

5   defendant is denied the right to an impartial jury if even one juror is biased or prejudiced.  *Fields*

6   *v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002), (amended, 315 F.3d 1062 (9th Cir. 2002));

7   *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).

8          In a capital case, "a prospective juror may be excluded for cause because of his or her

9   views on capital punishment . . . if the juror's views would 'prevent or substantially impair the

10  performance of his duties as a juror in accordance with his instructions and his oath.'"

11  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980));

12  *see also Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (general objections to death penalty or

13  expressed conscientious or religious scruples against its infliction not sufficient basis to exclude

14  potential juror for cause); *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (juror who is substantially

15  impaired in his or her ability to impose the death penalty should be excused for cause).  "[A] juror

16  who in no case would vote for capital punishment, regardless of his or her instructions, is not an

17  impartial juror and must be removed for cause."  *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

18  Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty

19  is not impartial and must be removed for cause.  *Id*. at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85

20  (1988).

21         In habeas corpus, the reviewing court must give deference to the trial court's finding that a

22  prospective juror demonstrated views that would substantially impair his or her performance as a

23  juror, as the trial judge is in the best position to assess demeanor and credibility.  *Uttecht*, 551

24  U.S. at 7-8.  The trial court's ruling should be upheld if it is fairly supported by the record.  *Id.*;

25  *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992); *see also Rice v. Collins*, 546 U. S.

26  333, 341-42 (2006) (Even if "reasonable minds reviewing the record might disagree about" the

27  evidence, "on habeas review that does not suffice to supersede the [state] court's credibility

28  determination.").  This standard may be met even if no specific analysis was conducted by the

1    trial court and even if the prospective juror's statements seem ambiguous or inarticulate in the

2    record.  *Uttecht*, 551 U.S. at 7.

3        The wrongful exclusion of a prospective juror under *Witherspoon* and *Witt* requires

4    reversal of the petitioner's death sentence, with no showing of prejudice required.  *Gray v.*

5    *Mississippi*, 481 U.S. 648, 665 (1987); *see Adams*, 448 U.S. at 51.

6        **b.  Analysis**

7        Petitioner argues that the trial court wrongfully excluded prospective jurors E.S. and P.R.

8    under *Witherspoon* and *Witt*.  Upon review of the record, the undersigned concludes petitioner

9    has not shown constitutional error.

10               **i. Prospective Juror E.S.**

11       Petitioner argues that the record demonstrates that prospective juror E.S. communicated

12   not that she was unable to impose the death penalty, but only that "she would be unable to follow

13   the 'shall' instruction (CALJIC 8.84.2)," because she had a problem with an instruction that

14   would make the imposition of the death penalty mandatory should certain findings be made, a

15   view that comports with constitutional mandates.  ECF No. 421 at 10-14.  Petitioner also argues

16   that the trial court abdicated its duties by failing to disabuse E.S. of her misunderstandings of the

17   law.  *Id.* at 12-13.  Petitioner fails to prove his entitlement to relief on either basis.

18       The trial court's dismissal for cause of E.S. is fairly supported by the record.  *See Uttecht*,

19   551 U.S. at 7-8.  During voir dire, E.S. expressed repeatedly, over the course of extensive voir

20   dire, that she had reservations about the death penalty, beyond simple confusion or qualms about

21   the language of CALJIC 8.84.2.  She expressed that she opposed the death penalty in the abstract,

22   due to its disproportionate use against people who are socially and economically disadvantaged.

23   29 RT 3569A.  When questioned about whether she could set aside these concerns and consider

24   imposing the death penalty in a particular case, she expressed ambivalence, stating that she

25   thought the only way she could select it as a sentence was if she assumed the Governor would

26   later commute the sentence.  29 RT 3569A-71A.  Notwithstanding this, she "d[id]n]t think [she]

27   could" ever vote for a death verdict if she were a juror, because "[i]t just goes against everything

28   I've been believing for 30 years and . . . at this point if anybody ask me outside I'd say, no way, I

1    just didn't believe in that at all." 29 RT 3571A-72A.  She continued to express this view in

2    response to defense counsel's questions, which elaborated on the law governing homicide liability

3    and the imposition of the death penalty.  29 RT 3572A-80A.  When pressed further by the

4    prosecutor, she repeatedly stated that she was unsure whether she could ever impose the death

5    penalty, since it was contrary to her personal beliefs.  29 RT 3581A-95A; *see also* 29 RT 3598A

6    (counsel observes to E.S., "you have said it about thirty times now, and we seem to be saying that

7    we still don't understand you").

8         The court then read to E.S. part of the instructions that the jury would receive at the close

9    of the penalty phase, including the portion of CALJIC 8.84.2 that stated, "If you conclude that the

10   aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of

11   death.  However, if you determine that the mitigating circumstances outweigh the aggravating

12   circumstances, you shall impose a sentence of confinement in the state prison for life without the

13   possibility of parole."  29 RT 3596A-97A.  The court then asked, "having that instruction in

14   mind, would you disregard that instruction and always vote for life imprisonment without

15   possibility of parole?" and E.S. replied, "Yes, I think I would."  29 RT 3597A.  The court

16   reiterated the question, and she reiterated her response.  *Id*.

17        Defense counsel questioned E.S. further.  Although expressing some confusion about the

18   instructions, E.S. reiterated that she "couldn't" conceive of any circumstances in which she could

19   vote for the death penalty; she "cannot" follow the instructions of the court that could lead to the

20   imposition of the death penalty; and finally, "I'm not going to vote in any way for the death

21   penalty."  29 RT 3597A-3601A.  She observed that, after all the voir dire, "we are back where we

22   started from" in terms of the nature of her responses.  29 RT 3601A.

23        On this record, petitioner fails to show that the trial court erred in excusing E.S. under

24   *Witherspoon* and related authority.  Contrary to petitioner's representation, the totality of E.S.'s

25   voir dire responses do not convey that she took issue with the implication of the mandatory

26   imposition of the death penalty in the language of CALJIC 8.84.2.  Rather, she repeatedly, in

27   response to protracted questioning by the court, the prosecutor, and two defense counsel,

28   communicated her unwillingness to impose the death penalty on personal, moral grounds.  Her

1    responses in this regard were even more categorical than those given by other prospective jurors

2    in cases in which the Supreme Court has held a juror properly excused under *Witherspoon*.  *See*

3    *Uttecht*, 551 U.S. at 17-19; *Witt*, 469 U.S. at 416.  Particularly in light of the deference owed to

4    the trial court's assessment of E.S.'s demeanor, the record does not support a finding that the trial

5    court erred in excusing her for bias.

6         The record also does not support petitioner's argument that E.S. was excused on the basis

7    of her responses to questions about CALJIC 8.84.2 specifically.  The responses E.S. gave about

8    her willingness to impose the death penalty were consistent in their content before and after she

9    had CALJIC 8.84.2 read to her, as E.S. herself observed.  *See* 29 RT 3601A.  Petitioner fails to

10   show that the trial court's ruling was unsupported on this basis.

11        Finally, petitioner fails to show that he is entitled to relief because the trial court failed

12   properly to explain the law to her.  *See* ECF No. 421 at 13.  The record demonstrates that the trial

13   court read CALJIC 8.84.2 to E.S., including portions that do not contain the "shall" language, and

14   explained its meaning to her accurately, consistent with the Supreme Court's construction of the

15   instruction.  *See Boyde v. California*, 494 U.S. 370, 377 (1990); 29 RT 3595A-97A, 3600A-01A.

16   Petitioner has not shown either that the trial court committed any error, or that its articulation of

17   the law was incorrect so as to have tainted the voir dire of E.S. and rendered her exclusion from

18   the jury improper.  The undersigned therefore recommends that relief be denied on these

19   allegations.

20                         **ii. Prospective Juror P.R.**

21        Petitioner has also failed to show that the trial court committed constitutional error in

22   excusing prospective juror P.R.  Petitioner argues that P.R. was wrongly excused because she did

23   not evince that she would be substantially impaired in performing her duties as a juror, but rather

24   that she was "pushed" to her responses by the trial court's and the prosecutor's questions,

25   including the court's invocation of the "shall" language of CALJIC 8.84.2 when describing that

26   instruction.  ECF Nos. 421 at 14, 454 at 9.  Review of the totality of P.R.'s voir dire supports the

27   trial court's ruling to dismiss her under *Witherspoon*.  Throughout her voir dire, both before and

28   after the court quoted the portion of CALJIC 8.84.2, P.R. stated that she did not think she would

1  be able to impose the death penalty no matter what the evidence showed and regardless of the

2  instructions.  28 RT 3428A-38A.  She reiterated these answers even in response to defense

3  counsel's extensive efforts to rehabilitate her.  28 RT 3432A-38A.  The record shows no

4  indication that the court or prosecutor pressed P.R. into her position or otherwise acted

5  improperly.  *See* 28 RT 3428A-38A.  Simply put, P.R.'s responses were entirely consistent with

6  excusal under *Witherspoon*, as she repeatedly and clearly communicated that she held "views

7  [that] would prevent or substantially impair the performance of h[er] duties as a juror in

8  accordance with h[er] instructions and h[er] oath."  *Witt*, 469 U.S. at 424.  Petitioner therefore

9  fails to prove his entitlement to relief on subclaim 1 of claim A, and the undersigned recommends

10  that it be denied.

11         **2.  Denials of Defense Challenges for Cause**

12         The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to an

13  impartial jury.  *Ross v. Oklahoma*, 487 U.S. 81, 85-86 (1988); *Witt*, 469 U.S. 412; *Irvin v. Dowd*,

14  366 U.S. 717, 722 (1961); *see also Lockhart v. McCree*, 476 U.S. 162, 184 (1986).  To this end,

15  most jurisdictions, California included, have a statute-based jury selection process that allows the

16  defense and prosecution to challenge prospective jurors for cause and to have prospective jurors

17  excused through each party's exercise of peremptory challenges.  *See* Cal. Civ. Proc. Code

18  §§ 192, 225; *see generally United States v. Martinez-Salazar*, 528 U.S. 304, 310-14 (2000).  If

19  the trial court erroneously denied a defendant's for-cause challenge to a prospective juror, the

20  habeas petitioner must show that he was prejudiced by that ruling, i.e., that the ruling resulted in a

21  biased juror being empaneled.  *Martinez-Salazar*, 528 U.S. at 307.  Consequently, if the petitioner

22  utilized a peremptory challenge to have the prospective juror excused and therefore he or she was

23  not empaneled, petitioner suffered no violation of his constitutional right to an impartial jury.  *Id.*;

24  *Ross*, 487 U.S. at 86, 88.

25         Here, petitioner argues that his rights under the Sixth, Eighth, and Fourteenth

26  Amendments were violated by the trial court's erroneous denials of the defense's challenges for

27  cause to prospective jurors C.B., R.K., R.F., and C.M.  ECF No. 421 at 15-21; *see also* ECF No.

28  203 at 8-12 (listing these individuals by name).  The record demonstrates, however, that none of

1    these persons were selected to serve on petitioner's jury.  *See* 3 CT 710-11.  As such, petitioner

2    cannot show that he suffered any violation of his constitutional rights as a result of the trial

3    court's denials of the defense's challenges for cause of them.  *Martinez-Salazar*, 528 U.S. at 307;

4    *Ross*, 487 U.S. at 86, 88.  I therefore recommend that this subclaim be denied on the merits.

5    **Claim B**

6         In claim B, petitioner alleges that the prosecution violated his rights under the Fifth, Sixth,

7    Eighth, and Fourteenth Amendments by using a jailhouse informant to elicit statements from

8    petitioner outside the presence of his lawyer.  ECF No. 203 at 13-19.  The undersigned concludes

9    that petitioner has not shown entitlement to relief on this claim.

10        **1.  Applicability of Federal Rule of Civil Procedure 56**

11        Petitioner asks to have the court apply Federal Rule of Civil Procedure 56 to this claim, to

12   enable to the court to consider the extra-record evidence offered in support of it.  ECF No. 421 at

13   1.  Respondent opposes the request.  ECF No. 441 at 41 n.20.  Petitioner had previously made the

14   same request, ECF Nos. 397, 402, which the prior magistrate judge denied.  ECF No. 404.

15   Petitioner does not acknowledge this ruling and makes no argument as to why the court should

16   revisit it.  *See* ECF No. 421 at 1, 6, 26-44; ECF No. 454 at 11-18; *see generally Arizona v.*

17   *California*, 460 U.S. 605, 618 (1983) (describing the law of the case doctrine).  The undersigned

18   therefore denies petitioner's request and, consistent with the prior order of the court, shall

19   consider petitioner's arguments for summary judgment as offered in support of his argument that

20   he is entitled to relief on the merits under 28 U.S.C. § 2254.  *See* ECF Nos. 396, 404.

21        **2.  Claim B Fails on the Merits**

22        Under the Sixth Amendment, a criminal defendant has the right to counsel during all

23   critical stages of the adversarial proceeding, which includes interviews by law enforcement or

24   their agents that occur after the initiation of criminal proceedings.  *Massiah v. United States*, 377

25   U.S. 201 (1964).  An agent of the State in this context may include a confidential informant, and

26   the defendant's uncounseled statements to that person cannot be admitted against him at trial

27   where the other party was acting as an agent of the State when he obtained the information from

28   the defendant and the other party had made some effort to "stimulate conversations about the

1   crime charged." *United States v. Henry*, 447 U.S. 264, 271 n.9 (1980); *see also Sanders v.*

2   *Cullen*, 873 F.3d 778, 812 (9th Cir. 2017); *Randolph v. People of the State of Cal.*, 380 F.3d

3   1133, 1144 (9th Cir. 2004).  To prove the first element, the habeas petitioner must show that an

4   agency relationship was created between the informant and members of law enforcement or the

5   prosecution team prior to the elicitation of the statement at issue.  *Henry*, 447 U.S. at 271;

6   *Randolph*, 380 F.3d at 1144; *Brooks v. Kincheloe*, 848 F.2d 940, 945 (9th Cir. 1988).  This

7   agency relationship can exist through an express agreement but may also arise where the

8   prosecutor or law enforcement officer promises a benefit to the informant, such as a promise for

9   leniency or compensation.  *Randolph*, 380 F.3d at 1144.  It may even arise where the prosecutor

10  or officer knew or should have known that the informant expected a benefit and then acted on that

11  expectation, *Randolph*, 380 F.3d at 1144, although no agency relationship is created by the

12  informant's mere expectation of a benefit, without evidence that the relevant prosecutor or officer

13  would have had reason to know of that expectation.  *Hovey v. Ayers*, 458 F.3d 892, 917 (9th Cir.

14  2006).

15          Here, petitioner fails to establish that Mr. Colbert was acting as an agent of the State in

16  petitioner's case when he obtained statements from petitioner to which Mr. Colbert later testified.

17  Per Mr. Colbert's testimony, petitioner made the inculpatory statements at issue to him when they

18  were housed together in the Sacramento County Jail in November and December 1984.  48 RT

19  7847-48, 7871, 7886-88.  Prior to this, Mr. Colbert had acted as an informant in multiple cases

20  aside from petitioner's and was paid for at least some of these activities.  ECF No. 421 at 28-33;

21  ECF No. 421-13 at 7, 12-15, 19, 21-22, 25-27, 29, 60, 62, 121; ECF No. 441, Ex. 2 at 6-41, 48

22  RT 7849-60.  There is evidence that, while Mr. Colbert was in jail and shortly before petitioner's

23  trial, Mr. Colbert had met with Riverside County detective Pingrey on Mr. Colbert's request.

24  ECF No. 421 at 32; ECF No. 421-13 at 67-68.  Petitioner has presented some evidence that, in

25  one of his requests to speak to the detective, Mr. Colbert left him a message indicating that he

26  wanted to "work" for the detective, as he was facing two counts of armed robbery.  ECF No. 421

27  at 32; ECF No. 421-2; *but see* ECF No. 421-13 at 67-70 (Mr. Colbert testifies that he never left

28  this message); ECF No. 441, Ex. 2 at 95-96 (same).  The detective met with him multiple times,

including after Mr. Colbert had been transferred to the Sacramento County Jail.  ECF No. 421 at 32; ECF No. 421-13 at 67-75; 48 RT 7889-95, 7910.

The record before the court contains little to establish whether these meetings occurred before Mr. Colbert obtained the statements at issue from petitioner.  Petitioner has presented evidence that detective Pingrey served a warrant on Mr. Colbert in jail on September 4, 1984, ECF No. 421-1, although that report does not indicate that detective Pingrey personally served or otherwise met with Mr. Colbert that day.  Additionally, of one of his meetings with detective Pingrey, Mr. Colbert testified:

> I think in the process of him coming there, he came to see me at the county jail at the time the trial was going on and I brought it up to him.  I don't think I called him on the phone.  I think when in the process of one of the times he come to Sacramento is when I told him about and he was really concerned about that . . . .
>
> He just said, yeah, he got a warrant out for murder or something, robbing a K-Mart or Target or whatever it was that he robbed and supposed had some killing or murder happen.  And I explain to him, you understand, about how he was talking about that.  You know what I'm saying?  And they was very interested in that.

ECF No. 421-13 at 75-76.  Per petitioner, however, Mr. Colbert's statement "he was talking about that" refers to petitioner's inculpatory statements to Mr. Colbert to which Mr. Colbert later testified, *see* ECF No. 421 at 34, which would temporally have placed this discussion after Mr. Colbert conversed with petitioner about his case.

The record also contains little to establish what Mr. Colbert and detective Pingrey talked about in these meetings.  *See generally* ECF No. 441, Ex. 2.  Mr. Colbert testified, however, that during these meetings, the detective never promised to help him obtain leniency on his pending cases if he assisted in the prosecution of petitioner.  ECF No. 441, Ex. 2 at 77.  When asked if he could have discussed petitioner with detective Pingrey when he was served a warrant in jail on September 4, 1984, Mr. Colbert testified that would have been "impossible" because he had not yet met petitioner at that point.  ECF No. 441, Ex. 2 at 120.

The record also does not show that other members of the investigatory or prosecutorial team had conversations with Mr. Colbert before his conversation with petitioner during which an

72

1    agency relationship was created. According to both Mr. Colbert and the prosecutor, they had no

2    personal contact with one another before Mr. Colbert's trial testimony. 44 RT 6912; 49 RT 7851.

3    The prosecutor's investigator testified he met with Mr. Colbert on December 10, 11, 18, and 20,

4    1984, and January 8, 1985. 47 RT 7668-71. According to Mr. Colbert's testimony, those

5    conversations occurred after he and petitioner had spoken about petitioner's case. 48 RT 7851-

6    55. The prosecution investigator testified that, during his conversations with Mr. Colbert, he did

7    not promise Mr. Colbert anything, and he was unaware of anyone from his office having

8    promised Mr. Colbert anything if he testified against petitioner, although he offered to write a

9    letter to Mr. Colbert's sentencing judge informing the court of Mr. Colbert's willingness to

10   testify, regardless of whether he testified or not. 47 RT 7674-75, 7705. Mr. Colbert also later

11   testified, twice, that no one in the District Attorney's case had promised him anything for his

12   testimony; he did not expect the investigator to write a letter for him; and he did not think a letter

13   from a member of the District Attorney's Office would have been particularly helpful for him. 48

14   RT 7866; ECF No. 441, Ex. 2 at 89-93, 99-100.[12] On January 11, 1985, the prosecutor and his

15   investigator attended Mr. Colbert's sentencing hearing, which was continued. 47 RT 7668-70.

16   Mr. Colbert testified in petitioner's case on January 31, 1985. 48 RT 7847. On February 14,

17   1985, the prosecutor wrote a letter to the probation department stating that Mr. Colbert's

18   testimony had been "vital" to the prosecution's case, but that "[p]rior to his testimony, the only

19   thing Mr. Colbert was told was that his cooperation would be brought to the attention of the Court

20   and the Sacramento County District Attorney's Office." ECF No. 421-12 at 44.

21        In sum, although the evidence demonstrates that Mr. Colbert may have acted as a State

22   agent in other cases, and although he may have initiated contact with the prosecution team with a

23   hope of receiving some benefit, the evidence is silent as to the contents of any meetings between

24   law enforcement officers and Mr. Colbert before Mr. Colbert may have elicited inculpatory

25   statements from petitioner. There is no evidence tending to show that any promises were made to

26

27        _____

          [12] The prosecutor's investigator testified that his conversations with Mr. Colbert primarily
          centered around Mr. Colbert's concerns for his safety should he testify against petitioner. *See* 47
28        RT 7677-7702.

                                                    73

1   Mr. Colbert in these meetings, if they occurred, and no evidence from which the court could

2   conclude that, from those communications, the detective should have known of Mr. Colbert's

3   expectations such that an agency relationship was formed de facto. *See Maine v. Moulton*, 474

4   U.S. 159, 176-77 & n.12 (1985); *Henry*, 447 U.S. at 271; *Randolph*, 380 F.3d at 1144. Although

5   Mr. Colbert may have, internally, desired a benefit from acting as an informant, *see* ECF No. 441,

6   Ex. 2 at 79-80, that desire does not effectuate an agency relationship unless the prosecutor or

7   investigators would have had reason to know of it and acted accordingly. *See Moulton*, 474 U.S.

8   at 176-77 & n.12; *Randolph*, 380 F.3d at 1144; *Brooks*, 848 F.2d at 944-45. Here, there is no

9   evidence of the contents of any conversations between Mr. Colbert and members of law

10  enforcement or the prosecution team before Mr. Colbert obtained petitioner's statements, and

11  therefore nothing in the record to establish such actual or constructive knowledge.

12          Petitioner argues that an agency relationship can be inferred from the circumstantial

13  evidence, particularly the prosecutor's efforts on Mr. Colbert's behalf at sentencing. ECF No.

14  421 at 31-34, 38-40, 42-43. The record does not support this inference, however. The

15  uncontroverted evidence is that neither the prosecutor nor his investigator had had any contact

16  with Mr. Colbert before Mr. Colbert elicited statements from petitioner. *See* 44 RT 6912; 47 RT

17  7668-71; 49 RT 7851. There is no evidence that anyone else conveyed promises of benefits, or

18  anything else, on the prosecutor's behalf before Mr. Colbert spoke to petitioner. Even after his

19  December 1984 and January 1985 meetings with the prosecutor's investigator, Mr. Colbert still

20  did not believe any promise of benefit had been made to him. 48 RT 7866. Simply, there is

21  nothing permitting the court to deduce that the prosecutor's February 1985 letter to Mr. Colbert's

22  sentencing judge was made pursuant to overt or implicit promises that a member of the

23  prosecution or law enforcement team had made to Mr. Colbert before November 1984. *See*

24  *Henry*, 447 U.S. at 270; *Brooks*, 848 F.2d at 945

25          For all of these reasons, petitioner has failed to prove that an agency relationship was

26  created between Mr. Colbert and law enforcement or the prosecution such that Mr. Colbert's

27  engaging petitioner in conversation about his case implicated petitioner's Sixth Amendment

28  rights. *See Henry*, 447 U.S. 264; *Massiah*, 377 U.S. 201. Because this is an essential element of

1  the claim for relief, *see id.*, the claim fails, and the undersigned recommends that it be dismissed.

2  **Claim C**

3      In claim C, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

4  Amendments were violated by the prosecutor's presentation of the false testimony of Billy

5  Colbert and by the prosecutor making false arguments to the court and jury.  ECF No. 203 at 19-

6  24.  In his merits briefing, he specifies that the prosecutor knowingly presented on direct

7  examination Mr. Colbert's false testimony wherein Mr. Colbert omitted parts of his own criminal

8  history, testified that he was not a violent person, and testified that he had not used a real firearm

9  in committing crimes.  ECF No. 421 at 47-54.  He argues that, due to the prosecutor's

10 presentation of Mr. Colbert's false testimony, he is entitled to a reversal of his guilt and penalty

11 judgments.  ECF No. 203 at 24; ECF No. 421 at 54-57; *see also* ECF No. 454 at 18-21.[13]  For the

12 reasons set forth below, the undersigned recommends that this claim be denied.

13      **1.  Legal Standard**

14      A criminal defendant's due process rights under the Fourteenth Amendment are violated if

15 he is convicted "through use of false evidence."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see*

16 *also United States v. Agurs*, 427 U.S. 97 (1976) ("[A] conviction obtained by the knowing use of

17 perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable

18 likelihood that the false testimony could have affected the judgment of the jury."); *Giglio v.*

19 *United States*, 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors by the

20 presentation of known false evidence is incompatible with 'rudimentary demands of

21 justice.'"); *Miller v. Pate*, 386 U.S. 1, 7 (1967) ("[T]he Fourteenth Amendment cannot tolerate a

22 state criminal conviction obtained by the knowing use of false evidence.").  To obtain a reversal,

23 "the petitioner must show that (1) the testimony [or evidence] was actually false, (2) the

24 prosecution knew or should have known that the testimony [or evidence] was actually false, and

---

25      [13] In his merits briefing, petitioner makes no argument in support of and therefore

26 abandons the allegations comprising subclaims 1(c), 1(d), 1(e), 1(g), 1(h), 1(i), 1(j), 1(k), 2(a),
   2(b), 2(c), and 2(d) of claim C.  *See Kates*, 776 F.2d at 1397.  He briefly mentions in his merits

27 brief that the prosecutor improperly vouched for Mr. Colbert's credibility, ECF No. 421 at 44-45,
   but makes no argument that this occurrence, if indeed it took place, entitles him to relief in any

28 way.  *See generally id.* at 44-57.

1    (3) that the false testimony [or evidence] was material." *Hein v. Sullivan*, 601 F.3d 897, 908 (9th

2    Cir. 2010), *cert. denied*, 563 U.S. 935 (2011); *see Napue*, 360 U.S. at 269; *see also United States*

3    *v. Bagley*, 473 U.S. 667 (1985) ("[T]he knowing use of false testimony to obtain a conviction

4    violates due process regardless of whether the prosecutor solicited the false testimony or merely

5    allowed it to go uncorrected when it appeared."); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). Each

6    element of the test must be satisfied with competent evidence before a reversal may be granted.

7    *See Sanders v. Cullen*, 873 F.3d 778, 801 (9th Cir. 2017) (affirming denial of *Napue* claim when

8    the petitioner "did not support the claim that [the witness] lied or that the prosecution knew his

9    testimony was false"), *cert. denied*, 139 S. Ct. 778 (2019).

10    **2. Discussion**

11    Petitioner identifies three specific aspects of Mr. Colbert's testimony that were false, and

12    on which he premises his claim for relief. First, he argues that when Mr. Colbert testified he had

13    been convicted of "forgery, forgery, forgery, forgery, forgery, forgery, embezzlement, robbery,

14    robbery," 48 RT 7866, he misleadingly failed to include his additional convictions for "battery of

15    a police officer, felony drug sale, prison escape, felony grand theft, promoting prostitution, and

16    the possession and use of firearms," and that the prosecutor knew or should have known of these

17    additional convictions. ECF No. 421 at 47. Relatedly, petitioner argues that, when defense

18    counsel cross-examined Mr. Colbert on whether one of his robbery charges included a firearms

19    enhancement, Mr. Colbert falsely testified that it did not, and the prosecutor improperly allowed

20    this testimony to go uncorrected. ECF No. 421 at 49. Second, petitioner argues that Mr.

21    Colbert's testimony that he was "not a violent person," 48 RT 7867, was also false, as evidenced

22    by crimes of violence of which Mr. Colbert had been convicted and which he had been witnessed

23    perpetrating. ECF No. 421 at 47-51. Finally, petitioner argues that Mr. Colbert testified falsely

24    that he committed "robberies, but, you know, toy guns, I never use a loaded weapon in my li[f]e,

25    and never will." 48 RT 7867. Per petitioner, this was false because, at the time of Mr. Colbert's

26    testimony, Mr. Colbert had been convicted of offenses that included proof of his use of a firearm

27    in their commission. ECF No. 421 at 49-51. Given the specific record in this case of the

28    evidence that the jury did hear, petitioner fails to make out a claim of prejudicial constitutional

76

1  error.

2      **a.  Testimony Concerning Mr. Colbert's Past Arrests and Convictions**

3      The record demonstrates that the portion of Mr. Colbert's testimony cited by petitioner

4  concerning Mr. Colbert's criminal history was sufficiently misleading so as to be false within the

5  meaning of *Napue*.  Testimony that is misleading, even if "technically correct," is considered

6  false under *Napue*.  *Bagley*, 473 U.S. at 683-84; *see also Alcorta v. State of Tex.*, 355 U.S. 28, 31

7  (1957) (per curiam) (holding that the prosecutor violated the defendant's due process rights by

8  eliciting testimony that was misleading, although strictly true); *Panah v. Chappell*, 935 F.3d 657,

9  664 (9th Cir. 2019) (*Napue* bars prosecution from presenting evidence that is false or misleading);

10  *Phillips v. Ornoski*, 673 F.3d 1168, 1184 (9th Cir. 2012), *as amended on denial of reh'g and*

11  *reh'g en banc* (May 25, 2012) (prosecutor committed *Napue* violation by eliciting testimony that

12  gave a false impression, although technically true); *Bragan v. Morgan*, 791 F. Supp. 704, 713

13  (M.D. Tenn. 1992) (collecting cases).

14      Here, the record reflects, and respondent does not dispute, *see* ECF No. 441 at 85, that Mr.

15  Colbert testified incompletely when he listed his felony convictions and arrests as encompassing

16  six counts of forgery, two counts of robbery, and embezzlement, *see* 48 RT 7866, since this list

17  omitted, at least, convictions for sale of marijuana, grand theft, issuing checks with insufficient

18  funds, and escape; and an arrest in Los Angeles for assault.  *See* 48 RT 7869, 7882, 7891, 7928.

19  To the extent that Mr. Colbert's testimony suggested he had presented an exhaustive list of his

20  arrests and convictions, it was misleading and therefore false under *Napue*.

21      In order for the presentation of false evidence to violate a defendant's due process rights,

22  the prosecution must have had actual or constructive knowledge of the evidence's falsity.  *Napue*,

23  360 U.S. at 269 ("it is established that a conviction obtained through use of false evidence, known

24  to be such by representatives of the State, must fall under the Fourteenth Amendment"); *see also*

25  *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025).  Here, petitioner has shown that the prosecutor

26  knew or should have known that Mr. Colbert's testimony listing his criminal arrests and

27  convictions was incomplete and misleading, given that it was contradicted by the rap sheet of Mr.

28  Colbert that was in the prosecutor's actual possession.  Indeed, the record indicates that, at the

1    time of Mr. Colbert's direct examination by the prosecutor, the prosecutor had in his possession

2    Mr. Colbert's rap sheet that indicated the latter had been convicted of grand theft, issuing checks

3    with insufficient funds, and escape.  *See* 48 RT 7874, 7879, 7882, 7928; *cf.* 44 RT 6911-12.

4    Thus, the prosecutor had an obligation under *Napue* to correct Mr. Colbert's misleading

5    testimony.  *See Napue*, 360 U.S. at 269.  The undersigned addresses the materiality of this failure

6    *post*.

7              **b.  Testimony Concerning May 11, 1982 Robbery**

8              Petitioner has also shown that Mr. Colbert testified falsely when, on cross-examination, he

9    testified that there had been no firearm enhancement to his conviction in Riverside County for a

10   robbery that occurred on May 11, 1982.  ECF No. 421 at 49.  Petitioner has tendered a probation

11   report from that offense indicating that Mr. Colbert pled guilty to the charge and "admitted . . .

12   the special allegation of being armed with a revolver" during the commission of the offense.  ECF

13   No. 421-7, Ex. C-4, at 1-2.  Mr. Colbert's testimony was therefore false on this point.

14             Petitioner has not, however, demonstrated that the prosecutor knew or should have known

15   of this falsehood.  Petitioner has presented no evidence that the prosecutor had actual knowledge

16   of this offense and its enhancement.  *See generally* ECF NO. 421 at 49.  Petitioner also fails to

17   show that the prosecutor had constructive knowledge of the testimony's falsity.  Generally, the

18   prosecutor's constructive knowledge extends to other members of the prosecution team working

19   on the defendant's case and other prosecutors in the same office.  *See Giglio*, 405 U.S. at 154-55

20   (holding *Napue* violated where prosecutor failed to correct false testimony that disavowed

21   promises made by another prosecutor); *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008)

22   (holding defendant's due process rights violated under *Napue* by prosecutor's failure to correct

23   false and misleading testimony about promises made by the investigating police and sheriff's

24   department, despite prosecutor's lack of personal knowledge).  Petitioner cites no authority—nor

25   is the undersigned aware of any—that would extend the prosecution's constructive knowledge to

26   encompass the probation department of another county, and information gathered during their

27   work on an unrelated case.  *See generally id*.  Petitioner has therefore failed to prove this element

28   of *Napue*'s standard for this subclaim.  *See Napue*, 360 U.S. at 269.

                                                        78

1

### c. Testimony That Mr. Colbert Was Not Violent

2
Petitioner has demonstrated that Mr. Colbert testified misleadingly when he testified that

3
he was "not a violent person." 48 RT 7867.  Although respondent describes this as opinion

4
testimony that intrinsically cannot be false if Mr. Colbert subjectively believed it, *see* ECF No.

5
441 at 97, in its overall context, this testimony was misleading so as to constitute false testimony

6
under *Napue*.  Mr. Colbert's description of himself as non-violent came on the heels of his

7
incomplete list of his arrests and convictions, which he had omitted, most notably, his recent

8
arrest for assault on a police officer.  When Mr. Colbert asserted that he was non-violent, he

9
completed that sentence by describing how he had conducted the robberies he had committed.  48

10
RT 7867 (". . . I'm not a violent person either, I pull robberies, but, you know, toy guns, I never

11
use a loaded weapon in my li[f]e, and never will.").  Hence, Mr. Colbert's descriptor of himself as

12
not violent did not so much suggest his self-assessment of his internal character as it implied that

13
he had not committed violent acts or utilized violence in committing crimes.  Given, however,

14
that he had recently been arrested for assault, his testimony on this point was misleading and as

15
such false under *Napue*.  *See Bagley*, 473 U.S. at 683-84.

16
Petitioner has not shown, however, that the prosecutor knew or should have known that

17
Mr. Colbert was testifying falsely when he described himself as non-violent.  Petitioner argues

18
that the prosecutor must have known that Mr. Colbert's testimony was false, because the

19
prosecutor knew that he had been convicted of crimes with firearm use allegations, because Mr.

20
Colbert recently had an assault arrest, and due to the details of some of Mr. Colbert's offenses.

21
ECF No. 421 at 48-54.  Petitioner has not shown that the prosecutor had actual or constructive

22
knowledge of these facts.  Petitioner has presented no evidence that, at the time of Mr. Colbert's

23
testimony, the prosecutor knew or should have known about violent details of some of Mr.

24
Colbert's crimes of conviction.  *See id.*  Petitioner has presented no evidence that, at the time of

25
Mr. Colbert's direct examination, the prosecutor had actual or constructive knowledge of Mr.

26
Colbert's recent arrest in Los Angeles for assault, let alone the details of that offense.[14]  *See id.*

27

28
[14] Although the record demonstrated that a District Attorney investigator interviewed Mr. Colbert approximately two months before the latter's testimony, *see* 47 RT 7667-68, that

1  Finally, the fact that Mr. Colbert had been found to have used a firearm in some of his offenses

2  did not, itself, demonstrate that he had used violence during those occurrences.  *See generally*

3  *People v. Aranda*, 63 Cal. 2d 518, 532-33 (1965) (under California law at the time, mere

4  brandishing sustained a firearm use finding).

5      **d.  Testimony About Mr. Colbert's Firearms Use**

6      Petitioner has not demonstrated that Mr. Colbert testified falsely when he testified, "I pull

7  robberies, but, you know, toy guns, I never use a loaded weapon in my li[f]e, and never will."

8  *See* 48 RT 7867.  Petitioner argues that this is false as evidenced by his convictions for robbery

9  with an enhancement for use of a firearm, in 1982, 1983, and 1984.  ECF No. 421 at 49-52.  The

10  evidence adduced by petitioner, however, does not show that Mr. Colbert's testimony was false.

11  At the relevant time, California law held that a firearm enhancement could be proven by

12  circumstantial evidence that the weapon appeared to be real and operable, regardless of whether it

13  actually was.  *See People v. Jackson*, 92 Cal. App. 3d 899, 900-03 (1979) (upholding firearm

14  enhancement where defendant brandished a gun at witnesses, but at trial proved the gun had been

15  inoperable at the time); *People v. Norton*, 80 Cal. App. 3d Supp. 14, 25-26 (1978) (holding

16  unloaded gun constituted a "firearm" for the purposes of the enhancement); *Aranda*, 63 Cal. 2d at

17  533 (holding that jurors "may draw an inference from the circumstances surrounding the robbery

18  that the gun was not a toy" so as to sustain a use of a firearm finding); *cf.* 49 RT 8164-67 (on

19  cross-examination, Mr. Colbert testifies that his firearm enhancements were based on his use of a

20  pellet gun and an inoperable gun).  Ergo, Mr. Colbert's testimony that he had only used toy guns

21  and unloaded weapons in his past crimes was not rendered false by the mere fact of his having

22  pled guilty to, or having been found culpable of, firearm use allegations.

23      **e.  Materiality and Prejudice**

24      Where the prosecutor has knowingly allowed false or misleading testimony to go

25  ─────────────

26  interview occurred at a Sacramento County jail, *see ibid.*, 48 RT 7094, after Mr. Colbert had been
    transferred there from Los Angeles County.  *See* 48 RT 7871, 7895-98, 7904.  The record

27  contains no evidence that the prosecution investigator knew or had reason to know of the Los
    Angeles charges or transfer at the time of his direct examination of Mr. Colbert.  *See generally* 44

28  RT 6891-6914; 47 RT 7668-7706; 48 RT 7929-33, 7936-37.

1  uncorrected, the petitioner is entitled to relief "if there is any reasonable likelihood that the false

2  testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97,

3  103-04 (1976) (collecting cases); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972).

4  Materiality is considered in the context of the total body of evidence the jury heard. *See Glossip*,

5  604 U.S. at 248; *Dickey v. Davis*, 69 F.4th 624, 644-45 (9th Cir. 2023); *Heishman v. Ayers*, 621

6  F.3d 1030, 1035 (9th Cir. 2010).

7      The Court of Appeals has also recognized that, even where the prosecution unknowingly

8  presents false evidence and therefore the claim does not meet the standard for reversal under

9  *Napue*, a petitioner is nevertheless entitled to a new trial if he can show that "there is a reasonable

10  probability that [without the evidence] the result of the proceeding would have been different."

11  *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994) (citing *United States v. Endicott*,

12  869 F.2d 452, 455 (9th Cir.1989) and *United States v. Bagley*, 473 U.S. 667, 678-80 (1985)).

13  This is a more stringent prejudice standard than the *Napue* materiality standard. *See Jackson v.*

14  *Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008); *Endicott*, 869 F.2d at 455.

15      Here, petitioner has shown that the prosecutor knowingly presented misleading testimony

16  from Mr. Colbert describing the latter's list of convictions and arrests, implicating the *Napue*

17  materiality standard. Petitioner has also shown that Mr. Colbert testified falsely when he denied a

18  firearms enhancement to one of his convictions and misleadingly when he testified that he was

19  not violent, although petitioner has failed to show that the prosecutor had actual or constructive

20  knowledge that these were false. The possible prejudice of these latter two instances of testimony

21  are considered under the *Bagley* standard. *See Jackson*, 513 F.3d at 1076; *Young*, 17 F.3d at

22  1203. Thus, the undersigned considers first whether relief is merited under *Napue* for Mr.

23  Colbert's testimony concerning his criminal record and, if not, whether the cumulation of all

24  instances of false testimony—that which petitioner has shown the prosecutor was aware and those

25  for which no such showing has been made—prejudiced him under the more rigorous *Bagley*

26  standard. *See Jackson*, 513 F.3d at 1076. The undersigned concludes that petitioner has not

27  shown his entitlement to relief under these standards, given the totality of evidence presented to

28  the jury.

1    To be sure, the fact that Mr. Colbert testified to petitioner's purported confession weighs

2    in favor of finding materiality under *Napue* or, alternatively, prejudice under *Bagley*. Evidence

3    that the defendant confessed "is like no other evidence. Indeed, . . . [it] is probably the most

4    probative and damaging evidence that can be admitted against" a criminal defendant. *Arizona v.*

5    *Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40

6    (1968) (White, J., dissenting)). Moreover, a juror is likely to give evidence of the defendant's

7    confession particular weight where, as here, the other evidence connecting the defendant to the

8    crime was circumstantial. *See Hayes v. Brown*, 399 F.3d 972, 986 (9th Cir. 2005).

9    Even taking this into account, however, the totality of the record does not support a

10    finding of materiality under *Napue* or of prejudice under *Bagley*. Although Mr. Colbert testified

11    on direct examination to the false and misleading statements identified herein, all of which relate

12    to details of his past criminal acts, the jury was later thoroughly apprised both of the scope of Mr.

13    Colbert's past criminality and of the fact that he had misrepresented in his testimony the specific

14    details on which this claim is premised. On cross-examination, defense counsel questioned Mr.

15    Colbert at length about his criminal history, in the course of which eliciting from him the criminal

16    history, including his recent assault arrest in Los Angeles County, which Mr. Colbert had omitted

17    on direct examination. 48 RT 7870-7913, 7928; 49 RT 8162-67. Defense counsel further elicited

18    on cross-examination that several of his past charges had included the use of a firearm or

19    allegations of the same. 48 RT 7871-73, 7886-88; 49 RT 8165-67.

20    Defense counsel then called as a rebuttal witness the court reporter who had reported the

21    proceedings for Mr. Colbert's trial for robbery in Sacramento County. 49 RT 8169-70. The

22    reporter read into the record Mr. Colbert's testimony from the robbery trial, wherein he had

23    testified that he had not committed the robbery and had not brandished a gun at the clerk in the

24    store that was robbed. 49 RT 8174-75. Defense counsel then recalled Mr. Colbert—who had

25    been present in the courtroom for the court reporter's read-back of his testimony—and asked

26    about the fact that, in his robbery trial, Mr. Colbert had testified that he did not commit the

27    robbery or brandish gun on anyone, but just a few minutes prior, in the instant trial, Mr. Colbert

28    testified to the contrary, that he did commit the robbery and had brandished a pellet gun during it.

82

1    49 RT 8179.  Counsel asked Mr. Colbert, "on which of those two occasions that you testified both

2    under oath were you telling the truth?" and Mr. Colbert indicated that he had been testifying

3    falsely in his robbery trial, explaining "I was on trial.  I was defending myself.  Surely you

4    wouldn't expect me to set up and tell the jury I had a gun in my hand.  I am on trial.  That's just

5    common sense."  49 RT 8179.

6         Defense counsel then called a second rebuttal witness, William Teller, who had been

7    incarcerated with Mr. Colbert for the previous five months.  50 RT 8197-8227.  Mr. Teller

8    testified that Mr. Colbert had asked him for information about petitioner's case because Mr.

9    Colbert intended to lie about petitioner confessing in an effort to get a reduced sentence in his

10   own robbery case.  50 RT 8199-8201, 8210-13.  The defense called a third rebuttal witness,

11   Glenn Cornwell, who was also housed with Mr. Colbert and petitioner at the jail, who testified

12   that petitioner had often spoken about the details of his trial with Mr. Colbert and himself, but

13   petitioner had never confessed to the crimes during these conversations.  50 RT 8228-74.

14        Given this record, there is no showing of materiality under *Napue* or prejudice under

15   *Bagley*.  Mr. Colbert was so thoroughly impeached on his criminal history, his use of firearms

16   during his past crimes, and his having minimized both on direct examination, that any further

17   impeachment in the form of the prosecutor also correcting Mr. Colbert on these points would

18   have been merely cumulative.  *See, e.g.*, *Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010);

19   *United States v. Manning*, 56 F.3d 1188, 1198 (9th Cir.1995); *United States v. Rewald*, 889 F.2d

20   836, 860-61 (9th Cir. 1989), *amended*, 902 F.2d 18 (9th Cir. 1990); *United States v. Polizzi*, 801

21   F.2d 1543, 1550-51 (9th Cir. 1986).  Put differently, the jury had before it ample reason to

22   disbelieve Mr. Colbert's testimony, as a result of defense counsel's exceptional efforts to impeach

23   him, but nonetheless convicted petitioner; petitioner offers no reason why the prosecutor's bare

24   correction of the three statements at issue here would have had a more persuasive effect than the

25   elaborate, protracted impeachment that the jury heard.  *See United States v. Renzi*, 769 F.3d 731,

26   752 (9th Cir. 2014) (no materiality where "defense counsel effectively attacked the credibility of

27   [the witnesses at issue] on cross-examination"); *cf. Dickey v. Davis*, 69 F.4th 624, 644-45 (9th

28   Cir. 2023) (*Napue* materiality shown where jury had not learned that witness had lied in his direct

1    examination).  On this basis, therefore, petitioner fails to prove his entitlement to relief, and the

2    undersigned recommends that claim C be denied.

3    **Claim D**

4          In claim D, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

5    Amendments were violated by the prosecutor's failure to disclose evidence that was material and

6    favorable to petitioner on guilt and penalty.  ECF No. 203 at 24.  In his merits briefing, he

7    abandons all subclaims to this claim, save subclaim 1(b), wherein he alleges that the prosecutor

8    failed to disclose Mr. Colbert's status as a police agent at the time he questioned petitioner;

9    subclaim 1(c), wherein he alleges that the prosecutor failed to disclose Mr. Colbert's full criminal

10    history; and subclaim 2, wherein he alleges that the prosecutor failed to disclose the identity of a

11    confidential informant, who possessed information exculpatory to petitioner on guilt.  ECF No.

12    203 at 24-27; ECF No. 421 at 57-62; ECF No. 447 at 1-4.  The undersigned concludes that

13    petitioner has not demonstrated his entitlement to relief on this claim and recommends that it be

14    denied.

15        **1.  Legal Standard**

16          Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecutor is required to disclose to a

17    criminal defendant all evidence favorable to the accused, which is material to guilt or penalty.

18    "To establish a *Brady* violation, a defendant must show that: (1) the evidence at issue is favorable

19    to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was

20    suppressed by the government, regardless of whether the suppression was willful or inadvertent;

21    and (3) the evidence is material to the guilt or innocence of the defendant."  *United States v.*

22    *Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013) (*citing Brady*, 373 U.S. at 87).

23        **2.  Discussion**

24            **a.  Subclaim 1(b)**

25          In subclaim 1(b) of claim D, petitioner argues that the prosecutor improperly failed to

26    disclose to the defense the "agency relationship" between Mr. Colbert and the prosecution,

27    relying on the same evidence on which he relies in claim B.  ECF No. 421 at 57-61.  Because the

28    undersigned concludes that petitioner has not shown that an agency relationship existed, *see ante*,

1   petitioner fails to prove that this information was wrongly suppressed by the state.  *See generally*

2   *Brady*, 373 U.S. at 87.  Accordingly, the undersigned recommends subclaim 1(b) be denied.

3       **b.  Subclaim 1(c)**

4       Petitioner also fails to prove his allegations comprising subclaim 1(c).  Petitioner argues

5   that the record shows that the prosecutor improperly "failed to disclose accurate and complete

6   information about Colbert's criminal history and his use of firearms."  ECF No. 421 at 62

7   (incorporating arguments of claim C).  In his merits brief, he identifies several incidents in Mr.

8   Colbert's criminal history, *see* ECF No. 421 at 48-54, 62, but petitioner fails to demonstrate that

9   the prosecutor had actual or constructive knowledge of these incidents and, if he did, that he

10  failed to disclose information about them to petitioner.  *See id.*; *see generally Brady*, 373 U.S. at

11  87.

12      In his reply brief, petitioner additionally argues that the prosecutor suppressed Mr.

13  Colbert's full criminal history by initially only providing to defense counsel a criminal history

14  report that dated May 1977.  ECF No. 454 at 21; *see* ECF No. 441 at 90-91; 49 RT 7957.  The

15  record appears to reflect this, but the record also appears to reflect—and petitioner does not

16  dispute—that the prosecutor produced to the defense the criminal history information for Mr.

17  Colbert that was in the prosecutor's actual possession.  *See* 44 RT 6904-13, 47 RT 7675-76, 7700;

18  48 RT 7874, 7878-79; 49 RT 7957-61; *see* ECF No. 454 at 21 (citing ECF No. 441 at 89-91).

19  Petitioner has not demonstrated that more complete information was in the constructive

20  possession of the prosecutor at any time prior to the defense receiving it, by virtue of such

21  information being known by a member of the prosecution or investigation team.  *See Kyles v.*

22  *Whitley*, 514 U.S. 419, 438 (1995); *United States v. Price*, 566 F.3d 900, 909 (9th Cir. 2009).

23  Rather, the record indicates that both the defense and prosecutor received copies of Mr. Colbert's

24  pre-May 1977 rap sheet from the probation department, which provided it to the parties on the

25  order of the trial court, upon the unopposed motion of the defense.  *See* 49 RT 7957-63.[15]  That

26  

27      [15] The record shows that the trial court ordered that the rap sheet be provided to both
    parties.  49 RT 7957-63.  The record does not reveal when it was provided to the parties, but
    given that defense counsel subsequently examined Mr. Colbert about his criminal history without
28  further objection on this issue, *see* 49 RT 8162-67, and absent any indication to the contrary, the

1    motion had been made by the defense after Mr. Colbert's testimony indicated that he had had

2    arrests and convictions before May 1977; nothing in the record, or elsewhere cited by petitioner,

3    demonstrates that the prosecutor had actual or constructive knowledge of those arrests and

4    convictions prior to Mr. Colbert's testimony.  *See* ECF No. 454 at 21 (citing ECF No. 441 at 90-

5    91); *see generally* 44 RT 6891-6914; 49 RT 7958-60.  Although the probation office apparently

6    had obtained the report at some point prior, *Brady* does not impute to the prosecution the

7    knowledge of the probation office.  *See United States v. Zavala*, 839 F.2d 523, 528 (9th Cir.

8    1988).  Accordingly, petitioner has not shown his entitlement to relief on subclaim 1(c).

9             **c.  Subclaim 2**

10            In subclaim 2 of claim F, petitioner argues that the prosecution improperly suppressed

11   information that was exculpatory and material, which had been provided by a criminal informant

12   to law enforcement investigators.  ECF No. 447 at 1-4.  Petitioner has made no showing,

13   however, that this information was withheld from him at the time of trial, *see id.*, and provides no

14   response to respondent's argument that this omission is fatal to the claim.  ECF Nos. 454 at 22-

15   24, 465; *see* ECF No. 448 at 1-5.  Because petitioner has failed to prove an essential element of

16   this subclaim—that the information at issue was actually suppressed—this subclaim must be

17   denied.  *See generally Brady*, 373 U.S. at 87.

18            **3.  Conclusion**

19            For the reasons stated herein, the undersigned recommends that claim D be denied on the

20   merits in its entirety.

21   **Claim E**

22   [UNDER SEAL]

23   **Claim F**

24            In claim F, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

25   Amendments were violated by the prosecutor's delay in providing discovery, failure to provide

26   discovery, and misrepresentations during discovery.  ECF No. 203 at 30-36.  In his briefing, he

27   ─────────────────

28   court presumes the trial court's order was obeyed.

1    argues that he is entitled to guilt- and penalty-phase relief due to, specifically, the prosecutor's

2    representations concerning witness Villaron; failure to provide notice of its intent to call witness

3    Colbert; failure to provide discovery concerning the husband of witness Gomez; failure to provide

4    discovery related to an interview between witnesses Wingo and Rauch; and failure to timely

5    produce discovery of the jailhouse notes attributed to petitioner and his co-defendants.  ECF No.

6    421 at 62-77.[16]  The undersigned concludes that petitioner has not shown his entitlement to relief

7    on this claim and recommends that it be denied.

8        **1.  Legal Standard**

9        The due process clause of the Fourteenth Amendment guarantees criminal defendants "a

10   meaningful opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479,

11   485 (1984).  From this guarantee flows the requirement that prosecutors disclose exculpatory

12   evidence that is material to guilt or punishment, *see id*.; *Brady*, 373 U.S. 83 (1963), and that the

13   State give the defendant notice of the charges against him.  *In re Ruffalo*, 390 U.S. 544 (1968);

14   *Cole v. Arkansas*, 333 U.S. 196 (1948); *see Gray v. Netherland*, 518 U.S. 152, 168, (1996).  The

15   Supreme Court, however, has never held that the due process clause requires that the prosecution

16   give the defendant any particular notice of the evidence that it intends to use against him.  *Gray*,

17   518 U.S. at 166-71 (holding that this claim fails as a new rule of constitutional law under *Teague*,

18   where the prosecution had misled the defense by falsely stating that it would not introduce

19   particular evidence at trial); *see also Weatherford v. Bursey*, 429 U.S. 545, 559-61 (1977)

20   (surprise testimony of undercover agent accomplice did not violate due process even though agent

21   had told the defendant and his counsel that he would not testify).  Rather, a defendant's due

22   process rights would only be violated if the prosecutor's actions rendered the trial fundamentally

23   unfair.  *Estelle*, 502 U.S. at 67-68; *see also Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995).

24       Petitioner argues that his Fourteenth Amendment due process rights were implicated

25   because he possessed a liberty interest in the State "follow[ing] its own death penalty

26

27       [16] In his amended petition, petitioner raises additional allegations and subclaims in support
         of this claim, which he makes no argument to advance in the pending briefing and therefore has
28   abandoned.  *See Kates*, 776 F.2d at 1397.

1  procedures." ECF No. 421 at 76 (citing *Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993),

2  and *Ballard v. Estelle*, 937 F.2d 453, 456 (9th Cir. 1991)). Generally, "federal habeas corpus

3  relief does not lie for errors of state law," *Estelle*, 502 U.S. at 67 (collecting cases), and "it is not

4  the province of a federal habeas court to reexamine state-court determinations on state-law

5  questions." *Id.* at 67-68. The Supreme Court has recognized, however, that certain state statutes

6  generate a liberty interest by creating an expectation in the populace that they may only be

7  deprived of liberty for the reasons and in the manner established by the statute. *Hicks*, 447 U.S.

8  at 346; *Vitek v. Jones*, 445 U.S. 480, 488 (1980). To obtain habeas relief on such a claim, a

9  petitioner would have to show that (1) state law was violated, (2) the relevant state statute had

10  created a liberty interest in which he had a federal due process right, and (3) the violation of the

11  state law served to arbitrarily deny petitioner his liberty so as to violate his Fourteenth

12  Amendment due process rights. *Hicks*, 447 U.S. at 345-47. In conducting this analysis, the

13  federal court must defer to the state court's interpretation of state law, *Bradshaw*, 546 U.S. at 76;

14  *Estelle*, 502 U.S. at 67-68, and must presume that the state court's factual findings are correct.

15  *See Sumner v. Mata*, 455 U.S. 591, 591-92 (1982).

16      **2. Discussion**

17          **a. Petitioner Fails to Prove a Constitutional Violation**

18      As noted, petitioner's theory for relief is that California discovery statutes and the trial

19  court's discovery orders created a liberty interest for him, such that the prosecutor violated his

20  due process rights by violating those orders.[17] ECF Nos. 421 at 76-77, 454 at 25. The

21  undersigned concludes that petitioner has not shown that his due process rights were violated.

22      Petitioner cites no authority that a state discovery statute, or a state court's discovery order

23  made pursuant to its statutory authority, creates a liberty interest, such that its violation

24  effectuates a denial of due process. The undersigned is aware of no authority recognizing such a

---

26  [17] Petitioner also briefly argues that his constitutional right to confrontation of witnesses
    was violated, but he offers no authority nor explanation for this theory. *See generally Crawford*

27  *v. Washington*, 541 U.S. 36 (2004) (holding Confrontation Clause satisfied where defendant had
    opportunity to cross-examine witnesses against him). He therefore has not shown his entitlement

28  to relief on this basis. *See Townsend*, 372 U.S. at 312.

1   constitutionally protected liberty interest.  Petitioner cites two cases in support of his argument,

2   but both dealt with the inapposite situation of a state failing to follow its own sentencing laws

3   when sentencing a defendant.  In *Fetterly*, 997 F.2d 1295, the trial judge sentenced the defendant

4   to death after failing to weigh the mitigating and aggravating factors in the manner directed by

5   state statute.  Holding that this statute created a liberty interest for the defendant, the Court of

6   Appeals observed that the statute went to "the very core" of the determination of who would be

7   sentenced to death, having been enacted for "the very purpose" of effectuating the narrowing

8   required by *Furman*.  *Fetterly*, 997 F.2d at 1300.  The court further observed that the Supreme

9   Court had held that, in capital sentencing, "[w]hen the weighing process itself has been skewed,

10  only constitutional harmless error analysis or reweighing at the trial or appellate level suffices to

11  guarantee that the defendant received an individualized sentence," further reinforcing the

12  conclusion that violation of the statute was of constitutional dimension.  *Id.* at 1301.  For these

13  reasons, the court concluded that petitioner had a liberty interest, to which due process rights

14  attached, in only being sentenced to death in accordance with the process set forth by the statute.

15  *Id.* at 1300-01.

16          Petitioner also cites *Ballard v. Estelle*, 937 F.2d 453, 456 (9th Cir. 1991).  There, the

17  Court of Appeals similarly acknowledged that a defendant has a liberty interest in being

18  sentenced in accordance with state sentencing statutes, so that, if the state court misapplies its

19  own sentencing law, the defendant's due process rights are violated.  *See also Wasko v. Vasquez*,

20  820 F.2d 1090, 1091 n.2 (9th Cir. 1987) ("Since Wasko has a liberty interest in the correct

21  sentence of eight months, it was a due process violation to order him to a full two-year term.").

22          These cases fail to demonstrate that a state discovery statute, or a state trial court's

23  discovery order, alone creates a liberty interest within the meaning of the due process

24  jurisprudence.  In the cases on which petitioner relies, the statutes at issue had plain and direct

25  relationships to defendants' exposure to greater sentences than would otherwise be authorized.

26  Discovery rules, however, have never been recognized to generate such a liberty interest; rather,

27  the Supreme Court has explained, discovery rules are part of the process created to vindicate a

28  liberty interest.  *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67, (2009); *cf.*

89

1    *Gray*, 518 U.S. at 166-71; *Weatherford*, 429 U.S. at 559-61.  Petitioner's due process claim fails,

2    therefore, because petitioner fails to show that California's discovery statutes, or the trial court's

3    orders made pursuant to them, alone created a liberty interest, such that their violation implicated

4    his due process rights.

5        Petitioner fails to show that, even if he had a liberty interest in the prosecutor complying

6    with state discovery rules and orders, and even if the prosecutor violated those rules and orders,

7    those violations rendered his trial fundamentally unfair in violation of his due process rights.  *See*

8    *Estelle*, 502 U.S. at 67-68; *Johnson*, 63 F.3d at 930.  Some of his claims of due process violation

9    appear foreclosed by Supreme Court precedent.  In subclaims 2 and 3 of this claim, petitioner

10   claims that his due process rights were violated by the prosecution's delayed disclosure, non-

11   disclosure, and, in the case of witness Villaron, affirmative misrepresentation of the identities of

12   persons who would be prosecution witnesses.  ECF No. 203 at 30-33; ECF No. 421 at 64-70.  In

13   subclaim 5, he alleges that his due process rights were violated by the prosecutor's delayed

14   disclosure of notes attributed to him and his co-defendants.  ECF No. 203 at 34; ECF No. 421 at

15   73-76.  In *Gray*, 518 U.S. at 168-69, however, the Supreme Court held that there was no due

16   process right to notice of the particular evidence the prosecution would use against the defendant,

17   so long as the defendant has the opportunity to challenge that evidence at trial and had notice of

18   the charges against him.  In *Weatherford*, 429 U.S. 545, the Supreme Court also held that the

19   prosecution had no obligation under the due process clause to reveal in advance the evidence it

20   would use against the defendant at trial, and further held that the defendant's due process rights

21   were not violated by the prosecutor's affirmative misrepresentation to the defense that a particular

22   witness would not testify for the prosecution.  These precedents thus preclude relief on

23   petitioner's subclaims 2, 3, and 5 of claim F, alleging the prosecution violated petitioner's due

24   process rights by its delayed disclosure, non-disclosure, and misrepresentations of Villaron as a

25   witness; delayed disclosure of Colbert as a witness; and delayed disclosure of jailhouse notes

26   attributed to petitioner and his brother, respectively.  ECF No. 203 at 30-34, ECF No. 421 at 62-

27   70, 73-77.

28       Petitioner's theory of due process violation for the remaining two subclaims also appears

1    foreclosed by Supreme Court precedent.  In subclaim 4, petitioner alleges that the prosecution

2    failed to disclose "information with respect to" an interview of Dennis Rauch by sergeant Wingo,

3    ECF No. 203 at 33, and, in his merit briefing, specifies that this refers to notes generated by

4    Wingo during the interview.  ECF No. 421 at 72-73.  Petitioner, however, makes no showing that

5    any such notes were favorable to his defense, *see Brady*, 373 U.S. at 87, and provides no other

6    theory by which the non-disclosure of the notes violated his due process rights.  *See* ECF No. 203

7    at 30-34, ECF No. 421 at 62-777.  On this subclaim, therefore, he fails to prove that a violation of

8    his constitutional rights occurred.

9            Similarly, in subclaim 7, petitioner alleges that the prosecution failed to "provide

10   discovery related to the husband of [prosecution witness] Beverly Gomez."  ECF No. 203 at 34.

11   In his merits briefing, petitioner explains that the prosecution failed to identify Mr. Gomez as "a

12   person who had personal knowledge pertaining to this case," despite the prosecution knowing, at

13   the time, that Mrs. Gomez had reported to Mr. Gomez that she had felt certain of her

14   identification of petitioner.  ECF No. 421 at 70-71.  The information petitioner alleges was not

15   disclosed concerning Mr. Gomez, thus, appears neither impeaching nor exculpatory, but rather

16   consistent with the prosecution's reliance on Mrs. Gomez's identification of petitioner.  As such,

17   there appears no purchase under governing precedent to petitioner's theory that the alleged

18   nondisclosure violated his due process rights.  *See Ruiz*, 536 U.S. at 628-29; *Gray*, 518 U.S. at

19   168; *Weatherford*, 429 U.S. at 559.

20           Thus, even if petitioner had a liberty interest created by the discovery rules and orders in

21   his case, and even if the facts supported petitioner's allegations, he fails to show that any due

22   process violation occurred in the specified subclaims.

23                   **b.  Petitioner Fails to Prove His Factual Averments**

24           Petitioner's claim fails not only as a matter of law, but also because he fails to prove the

25   facts underlying his theory of relief for each of the subclaims at issue.

26           In his first subclaim for which he requests relief, subclaim 2, petitioner argues that the

27   prosecutor misrepresented to the court and to petitioner that Ms. Villaron would not be a witness

28   and failed to provide notice to petitioner that she would be.  ECF Nos. 203 at 30-31, 421 at 64-68,

91

454 at 25-26.  Petitioner relies on the record to prove his claim.  ECF Nos. 421 at 63-68, 454 at 25-26.  The facts in the record, however, establish that the prosecution contacted Ms. Villaron and obtained an identification of petitioner from her in August 1984; prior to that, per the prosecutor, he had no reason to expect Ms. Villaron to be a witness.  36 RT 5192-93; *see* 21 RT 1973A-76A, 2064A-76A, 2080A-82A.  Petitioner points to no facts in the record or elsewhere indicating that the prosecution had identified Ms. Villaron as a prosecution witness earlier in the proceedings, when it responded to earlier discovery requests.  *See* ECF Nos. 421 at 63-68, 454 at 25-26.  On this additional basis, petitioner's subclaim 2 of claim F should be denied.

In subclaim 3, petitioner alleges that the prosecutor improperly delayed disclosure of Mr. Colbert as a prosecution witness, in violation of the trial court's orders, which thereby violated his due process rights.  ECF Nos. 203 at 31-33, 421 at 68-70.  The trial court, however, held a hearing on the question of whether the prosecutor had violated the court's discovery orders by delaying disclosure of Mr. Colbert and, after receiving evidence, concluded that it had not.  47 RT 7665-7711.  To the extent that this reflects the trial court's interpretation of state discovery rules, this court must defer to its legal ruling.  *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67-68.  To the extent that the trial court's ruling reflects a factual finding, petitioner has made no showing to overcome the presumption that that finding is correct.  *See Sumner*, 455 U.S. at 591-92.  For this additional reason, subclaim 3 fails.

Petitioner also fails to prove the factual allegations underlying his subclaim 7 of claim F, wherein he alleges that the prosecution failed to produce to the defense pretrial the identity of Mrs. Gomez's husband and the fact that Mrs. Gomez had told her husband that she felt certain of her identification of petitioner.  ECF Nos. 203 at 34-35, 421 at 71, 454 at 27-28.  Petitioner, however, relies on no evidentiary support to show that the prosecution failed to provide this information, or that it was even aware of the statements that Mrs. Gomez made to her husband.  *See id*.  Thus, in addition to failing as a matter of law, petitioner has not shown as a factual matter his entitlement relief on subclaim 7.

Finally, petitioner fails to prove the factual premise of subclaim 5 of claim F, that alleges that the prosecutor improperly delayed discovery of notes attributed to petitioner and his brothers.

92

1    ECF No. 203 at 34.  Per petitioner, the prosecutor violated the trial court's February 17, 1984

2    discovery order, because the notes at issue were intercepted by jail staff on February 21, 1984, but

3    not disclosed to defense counsel until April 24, 1984.  ECF No. 421 at 73; *see also* ECF No. 454

4    at 29.  Petitioner, however, raised this argument twice in the trial court, which denied it both

5    times.  1 CT 149, 247; 2 CT 284-86, 334, 357-62; 10 RT 1953; 11 RT 2143-45, 2160-61, 2187-

6    89, 2373-76.  To the extent that these rulings reflect the state court's finding that, as a matter of

7    state law, no discovery violation occurred, this court must defer to that finding.  *See Bradshaw*,

8    546 U.S. at 76; *Estelle*, 502 U.S. at 67-68.  To the extent the trial court's ruling reflects a factual

9    finding that the prosecution did not act in a dilatory manner, petitioner has not shown that that

10    finding was incorrect.  *See Sumner*, 455 U.S. at 591-92.  Accordingly, on this additional basis,

11    subclaim 5 should be denied.

12        Thus, for the reasons set forth herein, petitioner has failed to demonstrate his entitlement

13    to relief on claim F of the amended petition.  The undersigned recommends that this claim be

14    denied in full.

15    **Claim H**

16        In claim H, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

17    Amendments were violated by the trial court's erroneous admission of identification testimony

18    against him, derived from unduly suggestive pretrial identification procedures, and by its

19    improper restriction of petitioner's ability to present evidence to rebut these identifications.  ECF

20    No. 203 at 39-48.  Specifically, petitioner argues that the pretrial identification procedures

21    resultant in Beverly Gomez's, Loree Ashcraft's, and Rose Villaron's identifications were unduly

22    suggestive; he was denied effective counsel during Ms. Gomez's and Ms. Villaron's pretrial

23    identifications; the trial court erred in denying his motion for a mental health evaluation of Ms.

24    Gomez; the prosecutor unlawfully vouched for Ms. Gomez's reliability; and the trial court erred

25    in the scope of cross-examination of defense expert Dr. Loftus that it permitted the prosecutor to

26    pursue in voir dire.  ECF No. 421 at 86-121.  Petitioner does not seek an evidentiary hearing on

27    this claim but rather argues that he is entitled to relief based on the state-court record.  *See id*.

28        The undersigned has recommended that the subclaim concerning the voir dire of Dr.

1    Loftus be dismissed as defaulted.  *See ante*.  Upon review of the record, the undersigned

2    recommends that the remainder of the claim be denied as meritless.

3              **1.  Suggestive Pretrial Identification Procedures**

4                   **a.  Legal Standard**

5         A criminal defendant's due process rights are violated by the introduction of evidence

6    deriving from "a lineup that [was] unnecessarily suggestive and conducive to irreparable

7    mistaken identification."  *Kirby v. Illinois*, 406 U.S. 682, 690-91 (1972); *see also Perry v. New*

8    *Hampshire*, 565 U.S. 228, 238 (2012); *Neil v. Biggers*, 409 U.S. 188 (1972); *Sanders v. Cullen*,

9    873 F.3d 778, 814 (9th Cir. 2017).  To determine whether a due process violation occurred, the

10   reviewing court's analysis proceeds in two sequential steps.  "First, a court must decide 'whether

11   the police used an unnecessarily suggestive identification procedure.' . . . Second, if there was

12   'improper police conduct,' the court must then decide whether such police conduct 'created a

13   substantial likelihood of misidentification.'"  *Walden v. Shinn*, 990 F.3d 1183, 1198 (9th Cir.

14   2021) (quoting *Perry*, 565 U.S. at 235).

15        The courts have recognized various manners in which an identification procedure may be

16   suggestive.  A lineup may be implicitly suggestive where, for example, it contains people who are

17   "grossly dissimilar in appearance to the suspect."  *Perry*, 565 U.S. at 243 (quoting *United States*

18   *v. Wade*, 388 U.S. 218, 233 (1967)); *see also Simmons v. United States*, 390 U.S. 377, 382-83

19   (1968).  On the other hand, "[m]ere variations in appearance among persons or photographs

20   presented to a witness do not automatically invalidate a pretrial identification."  *United States v.*

21   *Robertson*, 606 F.2d 853, 857 (9th Cir. 1979); *see also Walden*, 990 F.3d at 1199-1200; *United*

22   *States v. Love*, 746 F.2d 477, 479 (9th Cir. 1984) (per curiam).  An identification procedure may

23   also be unduly suggestive due to comments made by the police officers conducting it.  For

24   example, it is unduly suggestive for "police [to] tell the witness 'that they have caught the culprit

25   after which the defendant is brought before the witness alone or is viewed in jail' or when the

26   police 'point[ ] out' the suspect 'before or during a lineup.'"  *Walden*, 990 F.3d at 1199 (quoting

27   *Perry*, 565 U.S. at 243, and *Wade*, 388 U.S. at 233).

28        Nonetheless, to satisfy the first step of the inquiry, the identification procedure must not

have only been suggestive, but unduly so. *Perry*, 565 U.S. at 237-39. Thus, this step is not met where the police employed a suggestive procedure out of necessity. *Id*. For example, in *Stovall v. Denno*, 388 U.S. 293 (1967), the Supreme Court held this step not satisfied where the identification process was plainly suggestive but nonetheless unavoidable due to the eyewitness's impending death. Similarly, in *Simmons v. United States*, 390 U.S. 377, 384-85 (1968), the Supreme Court held that the petitioner's claim failed where the photographic lineup at issue was suggestive but was performed out of the police officers' need to act quickly during an active manhunt for the perpetrators.

If, at the first step, the reviewing court determines that the police did not employ an unnecessarily suggestive lineup procedure, "the inquiry ends." *Walden*, 990 F.3d at 1198; *see Perry*, 565 U.S. at 232-33. If the reviewing court finds that the State engaged in an improperly suggestive identification procedure, admission of the evidence derived from it only violates the defendant's due process rights if the court also finds that the totality of the circumstances "created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239 (quoting *Biggers*, 409 U.S. at 201). In making this determination, the reviewing court should consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation" and "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

If a habeas corpus petitioner succeeds in proving a due process violation, he is only entitled to relief if he also shows that the admission of such evidence had a "substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Williams v. Stewart*, 441 F.3d 1030 (9th Cir. 2006) (applying *Brecht*'s harmlessness standard to claim of unconstitutional pretrial identification procedures); *Roof v. Maass*, 24 F.3d 249 (9th Cir. 1994) (same).

**b. Discussion**

**i.    Beverly Gomez**

1    Petitioner argues that the February 3, 1984 lineup at which Beverly Gomez identified him

2    was unduly suggestive, and thus the introduction of evidence about this identification violated his

3    due process rights.  ECF Nos. 203 at 41-45, 421 at 88-98.  Petitioner fails to prove his entitlement

4    to relief.

5    Petitioner argues that the lineup was improperly suggestive for two reasons.  First, he

6    argues that Ms. Gomez had previously described the person she saw as tall and with a large build,

7    and, in the lineup, petitioner was significantly taller and larger than the other participants.  ECF

8    No. 421 at 91-98.  The state court, however, previously made factual findings to the contrary.

9    When analyzing this claim on direct appeal, the California Supreme Court "scrutinized the record,

10   including the photographs of the lineup" and found that "[a]ll the participants in defendant's

11   lineup bore a general resemblance the one to the other; although defendant was the tallest, all the

12   others were tall as well.  Moreover, one of the participants in Michael's lineup, which preceded

13   defendant's [and which Ms. Gomez also viewed], bore a strong resemblance to defendant."

14   *Gordon*, 50 Cal. 3d at 1243.  This accords with the factual findings of the trial court as well.  *See*

15   11 RT 2135-36, 2381; 12 RT 2422-26 (trial court observes that petitioner appeared a few inches

16   taller than the other participants in his lineup, but similar to a person contained in the lineup with

17   Michael Caputo, which Ms. Gomez had also been shown).  This court must presume these factual

18   findings to be correct, unless petitioner shows that they are not fairly supported by the record.

19   *Sumner*, 455 U.S. 591.  Here, petitioner makes no such showing.  *See generally* ECF Nos. 421 at

20   88-98, 454 at 35-41.[18]

21   On these facts, petitioner fails to show that the lineup was inherently suggestive.  Some

22   variation among participants in a lineup is to be expected, and it is only where the defendant

23   appears "grossly dissimilar in appearance" to the other participants, *Perry*, 565 U.S. at 243, so as

24   to naturally "emphasize the focus [of the identifying witness] upon" him, that the lineup becomes

25   intrinsically suggestive.  *Bagley*, 772 F.2d at 493.  Here, petitioner was found to have generally

26

27   [18] The trial exhibits are not part of the state record lodged in this court, *see* ECF Nos. 7,
     441 at 357 n.143, consistent with the Local Rules.  *See* L.R. 191(h).  Petitioner also did not tender

28   it as evidence in support of his claims in the instant motion.  *See* ECF Nos. 421, 422, 423, 454.

1    resembled the other members of the lineup at issue, though he was a few inches taller than them.

2    *See Gordon*, 50 Cal. 3d at 1243; 11 RT 2135-36, 2381.  This slight difference would not have

3    made petitioner "stand out" to the identifying witness, so as to draw suggestive focus to him.

4    *Walden*, 990 F.3d at 1198.  Moreover, the state court made the finding that, considering all of

5    petitioner's features and characteristics including his height, he "bore a general resemblance" to

6    the other participants in his lineup, *see Gordon*, 50 Cal. 3d at 1243, defeating petitioner's claim

7    that the lineup was intrinsically suggestive.  *See Walden*, 990 F.3d at 1198-1200; *United States v.*

8    *Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005); *United States v. Love*, 746 F.2d 477, 479 (9th Cir.

9    1984) (per curiam); *United States v. Robertson*, 606 F.2d 853, 857 (9th Cir. 1979).

10         Petitioner also argues that the identification was suggestive due to comments by one of the

11    investigating officers to Ms. Gomez following it.  The record demonstrates, and petitioner does

12    not dispute, that when Ms. Gomez viewed the lineup containing petitioner, she informed the

13    officers, "Number 1 in the third lineup looks familiar, but I'm not certain,"  and then, "[a]s she

14    traveled home with her husband and reflected on the matter, she became certain (or at least

15    virtually certain) that the man who 'look[ed] familiar' was in fact the man she had seen shoot" the

16    victim.  *Gordon*, 50 Cal. 3d at 1241; *see* 12 RT 2587-2608; 36 RT 5241-44.  After she arrived

17    home, she received a call from a Riverside Police detective, who told her she had identified one

18    of the suspects.  *Gordon*, 50 Cal. 3d at 1241.  As a result of this conversation and the effect it may

19    have had on Ms. Gomez, the trial court ruled Ms. Gomez could not identify petitioner in court or

20    testify to any identification she may have made of him after the call, but she could testify about

21    her identification before the call.  *Id*. at 1241-42.  Petitioner argues that the pre-call identification

22    should have been suppressed as well, as the detective's comments rendered it suggestive after-

23    the-fact.  ECF No. 421 at 88-98.

24         Petitioner cites no law supporting this approach to the due process analysis, *see* ECF No.

25    421 at 91-98; ECF No. 454 at 35-41, and it appears at odds with the Supreme Court's

26    jurisprudence.  In its cases challenging identification procedures, the Supreme Court has

27    considered—simply and commonsensically—the facts surrounding the identification itself: who

28    was in the lineup, how it was presented to the witness, what was said or done in the witness's

1   presence.  *See* 565 U.S. at 243; *Simmons*, 390 U.S. at 382-83; *Stovall*, 388 U.S. at 293; *Wade*, 388

2   U.S. at 233.  The Supreme Court has never imputed knowledge to the witness or circumstances to

3   the identification that were not, as a factual matter, present.  Here, Ms. Gomez made statements

4   identifying petitioner as the person that she saw, prior to the detective's suggestive remarks, and

5   his remarks cannot have had a post hoc effect on her earlier identification.  *Walden*, 990 F.3d at

6   1198-1200; *see generally Perry*, 565 U.S. at 235 (due process violation shown by circumstances

7   of identification).  Petitioner has not shown that he suffered a violation of his due process rights

8   by the admission of evidence of the identification that occurred before the detective's comments.

9   The undersigned therefore recommends that subclaim 2 of claim H be denied.

10                          **ii.      Loree Ashcraft**

11          In subclaim 3 of claim H, petitioner alleges that the trial court erred in admitting evidence

12   of Loree Ashcraft's pretrial identification of petitioner because the circumstances of the

13   identification made it unreliable.  ECF Nos. 203 at 45-46, 421 at 104-10, 454 at 40-41; *see also*

14   43 RT 6699-6703 (testimony of Ms. Ashcraft).  Petitioner fails to prove his entitlement to relief

15   on this subclaim.

16          Petitioner fails to show that, as a threshold matter, the State engaged in an identification

17   procedure that was unduly suggestive.  *See Perry*, 565 U.S. at 232-33; *Walden*, 990 F.3d at 1198.

18   Petitioner represents, and the record shows, that Ms. Ashcraft attended live lineups, where she

19   identified Bernard Gordon in one lineup and failed to identify petitioner in another, although she

20   thought petitioner looked familiar.  Afterwards, she spoke to sergeant Wingo and identified

21   petitioner from a photographic array.  ECF No. 421 at 104-06; *see* 1 RT 179-84.  Subsequently,

22   she met with the trial prosecutor, who showed her a photograph of the live lineup that had

23   contained petitioner and mug shots of petitioner and his co-defendants.  ECF No. 421 at 106-07.

24   Ms. Ashcraft identified petitioner from the photographic lineup.  1 RT 187-88, 211-15.

25          During the preliminary hearing, while the three co-defendants were still joined, Michael

26   Caputo moved to recuse the prosecutor on the basis that he utilized improperly suggestive

27   procedures to obtain Ms. Ashcraft's identification when he showed Ms. Ashcraft the photographs

28   of the defendants.  1 RT 426.  The court denied the motion, finding no evidence that the

1    prosecutor had used suggestive procedures.  1 RT 435-36.  Bernard Gordon and Michael Caputo

2    then called the prosecutor as a witness at the preliminary hearing and examined him on the

3    process that he used to obtain Ms. Ashcraft's identification.  8 RT 1545-1611.  The prosecutor

4    testified that he had questioned Ms. Ashcraft as he would any witness whom he intended to call to

5    identify the defendant: by showing her the photographs of the lineup from which she had made an

6    identification, as well as the persons she had purportedly identified, in order to determine the

7    strength of her identification and the best tactical approach in presenting her testimony on direct

8    examination.  8 RT 1571-1611.  After this testimony, Bernard Gordon moved for suppression of

9    Ms. Ashcraft's identification of him, due to the prosecutor's improperly suggestive interview

10   techniques.  9 RT 1642-64.  The court denied the motion to suppress and the motion to recuse the

11   prosecutor, finding that there was no evidence that the prosecutor had engaged in any improper or

12   suggestive acts when interviewing Ms. Ashcraft concerning her identifications.  9 RT 1684-95;

13   *see also* 9 RT 1700-01.

14           Subsequently, petitioner moved to suppress Ms. Ashcraft's identification of him, arguing

15   that the totality of the circumstances, including the prosecutor's tactics during his interview of

16   her, rendered it unreliable.  3 CT 473-84.  After hearing argument and considering the

17   prosecutor's opposition, *see* 3 CT 496-518, the court ruled that "from the totality of the

18   circumstances . . . [the] pre-trial identification procedures were fair and not impermissibly

19   suggestive" and denied the defense motion.  36 RT 5241.  At trial, the prosecutor called Ms.

20   Ashcraft as a witness, and she testified on direct examination that petitioner looked "real similar"

21   to the person she saw at the Stockton crime scene, though she acknowledged that she had not

22   identified petitioner at the in-person lineup that she attended.  43 RT 6699-6703.

23           Given these facts, petitioner fails to show that the identification procedures employed by

24   the prosecutor, resulting in Ms. Ashcraft's trial testimony, were unduly suggestive.  The trial

25   court considered the issue and twice found that they were not suggestive.  9 RT 1684-95; 36 RT

26   5241.  To the extent that this reflects a finding of the facts, the finding is entitled to deference.

27   *See Sumner*, 455 U.S. 591.  Petitioner has not shown that that factual finding is not fairly

28   supported by the record or that the prosecutor's actions were, as a matter of law, suggestive.

1    There is nothing in the record indicating that the prosecutor made suggestive comments to Ms.

2    Ashcraft during the identification process or urged her to identify petitioner either overtly or

3    implicitly.  There is nothing in the record indicating that the lineup Ms. Ashcraft viewed was

4    intrinsically suggestive in its composition.

5         Although the prosecutor's later showing to Ms. Ashcraft the photographs of the lineup

6    containing petitioner and his mugshot would have suggested his identity as the suspect, the

7    context of this interview indicates that it was not unduly or improperly suggestive.  The record

8    undisputedly shows that the prosecutor's interview occurred after Ms. Ashcraft's identification of

9    petitioner from the photo array that sergeant Wingo had showed her and was conducted for the

10   purpose of trial preparation, as the prosecutor evaluated the strength of the prospective testimony

11   from his planned witnesses and tested their abilities to withstand challenge on cross-examination.

12   *See* 9 RT 1571-1603.  It is expected, and indeed may be necessary, for a prosecutor, like any

13   litigator, to evaluate the strength of the evidence he may introduce and prepare his witnesses for

14   trial.  *See generally Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976); *Genzler v. Longanbach*,

15   410 F.3d 630, 639 (9th Cir. 2005).  Petitioner has not shown that the prosecutor acted in any way

16   improperly by testing, during pretrial preparations, Ms. Ashcraft's ability to testify compellingly

17   about her previous identification of petitioner.

18        Because petitioner fails to show that Ms. Ashcraft's identification resulted from unduly

19   suggestive identification procedures, the court need not consider whether the totality of the

20   circumstances made it a reliable identification.  *See Perry*, 565 U.S. at 232-33; *Sumner*, 455 U.S.

21   591; *Walden*, 990 F.3d at 1198.  The undersigned recommends that subclaim 3 of claim H be

22   denied.

23            **iii.    Rose Villaron**

24        In subclaim 4 of claim H, petitioner argues that his rights to due process were violated by

25   the trial court's admission of Rose Villaron's identification of him.  ECF No. 203 at 45-46.  For

26   the most part, petitioner does not argue that the State engaged in any unduly suggestive

27   identification procedures, but rather that Ms. Villaron's identification was unreliable because

28   (1) it was made several months after her observations, (2) her observation was brief, (3) she was

1    uncertain in her description of the suspect, and (4) she saw news reports that may have tainted her

2    recollection.  ECF No. 421 at 111-16.  Petitioner briefly argues that the other individuals included

3    in the photographic lineup from which Ms. Villaron identified petitioner were dissimilar to him in

4    appearance, excepting their race and gender.  ECF No. 421 at 116.

5        Petitioner fails to demonstrate that the photographic lineup that Ms. Villaron was shown

6    was suggestive.  There is nothing in the record to substantiate petitioner's brief assertion that the

7    lineup from which she identified petitioner, *see* 3 CT 535-36, contained other persons who were

8    only similar to petitioner in race and gender, let alone that would permit the court to conclude that

9    the other persons were so "grossly dissimilar" to him as to have suggested his identity as the

10   police's suspect.  *See Wade*, 388 U.S. at 233.  There are no other facts in the record demonstrating

11   that the identification procedures used to obtain Ms. Villaron's identifications were unduly

12   suggestive in the manner that they were conducted.  *See generally* 3 CT 532-45, 615-40; 21 RT

13   1960A-2094A; 36 RT 5173-5200, 5241.  Because petitioner fails to make this threshold showing,

14   petitioner's claim of a due process violation fails, regardless of the presence or absence of other

15   facts that may have made Ms. Villaron's identifications unreliable.  *See Perry*, 565 U.S. at 232-

16   33; *Sumner*, 455 U.S. 591; *Walden*, 990 F.3d at 1198.  The undersigned therefore recommends

17   that this subclaim be denied.

**2.  Right to Counsel During Identifications**

19       In subclaim 1 of claim H, petitioner argues that he was denied his right to counsel during

20   the three lineups in which he participated in Riverside County, one of which resulted in Ms.

21   Gomez's identification.  ECF Nos. 203 at 40-41, 421 at 98-100.  He also argues that the state's

22   conduct relative to Ms. Villaron's identification deprived him of effective assistance of counsel.

23   ECF No. 421 at 116-18.  Petitioner fails to prove constitutional error on either basis.

24       A criminal defendant has, under the Sixth Amendment, a right to counsel for critical

25   stages of the proceedings.  *Kirby v. Illinois*, 406 U.S. 682, 690 (1972).  A post-indictment lineup

26   is a critical stage of the proceeding at which the right attaches, *United States v. Wade*, 388 U.S.

27   218 (1967), but the Sixth Amendment right to counsel does not attach to identification processes

28   that occur before a defendant's indictment, *Kirby*, 406 U.S. 682.  Petitioner does not dispute that

1    Ms. Gomez's identification occurred in February 1984, before he was charged and indicted in the

2    instant case. *See Gordon*, 50 Cal. 3d at 1235. Petitioner makes no argument that,

3    notwithstanding this, his Sixth Amendment right attached by virtue of the indictment in Riverside

4    County for any other reason. *See* ECF Nos. 203 at 40-41, 421 at 98-100. Petitioner therefore

5    fails to prove entitlement to relief on subclaim 1 of claim H.

6          Petitioner also argues that he was deprived effective assistance of counsel through the

7    prosecutor's delay in producing discovery relating to Ms. Villaron's identification. ECF No. 421

8    at 116-18. He argues specifically that the prosecutor, first, failed to invite Ms. Villaron to an in-

9    person lineup and, second, delayed providing discovery of the composite sketches from which she

10    had made her identification, and that both of these acts stymied petitioner's ability to impeach

11    Ms. Villaron and, more generally, deprived him of a fair trial and due process of law. *Id.*

12    Petitioner cites no authority, however, that either of the prosecutor's actions constituted any form

13    of misconduct that effectuated any deprivation of petitioner's Sixth or Fourteenth Amendment

14    rights. *See id.* Petitioner also fails to show that, as a factual matter, the prosecutor's actions were

15    improper in any way. *See id.* Finally, in light of the defense's extensive impeachment of

16    prosecution witnesses on the accuracy of their identifications and purported observations, as well

17    as the defense's presentation of Dr. Loftus's expert testimony that further substantiated this

18    theme, *see generally Gordon*, 50 Cal. 3d at 1236-37, 1243-44, the record belies petitioner's

19    argument that his presentation of this defense was undermined so profoundly as to have deprived

20    him of a fair trial, due process of law, or effective counsel. Petitioner therefore has failed to

21    prove entitlement to relief on this basis.

22          **3.  Motion for Mental Health Evaluation of Ms. Gomez**

23          In subclaim 2.j of claim H, petitioner argues that the trial court erred in denying his

24    motion to compel Ms. Gomez to undergo mental health examination. ECF No. 421 at 100-03.

25    The state court denied the motion on the basis that petitioner had failed to show that it would lead

26    to any admissible evidence. 10 RT 1888, 1921-22, 1952-53; 2 CT 334; *see* ECF No. 421 at 102.

27    Petitioner argues that this ruling deprived him of the ability to present a defense and to challenge

28    the prosecution's evidence. ECF No. 421 at 102-03. Petitioner cites no authority that a mental

1    health examination of prosecution witnesses has been held to be a necessary part of any defense

2    case, such that deprivation of it violates the defendant's due process rights.  *See generally id*.

3    Petitioner also does not show that, on the particular facts of his case, a mental health examination

4    of Ms. Gomez was so critical to the defense's theory and presentation that the trial court's denial

5    deprived him of his right to present a defense, or any other of his constitutional rights.  *See*

6    *generally id*.  Petitioner has failed to prove his entitlement to relief on this subclaim.[19]

7          **4.  Prosecutor's Vouching**

8          Finally, in subclaim 2.l of claim H, petitioner argues that the prosecutor improperly

9    vouched for Ms. Gomez's credibility in his guilt-phase closing argument, incorporating his

10   arguments made in support of claim O.  ECF No. 421 at 103-04.  None of the cited instances,

11   however, reflect improper vouching by the prosecutor, as discussed *post*.  Petitioner therefore

12   fails to prove entitlement to relief on these allegations.

13         Accordingly, for the reasons set forth above, the undersigned recommends that claim H be

14   denied in its entirety.

15   **Claim I**

16         In claim I, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

17   Amendments were violated by the trial court's admission of notes passed between petitioner and

18   his co-defendants after their arrests.  ECF No. 203 at 48-50.  In his merits briefing, petitioner

19   raises four specific arguments.  First, he argues that his due process rights were violated by one

20   witness's erroneous testimony about the content of the notes.  Next, he argues that there was little

21   probative value to the notes due to their speculative content, thus rendering them inadmissible

22   under California Evidence Code section 352 and thereby violating his due process rights under

23   *Hicks*.  Third, he argues that, because the jury was asked to speculate on the meaning of the notes,

24   petitioner's due process and Confrontation rights were violated by the notes' introduction.

25   Finally, he argues that admission of the notes created a conflict for his counsel, depriving him of

26   _____

27   [19] Petitioner briefly argues that his appellate counsel performed deficiently by failing to
     raise this claim as an assignment of error on direct appeal.  ECF No. 421 at 103 n.38.  Because
     the subclaim is meritless, however, appellate counsel was reasonable in not raising it as an

28   assignment of error.  *See Jones v. Barnes*, 463 U.S. 745, 753-54 (1983).

1    his Sixth Amendment rights.  ECF No. 421 at 124-26.  Upon review of the record, none of these

2    arguments have merit.

3        **1.  Misstatement of Note's Contents**

4        First, petitioner argues that his due process rights were violated by prosecution witness

5    deputy Redfearn's misstatement of the contents of the notes at one point in his testimony.  ECF

6    No. 421 at 124.  The record indicates that the notes were admitted as People's Exhibits 101, 102,

7    and 103, and deputy Redfearn, the officer who had seized the notes, read their contents to the

8    jury.  42 RT 6632-33.  The transcript of deputy Redfearn's testimony relating the contents to

9    Exhibit 101 reads:

10           Talked to said wife, worried about Denny cracking.  I agree with you
             pizza would stop.  If not I'll tell your story.  Biggest thing against me
11           is marks on call book for here.  I saw the reg. slip on wagon from
             bomba, that's scary.
12

13   42 RT 6632-33.  Petitioner takes issue with the first portion of the first sentence, which the court

14   had ruled should have read "Talked to blank, said wife . . . ," with the word "blank" substituting

15   for a redaction.  ECF No. 421 at 124; *see* 19 RT 1602A-03A.  Per petitioner, by omitting the word

16   "blank" in his testimony, deputy Redfearn altered the meaning of the note by suggesting that it

17   was petitioner who was "worried about Denny cracking."  ECF No. 421 at 124.

18        The record does not support petitioner's interpretation.  As a threshold matter, although

19   the record is transcribed in the manner quoted, it is not clear whether the witness actually omitted

20   the word "blank" when testifying, or whether the court reporter simply failed to transcribe it as a

21   word.  Typically, the court takes the reporter's transcript at face value, *see generally Witt*, 469

22   U.S. at 430, but here, given the nature of the word omitted, the circumstances beg the question of

23   whether the transcript reflects simply a misjudgment as to the best way to transcribe "blank"

24   when a witness states it as a redaction.  This possibility is made more probable by defense

25   counsel's failure to object to deputy Redfearn's testimony on this point, despite counsel

26   previously having engaged in extensive litigation concerning this redaction specifically.  *See* 19

27   RT 1519A-24A, 1556A-1629A.

28        Regardless, even if deputy Redfearn's testimony relating the contents of Exhibit 101

1    omitted the word "blank," petitioner fails to show that that violated his due process rights.  In

2    closing argument, the prosecutor described Exhibit 101 to the jury and specifically articulated the

3    redaction that deputy Redfearn had apparently omitted:

> As we indicated, in this case we are not submitting the actual notes.
> It's agreed by both sides that the actual notes will not be submitted.
> Instead, we have typed copies that both sides have agreed accurately
> reflect portions of the notes that we are dealing with.
>
> . . . The first note in this case reads as follows: . . .
>
> "Talk to –
> And then there is a blank, which you're not to consider, --
> "Talk to said wife, worried about Denny cracking.
> I agree with you pizza would stop.  If not, I'll tell your story.
> Biggest thing against me is marks on call book for here.
> I saw the reg. slip on wagon from bomba, that's scary."

11    51 RT 8564-65.  In light of this, as well as the jury's ability to view the contents of the notes

12    themselves as an admitted exhibit, petitioner has not shown that deputy Redfearn's testimony was

13    so misleading as to the contents to the exhibit that it rendered the entire trial fundamentally unfair.

14    *See Holley*, 568 F.3d at 1101.  Petitioner has failed to prove that deputy Redfearn's testimony

15    reflected constitutional error.

16         **2.  Admissibility Under the California Evidence Code**

17         Petitioner also argues that his due process rights were violated by the admission of

18    People's Exhibit 101 because it was inadmissible under state law and the state court's failure to

19    follow state evidentiary law in criminal case violated his federal due process rights.  ECF No. 421

20    at 124-25.  This claim fails as a matter of law.  The state court concluded that the notes at issue

21    was properly admitted under California Evidence Code § 352.  *See* 18 RT 3718-44; 19 RT

22    1517A-18A, 1572A-74A, 1602A-03A; 42 RT 6437-49, 6560-74.  Petitioner has not shown that

23    the facts on which the court relied in making this determination were not correct, *see Sumner*, 455

24    U.S. at 591-92; rather, he argues that, based on the content of the note, it was legal error for the

25    court to admit it as a matter of state law.  This court, however, must defer to the state courts'

26    interpretations of state law.  *See Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67-68.  Because

27    petitioner's due process allegations are premised on his claim of state-law error, they necessarily

28

1    fail.

2    ### 3. Speculation on Meaning of People's Exhibit 101

3    Petitioner next argues that admission of People's Exhibit 101 rendered his trial

4    fundamentally unfair because the jury would have had to speculate as to the meaning of some of

5    the exhibit's contents. ECF No. 421 at 125. He argues that, in order to dispel speculation, he

6    would have had to testify, and thus the introduction of Exhibit 101 impliedly violated his Fifth

7    Amendment rights. *Id*. Petitioner does not cite any authority holding that the Fifth Amendment

8    is violated by the prosecution's introduction of evidence that may be interpreted in a manner

9    unfavorable to the defendant, which interpretation the defendant might forestall by testifying, and

10   the court is unaware of any precedent applying the Fifth Amendment in this manner. As a matter

11   of due process, however, the admission of evidence that is open to multiple interpretations only

12   violates a defendant's right to a fundamentally fair trial "if there are *no* permissible inferences the

13   jury may draw from [the] evidence." *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003).

14   Here, Exhibit 101 was somewhat ambiguous in its meaning, given the author's apparent use of

15   code words in some instances, but the note did not invite undue speculation. In addition to the

16   ambiguous coded material, the note also included the statements: "I'll tell your story. Biggest

17   thing against me is marks on call book for here. I saw the reg. slip on wagon from bomba, that's

18   scary." These statements appear to comment on the prosecution's evidence against petitioner, as

19   well as petitioner's intention to "tell [the] story" of the recipient as it related to these matters. In

20   this context, the entirety of the note was neither so ambiguous as to invite improper speculation as

21   to its meaning, nor did it only permit an inference that was unlawful or improper. Petitioner fails

22   to show that introduction of this evidence rendered his trial so fundamentally unfair as to have

23   deprived him of due process of law. *Alcala*, 334 F.3d at 887.

24   ### 4. Conflict of Defense Counsel

25   Petitioner finally argues that introduction of People's Exhibits 101, 102, and 103 violated

26   his right to due process, because their introduction created a conflict for his counsel, who was

27   referenced in the redacted portion of Exhibit 101. ECF No. 421 at 124-26. Petitioner fails to

28   prove that his constitutional rights were violated.

106

The record indicates that the original, unredacted version of Exhibit 101 read:

Talked to lakyyer (*sic*), said wife worried about Denny cracking. I agree with you pizza would stop. If not, I'll tell your story. Lawyer said I have two choices, truth and try to clean it up from there or keep with my story and worry about them finding holes in it and surprising her in court. Biggest thing against me is marks on call book for here. I saw the reg slip on wagon from Bomba, that's scary.

6 RT 1127-28; 18 RT 3743. Before trial, defense counsel informed the court that she might have to withdraw due to having been referenced in the note, and the court and counsel discussed redacting the note prior to its admission. 18 RT 3697-3764. The court found that introduction of the statements referencing petitioner's lawyer created a non-waivable conflict of interest. 19 RT 1519A. The court suggested that the note be redacted to omit the fourth sentence and redact "lakyyer" in the first sentence, but petitioner objected to the exhibit being admitted with redactions. 19 RT 1519A-24A. The court then appointed independent counsel for petitioner on this limited issue, and petitioner through counsel, reiterated his objection to the note being admitted in any form, including as redacted. 19 RT 1529A-72A. The court ruled that it would not admit the redacted note without petitioner's consent, and defense counsel then moved to withdraw. 19 RT 1572A-75A. The court granted the motion and found it constituted good cause to continue the matter, without petitioner waiving time. 19 RT 1575A. Before the hearing adjourned, the prosecutor proposed that (1) the note be redacted so that the beginning of the first line had a blank in lieu of "lakyyer" and (2) the fourth sentence be struck entirely. 19 RT 1586A-99A. Defense counsel objected to this, but the court ruled that the note could be admitted with these redactions, since the redactions cured the conflict. 19 RT 1602-03A. The court reappointed defense counsel to petitioner, over her objection, and also appointed co-counsel, should defense counsel need to testify about the content of the note. 19 RT 1603A-06A. The note was admitted in redacted form, as described above.

In the present proceeding, petitioner argues that the admission of the redacted note did not cure the conflict of interest that the court had previously found was engendered by the unredacted note. ECF No. 421 at 125-26. He argues that, in order to rebut the prosecutor's interpretation of the note, petitioner would have needed to testify and, in so doing, would have had to make

1   statements that would in turn have caused his counsel to have to testify. *Id.* This argument fails.

2   The note as redacted did not implicate defense counsel in any way, and thus the trial court aptly

3   concluded that the redactions had eliminated the conflict for defense counsel that the unredacted

4   portions had created. *See generally Strickland*, 466 U.S. at 692 (to succeed on a motion to

5   withdraw, counsel must show an actual conflict of interest that detrimentally affects her ability to

6   represent her client). Speculation about counsel's need to testify if petitioner testified in a certain

7   manner to explain the note is too attenuated to show that defense counsel labored under an actual

8   conflict at the time of the exhibit's admission. *See Carlson v. Nelson*, 443 F.2d 21, 22 (9th Cir.

9   1971). Furthermore, the possibility that such a conflict might arise via petitioner's possible

10  testimony was addressed by the trial court's appointment of co-counsel should such a contingency

11  have come to pass. Finally, to the extent that petitioner argues that his decision not to testify was

12  impelled by the prosecutor's introduction of the note, *see* ECF No. 421 at 125-26, this is

13  contradicted by petitioner's representation elsewhere that his decision not to testify resulted from

14  the court's rulings on the scope of cross-examination and, specifically, that such cross-

15  examination might extend to testimony about the Riverside robbery-homicide. *See* ECF No. 421

16  at 162-68, 315-18; ECF No. 454 at 85-86; 56 RT 9473-75. For all these reasons, petitioner fails

17  to show that the introduction of Exhibit 101 deprived him of his constitutional rights to conflict-

18  free counsel and due process of law. Accordingly, the undersigned recommends that claim I be

19  denied.

20  **Claim K**

21      In claim K, petitioner alleges that his due process rights were violated by the trial court

22  allowing the prosecutor to re-open its case, after the defense presentation, to present the testimony

23  of witness Billy Colbert. ECF No. 203 at 52-56; ECF No. 421 at 151-61. The undersigned

24  concludes that this claim is meritless and recommends that it be dismissed.

25      The record shows that after the prosecution presented its final witness in its case-in-chief,

26  the parties and the court discussed a statement that Mr. Colbert had made to the prosecution

27  investigator and the discovery of same to the defense, with the defense moving to suppress any

28  testimony that Mr. Colbert may give. 44 RT 6891-6913. The court ordered the prosecution

108

1    provide discovery materials concerning Mr. Colbert to the defense, but reserved ruling on the

2    motion to suppress. *Id.* The prosecution then rested, and the defense presented its case-in-chief,

3    including the testimony of several alibi witnesses. 45 RT 7288-89; 46 RT 7432-34, 7468-69,

4    7476-78, 7535. During the course of the defense presentation, the court revisited the discovery

5    issue outside the presence of the jury. At defense counsel's request, the prosecution investigator

6    testified about his contacts with Mr. Colbert that had resulted in the latter's statement. 47 RT

7    7667-7706. On this basis of this testimony, the trial court ruled that the prosecution had not

8    willfully delayed disclosure of Mr. Colbert's statement, and thus it denied petitioner's motion to

9    suppress Mr. Colbert's testimony. 47 RT 7711. The prosecutor then indicated that he intended to

10   call Mr. Colbert as a rebuttal witness. 48 RT 7727. The trial court ruled that the testimony was

11   not proper rebuttal but should have been presented in the prosecution's case-in-chief. 48 RT

12   7728-30. The prosecutor explained that he had not intended initially to call Mr. Colbert as a

13   witness, out of concern about his credibility, but the defense witnesses' testimony had

14   corroborated some of what Mr. Colbert had said in his statement, persuading the prosecutor that

15   Mr. Colbert was credible. 48 RT 7733-42. The prosecutor then moved to reopen his case-in-

16   chief to present the testimony of Mr. Colbert, given the court's ruling that it was not proper

17   rebuttal. 48 RT 7753.

18        Defense counsel argued at length that it would be improper for the prosecutor to be

19   permitted to reopen his case to present Mr. Colbert's testimony, including arguing that the delay

20   had been merely tactical, and the prosecutor again argued that he had not believed Mr. Colbert to

21   be credible until surprise defense witnesses had corroborated Mr. Colbert's statement. 48 RT

22   7754-80. The trial court ultimately ruled that it found the prosecution's position credible and that

23   under California law it was proper to permit the State to re-open its case. 48 RT 7781-84. The

24   prosecutor did so, calling Mr. Colbert as a witness. 48 RT 7846-7938. In rebuttal, the defense

25   called as witnesses Kenneth Hadsell and William Teller, as well as Mr. Colbert again. 49 RT

26   8169-79, 50 RT 8198-8203.

27        Petitioner argues in claim K that the prosecutor's representations to the trial court were

28   false, because the prosecutor had not, in fact, doubted Mr. Colbert's credibility because Mr.

109

1    Colbert was a state agent at the time he had made his statement.  ECF No. 421 at 157-59.  For this

2    reason, per petitioner, the trial court's decision to permit the prosecution to re-open its case was

3    error under state law and deprived petitioner of due process.  *Id*. at 159-61.  To substantiate this

4    argument, petitioner relies on the evidence in support of his claim B.  *Id*. at 152, 155-56.  The

5    undersigned, however, has concluded that petitioner has not shown that Mr. Colbert was an agent

6    of the state in petitioner's prosecution.  *See ante*.  As such, the instant claim fails as well.  Given

7    that petitioner advances no other theory for a due process violation in this claim, *see* ECF No. 421

8    at 151-61, petitioner has not proven his entitlement to relief on this claim, and the undersigned

9    recommends that claim K be denied on the merits.

10   **Claim L**

11       In claim L, petitioner alleges that he was denied his rights under the Fifth, Sixth, Eighth,

12   and Fourteenth Amendments by the trial court's denial of petitioner's in limine motion to limit

13   the scope of cross-examination a priori if petitioner testified.  ECF No. 203 at 56-58.

14   Specifically, he argues that the trial court erred by refusing to rule that the prosecutor could not

15   cross-examine petitioner about "the Riverside robbery" if petitioner only testified on direct

16   examination about "the Stockton robbery" or about "the topic of his conversations with . . . Billy

17   Ray Colbert."  *Id*. at 57.  Upon review of the record, the undersigned concludes that petitioner has

18   not shown his entitlement to relief and recommends that this claim be denied on the merits.

19       **1.  Background**

20       During the course of the defense presentation in the guilt phase, an in limine hearing was

21   held in which defense counsel asked the court to make preliminary rulings about the scope of

22   cross-examination of petitioner, should petitioner testify.  47 RT 7662, 7711-12.  Counsel stated

23   that petitioner was facing pending prosecution for the Riverside crimes, so sought a ruling that "in

24   the event [petitioner] takes the stand whether or not this court will sustain the claim of privilege

25   as to anything tending to do with the Riverside case by virtue of the Fifth Amendment."  47 RT

26   7712-13.  Counsel also sought a ruling that, if petitioner testified denying that he made the

27   statements to Mr. Colbert that the latter ascribed to him, the prosecutor could not cross-examine

28   petitioner "on all facts and issues in this case."  47 RT 7718.  After hearing argument, the court

1    took the matter under submission, indicating that it did not believe it could make such a ruling in

2    advance, since the scope of cross-examination would be determined by the scope of petitioner's

3    testimony on direct examination.  47 RT 7713-26.

4         At the continued hearing on the issue, the court ruled that the prosecution could reopen its

5    case to call Mr. Colbert as a witness, then addressed petitioner's request to limit the scope of

6    cross-examination should petitioner testify:

> THE COURT: Now, as I indicated earlier, if Mr. Gordon is going to—to try the limit the scope of his direct-examination, I think it will have to be very carefully done with respect to this statement. And I indicated that if he chooses to testify in his own defense in the defense case, that that (sic) would be deemed a waiver.
>
> MS. FIALKOWSKI:  You Honor, just so I understand the court's ruling for the purpose of the record, as far as the defense case, the court is ruling that under, I think it's Evidence Code 773, that if Mr. Gordon were to take the stand and testify as to the Stockton case, that it would be permissible on cross-examination for Mr. Van Oss to raise issues concerning Riverside.  And Mr. Gordon would not have in this court's opinion a valid claim of Fifth Amendment privilege with respect to anything dealing with the Riverside case?
>
> THE COURT:          That's the court's position.
>
> MS. FIALKOWSKI:  . . . . Additionally, you just made reference to if he does take the stand—if the court is allowing Mr. Gordon—excuse me.  If the court is allowing Mr. Van Oss to reopen his case in chief, then what I am wondering about it what that does to his ability to take the stand and deny the statement?
>
> THE COURT: Well, it depends, I suppose, on what he says.  If he—if he testifies in denial of these—I think it just really depends on what he says.  If he—if he takes the stand and testifies with respect to the Stockton case, I think he's waived any Fifth Amendment privilege he has with respect to Riverside.
>
> Anything can come in.  I suppose if he just got up and said only one thing, somehow you were able to limit his testimony to this statement that Colbert made, only directing himself to that narrow statement and was able to—to do that, perhaps, there would not be a blanket waiver.  I think we have to almost wait until we see what—what he would say.  If he gets up—I can't anticipate that.
>
> But we know what the cases say, I think, with respect to waiving the Fifth Amendment privilege upon taking the stand, and I would—I have read the cases that were cited by Mr. Van Oss, and I think, they support that position.  *Thornton* and some other cases.

1    48 RT 7784-86.  Defense counsel replied that she recognized the difficulty of ruling in advance

2    prior to knowing the contents of direct examination, and then asked, "I guess my question is, if—

3    would it have to be a blanket denial of the charges?  I mean, if he tries to explain how any

4    conversation—" and the court replied that it "would just have to wait and see what questions are

5    asked and face that when it comes up."  48 RT 7787.  Shortly thereafter, defense counsel

6    informed the court that petitioner would not testify as a result of the rulings the court had made.

7    48 RT 7799-7800.

8        Before the defense rested its rebuttal case, counsel raised the issue again in an in limine

9    hearing, stating her understanding that the court had not made a ruling as to what the scope of

10   cross-examination could be if petitioner testified, but that it could include "a wider range of

11   questioning" of petitioner.  50 RT 8302-03.  The court explained that it had "made a certain

12   tentative ruling that if [petitioner] testified as to Stockton he would be waiving his Fifth

13   Amendment rights to Riverside" and that the court had not "ma[de] just a blanket ruling that

14   because Colbert's statement came in in the defense case, if he tried to testify that somehow he's

15   be waiving all of his rights," but rather that the court would "have to wait and hear the questions .

16   . . [b]ecause I think the law is that sometimes there can be testimony by a defendant in which he

17   does not waive all of his rights . . . depending on the questions."  50 RT 8303-04.  Petitioner

18   ultimately did not testify at the guilt phase.  *See generally* RT.

19       **2.  Discussion**

20       Preliminarily, the undersigned is unpersuaded by respondent's argument that petitioner's

21   claim is foreclosed by *Luce v. United States*, 469 U.S. 38 (1984).  In *Luce*, the defendant had been

22   prosecuted in federal court and, pretrial, moved for a ruling that the prosecutor could not impeach

23   him with his prior convictions if he testified.  469 U.S. at 39.  The trial court ruled that, generally,

24   a defendant's prior bad acts were proper impeachment, but stated that it could not rule

25   definitively on the proper scope of cross-examination without knowing the nature and scope of

26   his testimony on direct.  *Id.* at 40.  The defendant subsequently did not testify and, later, filed a

27   petition under 28 U.S.C. § 2255 alleging that the trial court erred in its in limine ruling.  *Id.*  The

28   Supreme Court held that, as a matter of federal criminal procedure, a defendant in a criminal

112

1    prosecution waives his right to seek review of an error under Federal Rule of Evidence 609(a)(1)

2    if he does not testify at trial.  *Id*. at 41-43.  The Supreme Court grounded its ruling in the practical

3    reality that the proper scope of cross-examination is a "subtle evidentiary question[]" that will

4    turn wholly on the precise nature of the testimony on direct, and because, if there was error,

5    "[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a

6    prior conviction is wholly speculative" given that, if the defendant testified, the prosecutor could

7    then impeach or rebut that testimony, further injecting conjecture into the reviewing court's

8    analysis.  *Id*. at 41-42.

9        *Luce*, therefore, neither addressed the cognizability of the instant claim as a matter of

10   constitutional law, nor purported to establish a waiver rule for claims arising from state

11   judgments.  *See generally Luce*, 469 U.S. 38.  Rather, the Supreme Court considered only the

12   limited issue of how a defendant in a federal prosecution must preserve a particular type of error

13   in order for it to be reviewed on appeal, via a § 2255 petition.  In contrast, in cases brought under

14   § 2254, where the underlying complained-of errors occurred in a state proceeding, the federal

15   court typically applies the state's rules for preservation of errors at trial.  *Martinez v. Ryan*, 566

16   U.S. 1, 9-10 (2012).  As such, whether petitioner here properly preserved the complained-of error

17   is governed by California law.  *See Walker v. Martin*, 562 U.S. 307 (2011).  In California, the

18   California Supreme Court adopted the reasoning of *Luce* in *People v. Collins*, 42 Cal. 3d 378

19   (1986), holding that a defendant must testify in order to preserve his claim that the trial court

20   erred in its rulings concerning the scope of cross-examination and rebuttal.  This opinion,

21   however, was issued after the trial occurred in petitioner's case, and its holding was expressly

22   prospective only.  *Collins*, 42 Cal. 3d at 388-89.  Thus, at the time of petitioner's trial, he was not

23   required as a matter of California procedural law to have testified in order to preserve his claim of

24   error that the trial court erred in its in limine ruling, and it consequently would be improper for

25   this court to hold this claim waived under a procedural rule of which petitioner had no notice at

26   the time of his trial.  *See Walker*, 562 U.S. at 320 (a procedural bar may be inadequate when it

27   reflects that the reviewing court's discretion has been exercised against him in a "surprising,"

28   "novel," or "unforeseen" manner); *Bradford v. Davis*, 923 F.3d 599, 611 (9th Cir. 2019)

1    (procedural bar "adequate" where the rules governing it gave the petitioner notice as to what he

2    had to do to avoid its application to him); *Lee v. Jacquez*, 788 F.3d 1124, 1128 (9th Cir. 2015),

3    *rev'd on other grounds sub nom. Johnson v. Lee*, 578 U.S. 605 (2016) ("The adequacy

4    requirement exists to . . . 'ensure that [litigants] have fair notice of what they must do to avoid

5    default.'" (internal citation omitted)); *Karis v. Vasquez*, 828 F. Supp. 1449, 1464 (E.D. Cal. 1993)

6    (to be adequate, procedural bar should "provide petitioners with adequate notice of the

7    circumstances that will bar their claims"); *see generally Wainwright*, 433 U.S. 72.  As such,

8    respondent has not shown that this court should hold petitioner's claim barred from habeas review

9    under *Luce* or its progeny.

10         Upon review of the record, however, the claim fails on its merits.  Petitioner argues that

11   the trial court denied him his Fifth Amendment rights in erroneously ruling that "any testimony

12   by Petitioner regarding the Stockton K-Mart robbery would be considered a blanket waiver of

13   Petitioner's Fifth Amendment privilege against self-incrimination," ECF No. 421 at 164; *see also*

14   *id*. at 162-63, and in failing to make an advance ruling on what the scope of permissible cross-

15   examination could be "if Petitioner testified only that he had not made incriminating statements to

16   Colbert.  *Id*. at 164; *see also id*. at 165-67.  The record does not support petitioner's argument.

17         First, to the extent petitioner argues that the trial court ruled that if petitioner testified

18   "regarding the Stockton K-Mart robbery," that would operate as a blanket waiver of his Fifth

19   Amendment right, allowing the prosecutor to cross-examine petitioner about anything at all, the

20   record does not support that contention.  *See* ECF No. 421 at 164.  The trial court did not rule that

21   petitioner's testimony about facts relating to the Stockton crimes would effectuate an unbounded

22   waiver; rather, the court ruled that "if [petitioner] takes the stand and testifies with respect to the

23   Stockton case," then petitioner will have waived his Fifth Amendment privilege with respect to

24   the Riverside case and "[a]nything can come in" relative to the latter.  48 RT 7784-86.  That

25   limitation was made clear a few days later, when the court reiterated its ruling, explaining, "if

26   [petitioner] testified as to Stockton he would be waiving his Fifth Amendment rights to

27   Riverside."  50 RT 8303-04.

28         Petitioner has not shown that this ruling was error.  The scope of proper cross-examination

1  is defined by the matters that were made relevant by the witness's testimony on direct

2  examination. *See Brown v. United States*, 356 U.S. 148, 154-56 (1958). Under California law at

3  the time of petitioner's trial, if a defendant testified denying his involvement in the charged crime,

4  he may be cross-examined on other, similar incidents "to establish on cross-examination his

5  involvement in offenses whose similarity to the charged offenses indicated a common

6  malefactor." *People v. Thornton*, 11 Cal. 3d 738, 760 (1974), *disapproved of on other grounds by*

7  *People v. Flannel*, 25 Cal. 3d 668 (1979); *see also People v. Tarantino*, 45 Cal. 2d 590, 599

8  (1955) (where the defendant testifies denying having committed the charged crime, the prosecutor

9  may cross-examine him on other, similar offenses, which call into question "matters implicit in

10  [the defendant's] general denial, i.e., his purpose and motive, his general plan and scheme").

11  Here, that would plainly encompass the evidence concerning the Riverside events, which had

12  been properly admitted in the guilt phase under California Evidence Code section 1101(b) to

13  prove petitioner's intent for the first-degree murder charged as Count 2 in the instant case. *See*

14  *generally Gordon*, 50 Cal. 3d at 1238-50 (holding no error in admission of this evidence under

15  § 1101(b)). Petitioner therefore has not shown that the trial court's ruling was error under

16  California law.[20]

17      Petitioner also fails to demonstrate that the trial court erroneously failed to rule on the

18  scope of permissible cross-examination if petitioner testified on direct examination that he had

19  not made the statements to Mr. Colbert that the latter attributed to him. *See* ECF No. 421 at 164-

20  67. The trial court ruled that any such ruling would be premature, as the proper scope of cross-

21  examination would be defined by the precise contents of petitioner's direct examination

22  testimony, but if petitioner's testimony on direct examination included a denial of having

---

23  [20] Petitioner makes no argument that, irrespective of California law, federal constitutional

24  law imposes greater limits on the scope of cross-examination in these circumstances. *See*
*generally* ECF No. 421 at 162-67, 454 at 53-56. Regardless, federal jurisprudence accords with

25  California's, providing that a criminal defendant who voluntarily testifies waives his Fifth
Amendment privilege with regards to all matters made relevant by his direct examination,

26  including, where he denies involvement with the charged offense, evidence of his commission of

27  other, similar acts. *See United States v. Panza*, 612 F.2d 432, 436 (9th Cir. 1979); *United States
v. Hearst*, 563 F.2d 1331, 1341 (9th Cir. 1977); *see generally Brown*, 356 U.S. at 154-56;

28  *Williams v. Borg*, 139 F.3d 737, 740 (9th Cir. 1998).

1  committed the Stockton crimes, he would be subject to cross-examination about that, including

2  about the Riverside events.  48 RT 7784-87; 50 RT 8303-04.  This approach was not error; in

3  fact, it mirrors the approach utilized by the trial court in *Luce*, which the Supreme Court affirmed.

4  *See Luce*, 469 U.S. at 40; *see United States v. Griffin*, 818 F.2d 97, 103 (1st Cir. 1987).

5  In his reply, petitioner argues that the trial court refused to consider petitioner's proffered

6  testimony in making this ruling.  ECF No. 454 at 56.  The record does not support a finding that

7  petitioner made a proffer, let alone one sufficient to permit the trial court to rule on the scope of

8  cross-examination.  *See generally Semsch v. Henry Mayo Newhall Mem'l Hosp.*, 171 Cal. App.

9  3d 162, 167 (1985) (at the time of petitioner's trial, California law required an offer of proof to be

10  "specific" in its recitation of the contents of testimony to be elicited); *United States v. Kay*, 513

11  F.3d 432, 458 (5th Cir. 2007) (describing proffer of witness's direct examination testimony that

12  was specific enough to permit the trial court to rule on the scope of cross-examination, consistent

13  with *Luce*).  Instead, defense counsel suggested broadly what petitioner's testimony might include

14  and requested guidance from the trial court as how that broad idea might be distilled into specific

15  testimony to avoid a particular area of cross-examination.  48 RT 7786-87; *see also* 50 RT 8302-

16  03.  The trial court did not err in declining this invitation, and neither did the trial court, as a

17  matter of historical fact, reject any specific offer of proof by petitioner.  *See id*.  On this basis as

18  well, petitioner fails to prove error.

19  In sum, because petitioner fails to prove the trial court's rulings were erroneous, he fails to

20  prove he suffered a violation of his constitutional rights.  *See* ECF No. 203 at 56-58.  The

21  undersigned therefore recommends that claim L be denied on the merits.

22  **Claim M**

23  In claim M, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

24  Amendments were violated by the trial court's failure to give the defense's requested jury

25  instruction in defining the intent required for the charged special circumstance to be found true.

26  ECF Nos. 203 at 58-60, 421 at 168-81.  Upon review of the record, the undersigned finds this

27  claim meritless and recommends that it be denied.

28  **1.  Background**

During trial, the defense requested, among other proposed instructions, that the instructions concerning the charged special circumstance include a special instruction that "if you find that defendant agreed to aid a robbery, knowing his companions were armed, this fact is insufficient to demonstrate that defendant himself intended to aid a killing." 4 CT 893; *see* ECF No. 203 at 58-60. The court denied this request. 51 RT 8449-52, 8471. At the close of the guilt and special circumstances phase, the court instructed the jury in relevant part as follows:

CALJIC 8.80 (1984 Revision)

SPECIAL CIRCUMSTANCES—INTRODUCTORY

If you find the defendant in this case guilty of murder of the first degree, you must then determine if the murder was committed under the following special circumstance: that the murder of William Camp Wiley was committed while the defendant was engaged in or aided and abetted the commission of a robbery. A special circumstance must be proved beyond a reasonable doubt and to a moral certainty.

If you have a reasonable doubt as to whether the special circumstance is true, it is your duty to find that it is not true. If defendant, Patrick Gordon, was an aider and abettor but not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant, Patrick Gordon.

In order to find the special circumstance charged in this case to be true or untrue, you must agree unanimously.

You will include in your verdict on a form that will be supplied your finding as to whether the special circumstance is or is not true.

CALJIC 8.81.17 (1984 Revision)

SPECIAL CIRCUMSTANCES--MURDER IN COMMISSION OF ROBBERY

To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved:

1. That the murder was committed while the defendant was engaged in or aided and abetted the commission of a robbery.

117

2. That the defendant intended to aid another in the killing of a human being.

3. That the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder.

4 CT 867-68; 53 RT 8960-62.  The jury was further instructed with CALJIC No. 3.34 that, "[t]he intent with which an act is done is shown as follows: By the circumstances attending the act, the manner in which it is done and the means used," 4 CT 845; 53 RT 8947, and that the Riverside evidence could be considered as "[a] characteristic method, plan, or scheme in the commission of criminal acts similar to the method, plan, or scheme used in the commission of the offense in this case which would further tend to show: The existence of the intent which is a necessary element of the crimes charged, and the special circumstance alleged."  4 CT 829; 53 RT 8936.  At the request of the defense, the court modified the special circumstances verdict form to require that the jury make a specific finding whether petitioner personally intended that his co-participants kill the victim or knew that they intended to kill the victim and intentionally aided and abetted the killing.  52 RT 8696-89706.  The jury ultimately found the special circumstance true, and specifically found "that the murder was committed while the defendant was engaged in or aided and abetted the commission of a robbery," and that petitioner "personally intended that the co-defendants kill the victim or knew that the co-defendants intended to kill the victim and intentionally aided and abetted, counselled, commanded, induced, solicited, requested, encouraged or assisted in the killing."  4 CT 924.

## 2. Discussion

Due process requires that, in a criminal trial, the State must prove every element of the offense, and the jury must be so instructed.  *See Sandstrom*, 442 U.S. at 520-521; *Francis v. Franklin*, 471 U.S. 307 (1985).  In capital cases, California statute establishes "special circumstances" that the jury must find true in order to render the defendant eligible for the death penalty, to comply with the narrowing requirement intrinsic to the Eighth Amendment.  *See*

1    *Pensinger v. Chappell*, 787 F.3d 1014, 1025-28 (9th Cir. 2015); *see People v. Green*, 27 Cal. 3d

2    1, 61 (1980), *abrogated on other grounds by People v. Martinez*, 20 Cal. 4th 225 (1999).  Under

3    California law at the time of petitioner's trial, "[t]he felony-murder special circumstance applie[d]

4    to those murders 'committed while the defendant was engaged in . . . the commission of . . . or the

5    immediate flight after committing' one of certain enumerated felonies," including robbery, as

6    charged here.  *Id*.; *see* Cal. Penal Code § 190.2 (1978); *Green*, 27 Cal. 3d 1.  Specific to the issue

7    of intent, California law required that, to find true a felony-murder special circumstance, the jury

8    must find that the defendant had the requisite specific intent to commit the murder, as well as an

9    independent intent to commit the felony indicated.  *Green*, 27 Cal. 3d at 61-62; *see Pensinger*,

10    787 F.3d at 1025-26.

11        A defendant's due process rights are violated where, when considering the entire jury

12    instructions, there is a "'reasonable likelihood that the jury has applied [an] instruction in a way'

13    that violates the Constitution."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v.*

14    *California*, 494 U.S. 370, 380 (1990)); *see also Middleton v. McNeil*, 541 U.S. 433, 437 (2004)

15    (per curiam); *Henderson v. Kibbe*, 431 U.S. 145, 156 (1977).  Where a habeas corpus petitioner

16    claims error from the trial court failing to have given a requested instruction, he must also show

17    prejudice under *Brecht*, that the failure to have given the instruction "in the whole context of the

18    particular case, had a substantial and injurious effect or influence on the jury's verdict."

19    *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht*, 507 U.S. at 637); *see also*

20    *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam) (holding that a federal habeas court reviews

21    claim of omitted jury instructions for harmless error); *California v. Roy*, 519 U.S. 2, 6 (1996) (per

22    curiam) (same).  This showing reflects an "especially heavy" burden for the habeas corpus

23    petitioner, as the omission of an instruction is "less likely to be prejudicial than a misstatement of

24    the law."  *Henderson*, 431 U.S. at 155.

25        Considering the instructions as a whole, petitioner has not shown that the omission of the

26    requested instruction constituted constitutional error.  *See Estelle*, 502 U.S. at 72.  Petitioner's

27    theory is that by omitting the requested special instruction, the jury may have been confused and

28    may have found the special circumstance true without finding that petitioner possessed an intent

1    to commit murder or to aid and abet in the commission of a murder, which would render the

2    verdict infirm under the Eighth Amendment.  ECF No. 421 at 168-81; *see also id.* at 188-90.  The

3    totality of the instructions, however, makes it not reasonably likely that the jury misunderstood

4    the instructions in this way.  The instructions the jurors received on the special circumstance

5    required them to find intent to kill or to aid and abet in the killing and further instructed them that

6    intent could be proven by all of the circumstances attending the defendant's actions, including his

7    participation in other events from which intent could be inferred.  *See* 4 CT 829, 845, 867-68; 53

8    RT 8936, 8947, 8960-62.  Nothing in the jury's instructions, then, suggested that any single fact

9    was dispositive or non-dispositive to their intent finding, and the instructions have not precluded

10   the jury from crediting the defense theory and finding that the prosecutor had not proven this

11   element of the charged special circumstance, if they found that petitioner was merely a getaway

12   driver or had only known that his co-participants were armed during their planned robbery.

13   Accordingly, petitioner has not shown that it was reasonably likely that the instructions, in their

14   totality, misled the jury into finding intent based on insufficient evidence.

15       Petitioner also fails to prove that he was prejudiced.  *See Hedgpeth*, 555 U.S. at 58;

16   *Calderon*, 525 U.S. at 147; *Brecht*, 507 U.S. at 637.  As noted, the jury here made in its special

17   circumstance verdict a specific finding that petitioner "personally intended that the codefendants

18   kill the victim or knew that the co-defendants intended to kill the victim and intentionally aided

19   and abetted, counselled, commanded, induced, solicited, requested, encouraged or assisted in the

20   killing."  4 CT 924.  It is proper for the reviewing court to consider the verdict form as part of

21   "the record as a whole," *Hedgpeth*, 555 U.S. at 62, that forms the basis of the prejudice inquiry.

22   *See Mills v. Maryland*, 486 U.S. 367, 375-76 (1988); *see also Pulido v. Chrones*, 629 F.3d 1007,

23   1016 (9th Cir. 2010), *abrogated on other grounds by Davis v. Ayala*, 576 U.S. 257 (2015) ("The

24   verdict form is especially relevant [to the prejudice inquiry] because '[v]erdict forms are, in

25   essence, instructions to the jury,' [citation] and thus in some cases 'can cure problems created by

26   defective instructions' [citation].").  Given the particular finding the jury made here, the

27   misunderstanding of the instructions that petitioner claims may have been engendered by the

28   omission of the requested instruction did not come to pass.  Petitioner ergo has not met his

1    "especially heavy" burden, *Henderson*, 431 U.S. at 155, to show that the verdict was substantially

2    and injuriously affected by the instructions the jury received.  *See Brecht*, 507 U.S. at 637.

3         For these reasons, petitioner has not proven his entitlement to relief on claim M, and the

4    undersigned recommends that it be denied.

5    **Claim N**

6         In claim N, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

7    Amendments were violated by the trial court's instructional errors at the guilt phase.  ECF No.

8    203 at 61-63.  For the reasons described *ante*, the undersigned recommends dismissal of subclaim

9    2 of this claim pursuant to *Wainwright v. Sykes*, 433 U.S. 72.  In his merits briefing, petitioner

10   argues that he is entitled to relief on subclaims 1 and 8.[21]  *See* ECF No. 203 at 61-63, 420 at 181-

11   201.  Upon review of the record, the undersigned recommends that this claim be denied.

12        **1.  Subclaim 1**

13        In subclaim 1 of claim N, petitioner alleges that the trial court's instructions on conspiracy

14   and aiding and abetting were confusing and unlawfully allowed the jury to infer intent to kill,

15   relieving the prosecution of its burden on count 1.  ECF No. 203 at 61.  He argues specifically

16   that the instruction defining the elements of conspiracy for count 1 allowed the jury to convict

17   petitioner of conspiracy even if the jury only found petitioner culpable of first-degree murder

18   based on a felony-murder theory, i.e., not having found petitioner to have had a specific intent to

19   kill during the murder charged as one of the bases of the conspiracy.  ECF No. 421 at 182-83.

20   Review of the record, including the jury instructions in their totality, does not support a finding

21   that there was a reasonable likelihood that the jury applied the instruction in a way that relieved

22   the prosecution of its evidentiary burden.  *See Estelle*, 502 U.S. at 72.

23        Relative to count 1, the jury was instructed with CALJIC No. 6.10 ("Conspiracy and

24   Overt Act—Defined"), which stated, inter alia:

25            A conspiracy, as alleged in Count One, is an agreement entered into
             between two or more persons with the specific intent to agree to
26           commit the public offenses of murder and robbery, as they are

27   _____

28        [21] By making no argument to advance them, petitioner has abandoned subclaims 3, 4, 5, 6,
     7, 9, and 10 of claim N.  *Kates*, 776 F.2d at 1397.

1

2

3

> defined later in these instructions, and with the further specific intent to commit each of such offenses, followed by an overt act committed in this state by one or more of the parties for the purposes of accomplishing the object of the agreement.

4 CT 848. Later in the instructions, murder was defined as a homicide that occurs with malice aforethought, which includes implied malice, or that occurs during the course of a homicide that is inherently dangerous to human life. 4 CT 857-58.

Although an "extremely refined . . . parsing" of the instructions, *Middleton*, 541 U.S. at 438, contains the ambiguity that petitioner identified, it is not reasonably likely that the jury adopted that interpretation. As then-Chief Justice Rehnquist once observed, "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process," where a "commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting." *Boyde v. California*, 494 U.S. 370, 380-381 (1990). Here, the conspiracy instruction contained a plain direction that a finding of "specific intent to commit" the "offense[] of murder" was required to find the defendant guilty on count 1. *See* 4 CT 848. In light of that, it is not reasonable to expect that the jurors disregarded this and instead adopted the more attenuated construction urged by petitioner. *See People v. Medrano*, 68 Cal. App. 5th 177, 185 (2021); *People v. Gilman*, 156 Cal. App. 3d 760, 766 (1984); *see generally United States v. Lucero*, 989 F.3d 1088, 1100 (9th Cir. 2021) (reviewing court adopts the "most straightforward reading of the instructions" in a claim of instructional error).

The undersigned therefore recommends that subclaim 1 of claim N be denied.

## 2. Subclaim 8

In subclaim 8 of claim N, petitioner alleges that the trial court failed to instruct the jury properly on eyewitness identification testimony and the testimony of petitioner's expert in eyewitness identifications. ECF No. 203 at 3. Specifically, petitioner argues that the trial court erred in rejecting his proposed modifications to CALJIC 2.92, and in the contents of its instruction on evaluation of the testimony of defense expert witness Dr. Loftus. ECF No. 421 at

122

191-96, 198-99.  The undersigned concludes that petitioner has not proven constitutional error.

### a.  Proposed Modifications to CALJIC 2.92

At the close of the guilt phase, the jury was instructed with CALJIC 2.92, which lists factors that the jury may consider when determining the weight to give to testimony from a purported eyewitness.  4 CT 840-41.  Among other factors, the instruction provides that jurors should consider "whether the witness's identification is in fact the product of his own recollection."  4 CT 841.  Petitioner had requested that the factor be modified to read, "whether the witness's identification is in fact the product of his own recollection or the product of information received subsequent to the event in question, or some combination thereof."  51 RT 8413.  The trial court rejected the proposal as ambiguous and unnecessary.  51 RT 8423.

The trial court's ruling was neither error, nor did it serve to deny petitioner his constitutional rights.  The instructions as given were more straightforward and simpler to understand than the proposed modification, while also being expansive enough to include the evidence that the proposed modification sought to highlight.  As such, they were proper, and they did not serve to lighten the prosecution's burden or stymie the jury's consideration of the defense theory or evidence.  *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999), *as amended on denial of reh'g* (Jan. 27, 2000).  Petitioner has not proven constitutional error with this allegation.

### b.  Proposed Instruction Concerning Defense Expert

Petitioner also fails show constitutional error in the court's rejection of his instruction concerning defense expert Dr. Loftus.

At the close of the guilt and special circumstance phase, the jury was instructed with CALJIC 2.80:

> A person is qualified to testify as an expert if he or she has special knowledge, skill, experience, training, or education sufficient to qualify him or her as an expert on the subject to which his or her testimony relates.
>
> Duly qualified experts may give their opinions on questions in controversy at a trial.  To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion.  You may also consider the qualifications and credibility of the expert.

> You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled.  You may disregard any such opinion if you find it to be unreasonable.

4 CT 833.  At the request of the prosecution, the jury was also given the following special

instruction concerning defense expert Dr. Loftus:

> Dr. Loftus testified as an expert witness on psychological factors that may affect the accuracy of eyewitness identifications in general and on psychological factors that could have affected the identifications in this case.

> You are not required to accept Dr. Loftus' opinions as conclusive.  You should evaluate them in the same way you evaluate the testimony of any other expert witness in accordance with the instruction on that subject which I have given you.

> It is for you to decide whether the factors enumerated by Dr. Loftus in her testimony are present in this case and, if so, what effect, if any, they may have on the accuracy of the identifications in this case.  In doing so, you should consider all the evidence in the case, including particularly that pertaining to the circumstances of the events in question and those after the events which bear on the accuracy and reliability of the identifications.  Also, you should consider all my instructions, including particularly those which bear directly on eyewitness identification.

4 CT 835.

Petitioner argues that the special instruction was unnecessary, as it was encompassed by

the more general instruction that the jury received, and that it served to induce the jury to discount

defense evidence.  ECF No. 421 at 197-99.  In general, it is rare that a superfluous jury instruction

effectuates a due process violation or other constitutional error in a criminal trial, because the

focus of the federal habeas corpus court's inquiry is the effect of the instructions when taken as a

whole.  *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147.  Here, the special instruction reiterated

the instruction the jury had received on evaluation of expert testimony generally in CALJIC 2.80,

with language tailored to the contents of Dr. Loftus's testimony.  None of that language

denigrated or minimized Dr. Loftus's testimony or encouraged the jury to view her testimony

with skepticism beyond the evaluative process described in CALJIC 2.80 (with which petitioner

does not take issue).  Viewing the totality of the court's instructions, petitioner has not shown a

reasonable likelihood that the jury applied the special instruction in a way that violated the

124

1  constitution. *See Estelle*, 502 U.S. at 72.

2      **3. Conclusion**

3      Petitioner has not shown his entitlement to relief on the merits on subclaims 1 or 8 of this

4  claim. Because respondent has shown that subclaim 2 of claim N is procedurally barred, and

5  because petitioner has abandoned the remaining allegations of this claim, the undersigned

6  recommends that claim N be dismissed in its entirety.

7  **Claim O**

8      In claim O, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

9  Amendments were violated by the prosecutor's misconduct during the guilt phase of the trial,

10 particularly in his closing argument. ECF No. 203 at 64-69. The undersigned has concluded that

11 subclaim 1 of this claim should be denied as meritless; subclaim 13 should be dismissed out of

12 deference to the state court's dismissal on procedural grounds; and subclaims 6, 10, and 11 should

13 be dismissed as defaulted under *Wainwright*. *See ante*. In his merits briefing, petitioner argues

14 that he is entitled to relief on the merits on subclaims 2 and 15 and on an unnumbered subclaim

15 alleging that the prosecutor committed misconduct in his references to Mr. Colbert's false

16 testimony in his guilt-phase closing argument. ECF No. 421 at 213-31. Petitioner abandons

17 subclaims 3, 4, 5, 7, 8, 9, 12, 16, and 17. *See* ECF No. 421 at 202-34. The undersigned

18 concludes that petitioner has not proven his entitlement to relief and recommends that the claim

19 be denied.

20     **1. Vouching**

21     A defendant's due process rights may be violated when the prosecutor vouches for the

22 reliability or credibility of prosecution evidence or suggests that information unknown to the jury

23 supports a prosecution witness's testimony, as doing so "plac[es] the prestige of the government

24 behind a witness through personal assurances of the witness's veracity." *United States v.*

25 *Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993); *see Lawn v. United States*, 355 U.S. 339, 359

26 n.15 (1958) (prosecutor commits misconduct when he "say[s] []or insinuate[s] that [his] statement

27 [in closing argument] was based on personal knowledge or on anything other than the testimony

28 of those witnesses given before the jury"). To warrant habeas corpus relief, the prosecutor's

1    vouching must have "'so infected the trial with unfairness as to make the resulting conviction a

2    denial of due process.'"  *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (quoting *Darden*,

3    477 U.S. at 181).

4           In subclaim 2, petitioner argues that the prosecutor in his closing argument improperly

5    vouched for the veracity of prosecution witnesses Mr. Colbert, Ms. Gomez, Mr. Captuo, Dr.

6    Lawrence, and Ms. Villaron.  ECF No. 203 at 64-65; ECF No. 421 at 213-23 (citing 51 RT 8496-

7    97, 8505, 8539; 52 RT 8655, 8659, 8885-87, 8902-04, 8907).  The undersigned has reviewed

8    each instance identified by petitioner, and none reflect vouching, i.e., that the prosecutor

9    personally assured the jury of the witness's veracity or otherwise implied that he had personal

10   knowledge that buttressed the witness's credibility.  *See Lawn*, 355 U.S. at 359 n.15.  Instead, in

11   each of these instances, the prosecutor simply referenced or summarized the witness's testimony

12   and argued that the jury should find the testimony credible through reasonable deductions from

13   the evidence.  These arguments were not improper and did not deprive petitioner of his due

14   process rights.  *See United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005); *United*

15   *States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992).

16          **2.  Argument Concerning Colbert Testimony**

17          In his merits briefing, petitioner argues that the prosecutor committed misconduct in his

18   guilt-phase closing argument by referencing false testimony from Mr. Colbert that the latter had

19   used toy guns in committing robberies.  ECF No. 421 at 226-29.  Petitioner relies on and

20   incorporates the arguments of claims B and C to prove that the testimony was false and, ergo, that

21   the prosecutor's argument was improper.  *See id*.  Because, however, the undersigned has

22   concluded that petitioner has failed to prove that this testimony was false, *see ante*, the premise of

23   petitioner's allegations of misconduct in the prosecutor's closing argument necessarily fail as

24   well.

25          **3.  Prosecutor's Failure to Recuse**

26          In subclaim 15, petitioner argues that the prosecutor failed to recuse himself, despite

27   having been personally involved in law enforcement's investigation of the Riverside and Stockton

28   crimes.  ECF No. 203 at 68; ECF No. 421 at 229-32.  Petitioner offers no argument as to the legal

authority that required the prosecutor to recuse himself, as a matter of state or federal law, or how his failure to recuse himself violated petitioner's Fifth, Sixth, Eighth, or Fourteenth Amendment rights. *See* ECF No. 421 at 229-32; ECF No. 454 at 65-70. Petitioner has therefore failed to prove his entitlement to relief on this basis.

Accordingly, the undersigned recommends that claim O be denied in toto.

**Claim P**

In claim P, petitioner alleges that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's refusal to have defense counsel's closing argument reread to the jury during deliberations, upon the request for same. ECF No. 203 at 69-70. He argues that this error prejudiced him at the guilt and penalty phases. *Id*. The undersigned concludes that petitioner has not shown his entitlement to relief on this claim.

During their guilt-phase deliberations, the jury requested of the court a readback of the entire defense closing argument. 53 RT 8985. The prosecutor objected on the grounds that the jury should only have evidence resubmitted to them, not argument, but, should the court be inclined to grant the jury's request, it should read back both sides' arguments. *Id*. The court gave the defense an opportunity to respond, but they made no objection or argument on the issue. 53 RT 8985-86. The court then denied the request, explaining to the jury that they could request testimony to be reread, but that it would be improper for the argument to be reread because the jury had been instructed to base their verdict on the evidence, not argument. 53 RT 8986. The jury was then excused for the noon recess, at which point defense counsel argued that the court's admonition may have left the jurors the mistaken impression that they could not consider the arguments of counsel. 53 RT 8989-91. When the jury returned from the noon recess, the court addressed the jurors again, instructing them that they could consider the arguments made by counsel in their deliberations, but that those arguments were not evidence, and they ultimately needed to reach their verdict based on the evidence presented. 53 RT 8993-94. Approximately one hour later, the jury returned their guilty verdicts; in total, their guilt-phase deliberations lasted a little more than four hours. 53 RT 8977, 8988, 8993, 8999; 4 CT 921-33.

Petitioner first argues that the trial court's refusal to read back the defense closing

1  argument was the functional equivalent of denying the defense the opportunity to give a closing

2  argument, which violates his rights to a defense under the Sixth Amendment.  ECF No. 421 at

3  237-38.  This is unpersuasive.  The Supreme Court has recognized that a criminal defendant has a

4  Sixth Amendment interest in the closing argument as a vital component of the defense case.  *See*

5  *Herring v. New York*, 422 U.S. 853, 858-59 (1975) ("There can be no doubt that closing argument

6  for the defense is a basic element of the adversary factfinding process in a criminal trial."); *see*

7  *also United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991) (describing defense closing

8  argument as a "critical stage of [trial] proceedings" that requires counsel to advocate for her

9  client).  Notwithstanding this, however, petitioner cites no case law—and the undersigned is

10  aware of none—in which the Supreme Court has recognized that a criminal defendant possesses a

11  constitutional interest in the jury having any portion of the trial read back to them, let alone that,

12  if such a constitutional interest exists, it would be governed by the same standard that governs the

13  right to present a defense in the first instance.  *Cf. United States v. Hernandez*, 27 F.3d 1403,

14  1408 (9th Cir. 1994) (describing the decision to accede to a jury's read-back request was squarely

15  in the trial court's discretion).  Here, because defense counsel was able to make a full closing

16  argument before the jury, petitioner's ability to have counsel participate fully and fairly in the

17  factfinding process was not significantly diminished under the Sixth Amendment.  *See Herring*,

18  422 U.S. at 858.

19       Petitioner next argues that his right to due process of law was violated because the trial

20  court erred under California law in failing to read the requested defense argument back to the

21  jury.  ECF No. 421 at 238-40; ECF No. 454 at 70-71.  This argument also fails.  Petitioner posits

22  that at the time of his trial, California Penal Code section 1138 stated,

23       After the jury have retired for deliberation, if there be any
     disagreement between them as to the testimony, or if they desire to
24       be informed on any point of law arising in the case, they must require
     the officer to conduct them into court. Upon being brought into court,
25       the information required must be given in the presence of, or after
     notice to, the prosecuting attorney, and the defendant or his counsel,
26       or after they have been called.

27  ECF No. 421 at 238, quoting Cal. Penal Code § 1138.  Per petitioner, this section "mandate[d] the

28  rereading of closing argument" upon the jury's request.  ECF No. 421 at 239.  By failing to

1    comply with mandatory state law in this regard, petitioner argues, the trial court deprived him of

2    due process under *Hicks*, 447 U.S. 343.

3         On direct appeal, the California Supreme Court rejected petitioner's argument as a matter

4    of state law, and this court is bound by that interpretation. *See Bradshaw*, 546 U.S. at 76.  The

5    California Supreme Court held that section 1138 required the trial court to satisfy jury requests

6    for rereading of testimony and for instructions on applicable legal issues, but that the statute did

7    not require a trial court to satisfy a jury's request for a readback of defense counsel's summations

8    or arguments. *Gordon*, 50 Cal. 3d 1223, 1259-60.  Instead, it held that trial courts had discretion

9    to read back summations and arguments by counsel, and, here, the trial court did not abuse its

10   discretion under state law.  *Id*.  Because the trial court did not err under state law, petitioner's due

11   process claim under *Hicks* also fails.  *See Hicks*, 447 U.S. 343.

12        Petitioner has accordingly failed to show his entitlement to relief on claim P, and the

13   undersigned recommends that it be denied.

14   **Claim Q**

15        In claim Q, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

16   Amendments were violated by the county jail's administration of anti-depressant and anti-

17   psychotic medication to him, which were "unwanted" by him and involuntarily administered.

18   ECF No. 203 at 71-73; ECF No. 421 at 240-49.  The record before the court fails to demonstrate

19   that any constitutional error occurred.

20        In *Riggins v. Nevada*, 504 U.S. 127, 135-38 (1992), the Supreme Court held that the

21   forced administration of anti-psychotic drugs to a defendant during trial, without a determination

22   by the trial court of an overriding justification for and the medical appropriateness of the

23   medication, violates the defendant's rights under the Sixth and Fourteenth Amendments.

24   Generally, the rule announced in *Riggins* has been applied in situations where medication has

25   been administered to the recipient over the recipient's express objection or express request to

26   have the medication discontinued.  In *Riggins*, for example, the jail had administered Mellaril and

27   Dilantin to the petitioner while he was awaiting trial, in response to his complaints of mental

28   distress and informed by petitioner's self-report that he had been positively treated with Mellaril

1   in the past. *Riggins*, 504 U.S. at 129. Approximately six months later, while still awaiting trial,

2   petitioner moved the trial court for an order suspending administration of both drugs until the end

3   of trial. *Id*. at 130. The trial court held a hearing on the motion and ultimately denied it, leading

4   eventually to the Supreme Court's consideration of the "narrowly define[d]" question of "whether

5   *forced* administration of antipsychotic medication during trial violated rights guaranteed by the

6   Sixth and Fourteenth Amendments." *Id.* at 132-33 (italics added); *see also Washington v.*

7   *Harper*, 494 U.S. 210 (1990) (holding incarcerated plaintiff has a Fourteenth Amendment interest

8   in avoiding involuntary administration of antipsychotic drugs, where plaintiff had affirmatively

9   refused the medications prescribed by prison doctor). In *Benson v. Terhune*, 304 F.3d 874 (9th

10  Cir. 2002), the Court of Appeals held that a petitioner may successful show that her medication

11  was "involuntarily" under *Riggins* if she can show that she consumed it without informed

12  consent, i.e., that she was "not fully informed about the nature, dosage and effects of the

13  medication prescribed for her" or, if no such information was volunteered by jail staff, that she

14  was for some reason "mentally [in]capable of seeking such information if she wanted it."

15  *Benson*, 304 F.3d at 884.

16          Here, petitioner argues that his constitutional rights were violated by his receipt of

17  "'Elavil', Amitriptyline, and 'Mellaril', Thioridazine" during trial,[22] ECF No. 421 at 240,

18  although he later acknowledges that he received these medications from the county jail after

19  having requested them himself as treatment for depression. ECF No. 454 at 72; *see* ECF No.

20  422-24, Ex. Q1. He further acknowledges that he did not affirmatively request that either

21  medication be discontinued or otherwise object to its administration. *See* ECF No. 454 at 71-72;

22  *see* ECF No. 422-24, Ex. Q1. Petitioner briefly argues that his taking of the medication was

23  nevertheless involuntary because he had not chosen the specific medications he was prescribed,

24  he was "ill-informed and uninformed as to [their] likely effect[s]," and he could not judge the

25  impact the medication would have on his functioning and demeanor. ECF No. 454 at 71-72.

26  

27  _____

[22] Mellaril is an anti-psychotic drug. *Riggins*, 504 U.S. at 133-34; *Washington v. Harper*, 494

28  U.S. 210, 214 n.1 (1990). Elavil is an antidepressant that may have psychotropic effects. *Benson v. Terhune*, 304 F.3d 874, 878, 881 (9th Cir. 2002).

The record does not demonstrate that petitioner was administered anti-psychotic or other drugs without being informed of their nature, dosage, or effects, *see Benson*, 304 F.3d at 884; instead, the sole exhibit on which petitioner relies for this claim contains copies of what appear to be petitioner's signed informed consent forms for both medications at issue here.  ECF No. 422-24, Ex. Q1 at 4-5.  There is nothing in the record to demonstrate that petitioner's functioning at the time of receiving that information was so impaired as to have rendered him unable to understand the information conveyed in those documents, unable to ask for more information about either drug should he have wanted it, or otherwise unable to knowingly consent to treatment.  *See generally* ECF No. 421 at 240-49; ECF No. 422-24, Ex. Q1 at 4-5; ECF No. 454 at 71-72; *see Benson*, 304 F.3d at 885.[23]  In sum, petitioner has failed to show that his constitutional rights were violated by the county jail's provision of Elavil and Mellaril to him.  The undersigned therefore recommends this claim be denied.

**Claim R**

In claim R, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when members of the jury observed him shackled and handcuffed during trial.  ECF No. 203 at 73-75.  Petitioner does not seek an evidentiary hearing for this claim but relies on the record to prove his entitlement to relief.  ECF Nos. 421 at 249-59, 454 at 75.  Upon review of the review of the record, the undersigned recommends that this claim be denied.

**1.  Legal Standard**

The Fifth and Fourteenth Amendments bar the use of shackles visible to the jury unless a trial court determines the physical restraints are justified by a state interest.  *Deck v. Missouri*, 544

---

[23] In support of his contention that, "[t]here is little doubt that the prescribed medication (and its termination) had significant deleterious effects on Petitioner," petitioner states that he "will submit a request for funding for expert analysis and opinions to further support the factual predicate that during the early 1980s, the San Joaquin County Jail regularly intoxicated numerous capitally charged prisoners with, *inter alia*, Mellaril for purported psychiatric treatment, and as a result, the prisoner lacked capacity and competency to proceed at trial."  ECF No. 421 at 247-48. To the extent this should be construed as a request for factual development of this claim, *see* ECF No. 396, petitioner fails to show how any such evidence would be relevant to the questions of what *his* knowledge and *his* understanding were at the times he received or took the medication. *See generally Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977).

U.S. 622, 622 (2005); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) ("Because visible shackling during trial is so likely to cause a defendant prejudice, it is permitted only when justified by an essential state interest specific to each trial.").  To establish his entitlement to relief on this claim, petitioner must show that he was shackled in the presence of the jury, the jury saw him shackled, and the shackles were not justified by state interests.  *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002).  If petitioner makes this showing, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt.  *Deck*, 544 U.S. at 635 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  In assessing prejudice, the Court of Appeals considers "the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (citing *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003)).  While prejudice may result from "even one juror" being affected "by the sight of the shackles," *Dyas*, 317 F.3d at 937, prejudice is unlikely where the jury had only a "brief," "infrequent," or "inadvertent" glimpse of the defendant shackled.  *Ghent*, 279 F.3d at 1133.

### 2.  Discussion

#### A.  The Claim Is Not Barred Under *Teague*

In *Teague*, 489 U.S. 288, the Supreme Court held that habeas corpus petitioners typically are not entitled to relief under new rules of constitutional law that have arisen since the time the petitioner's conviction became final, with certain narrow exceptions.  Respondent argues that petitioner's claim R is barred under *Teague* because it arises under *Deck*, 544 U.S. 622, a decision that was issued after petitioner's conviction became final on direct appeal in 1990.  ECF No. 441 at 287-88.  Respondent's argument is not well-taken.  In *Deck*, the Supreme Court held that the unjustified shackling of a capital defendant at the penalty phase of his trial violates his due process rights.  *See Deck*, 544 U.S. 622.  The Supreme Court had established long before that, however, that the shackling of a criminal defendant at the guilt phase of his trial, without a showing of necessity, violates his due process rights.  *See Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970).  Indeed, in *Deck*, the Court detailed this

1    prohibition's "deep roots in the common law," which predated the American colonies, and which

2    is embedded in our modern concept of a fundamentally fair trial. *Deck*, 544 U.S. at 626; *see also*

3    *Frye v. Broomfield*, 115 F.4th 1155, 1163 (9th Cir. 2024); *United States v. Wiley*, 103 F.4th 565,

4    571-72 (9th Cir. 2024). Petitioner's claim, which alleges that the jury saw him restrained at the

5    guilt phase of his trial, without any showing of necessity, therefore arises under law that existed at

6    the time his direct appeal became final, and *Teague* presents no bar to his relief.

7        **B. Claim R Fails on the Merits**

8        In his merits briefing, petitioner argues that he is entitled to relief on three alternative

9    grounds: members of the jury having seen him in handcuffs and shackles during trial and pretrial

10   proceedings; a juror having observed petitioner's co-defendants handcuffed and shackled; and a

11   prosecution witness describing in his testimony petitioner's restraints during transport. ECF No.

12   421 at 250-57. Petitioner fails to prove his entitlement to relief on any basis.

13       **1. Observations of Petitioner**

14       Petitioner argues that two instances in the record demonstrate that members of the jury

15   actually saw him handcuffed and shackled during guilt phase proceedings or prior. First, he

16   observes that the record indicated he was shackled at the waist, groin, and ankles during his

17   transport to and from the courtroom, and, during part of jury selection, some prospective jurors

18   may have seen him as he was transported through the hallway. ECF No. 421 at 252 (citing 19 RT

19   1767A-69A). In order to establish a constitutional violation and resultant prejudice, however,

20   petitioner must demonstrate that members of his jury observed him restrained. *Dixon v. Ryan*,

21   932 F.3d 789, 809-10 (9th Cir. 2019); *see Deck*, 544 U.S. at 626. Here, the instance cited by

22   petitioner occurred during jury selection, in which no persons who were ultimately selected to

23   serve as jurors were present. *Compare* 3 CT 710-11 (listing empaneled jurors) *with* 19 RT

24   1760A-63A (listing prospective jurors present during events in question). Petitioner therefore has

25   failed to prove that his rights were violated or that he was prejudiced if these prospective jurors

26   observed him shackled.

27       Second, petitioner argues that the record establishes that jurors observed him restrained

28   during a portion of the guilt phase. ECF No. 421 at 252-53. The record does not support a

1    finding that he suffered a violation of his constitutional rights, either as a matter of fact or of law.

2    The sole evidence on which petitioner relies to establish that members of the jury saw him

3    restrained is the record of a hearing that occurred during the guilt phase, wherein defense counsel

4    informed the trial court that petitioner had informed her that one of the jurors had seen him in

5    handcuffs while being moved from the court's "control area" to the courtroom.  39 RT 5961-62.

6    The court's escort officer then offered that, while he had not personally observed a juror view

7    petitioner during transport, petitioner had told him that jurors had seen him "about eight times."

8    *Id.*  The officer explained, "I've taken the long way around through all little passage ways that we

9    can hide out, it just seems every time we cross down there there is a juror on that phone."  39 RT

10   5962.  The trial court expressed concern that jurors not see petitioner restrained during transport,

11   but was uncertain how the possibility could be avoided given the layout of the courthouse.  *Id.*

12   The court made no findings that any jurors had, in fact, observed petitioner in the hallways or

13   otherwise while he was restrained, and made no inquiries of the jurors on this question.  *See* 39

14   RT 5961-63.

15       On this record, petitioner fails to establish that any juror actually observed him restrained.

16   The trial court did not find that any member of the jury had seen petitioner restrained as he was

17   transported to the courtroom.  Instead, petitioner argues that the court can infer that at least one

18   juror saw petitioner restrained through the remarks of counsel, the escort officer, and the trial

19   court during its brief discussion of the issue.  That inference, however, is unsupported.  The

20   record contains an untested hearsay statement by petitioner, conveyed through counsel, devoid of

21   any details from which it could be verified that any particular juror observed petitioner, even if

22   petitioner had observed the jurors.  *See* 39 RT 5961-63.  Similarly, the escort officer's statements

23   on the record conveyed only his first-hand knowledge of having seen jurors in the hallway, but no

24   statement—beyond a recitation of petitioner's hearsay—indicating that any of the jurors had

25   reciprocally seen petitioner.  *See* 39 RT 5961-62.  Simply put, the record fails to establish that any

26   juror actually observed petitioner's restraints, and this failure is fatal to petitioner's claim of error.

27   *See Deck*, 544 U.S. at 626; *Dixon*, 932 F.3d at 809-11.

28       **2. Observations of Co-Defendants**

134

Petitioner also argues that his rights were violated by a juror's observation of his co-defendants restrained. The Court of Appeals has recognized that a juror's observations of restraints on the co-defendants of a criminal defendant can violate the latter's rights, by undermining the presumption of innocence given to the co-defendants and, by association, to the defendant. *See United States v. Jarvis*, 792 F.2d 767, 768-70 (9th Cir. 1986). Here, the record fails to support petitioner's argument.

On December 19, 1985, during the guilt phase, the court held an in limine hearing outside the presence of the jury concerning the possibility of petitioner's co-defendants, Bernard Gordon and Michael Caputo, later being brought into court during the trial testimony of some of the prosecution witnesses for live identifications. 40 RT 6133-34. Bernard Gordon and Michael Caputo were present during this in limine hearing, dressed in orange jail clothing and shackled at the hands, feet, groin, and waist. 40 RT 6133-34, 6145-46. Defense counsel stated that there were six uniformed police officers present with them as well. 40 RT 6151. Defense counsel then stated for the record that, during the in limine hearing, one of petitioner's jurors "kept looking through the door" of the courtroom. *Id.* The trial court neither made any findings to that effect nor did it inquire of any of the jurors whether they had observed Bernard Gordon or Michael Caputo in the courtroom or courthouse that day. *See id.* Ultimately, the prosecutor withdrew his request to have the men attend the trial, and they did not appear again at petitioner's proceedings. *See* 40 RT 6137-39, 6143, 6147-48.

Petitioner argues that this instance reflected a violation of his constitutional rights, but the record fails to show that any of petitioner's jurors actually observed his restrained co-defendants. There was no factual finding to this effect in the trial court. The only facts on the record tending to establish this was petitioner's counsel's statement that "one of the jurors kept looking through the door" during the in limine hearing.[24] *See* 40 RT 6151. There is nothing in the record that

---

[24] Petitioner also argues that trial counsel represented that Bernard Gordon and Michael Caputo had been transported through the courtroom hallways "in full view of Petitioner's jurors and the trial witnesses occupying the hallway." ECF No. 421 at 253-54 (citing RT 6150-51). Defense counsel, however, never represented that any jurors had been present in the hallways during the co-defendants' transport, and the record does not otherwise indicate it. *See* 40 RT 6149-51.

1    corroborates the accuracy of counsel's stated observation. Even if the comment was accurate,

2    nothing on the record establishes what the juror would have seen, either given the layout of the

3    courtroom or the juror's own observational prowess. The reviewing court cannot presume a juror

4    observed a defendant's restraints, but rather there must be specific evidence that demonstrates

5    that he or she did. *See Dixon*, 932 F.3d at 809-11 (dispositive to denial of relief was lack of

6    evidence that restraint had been visible to jurors, given records facts establishing how it had been

7    positioned on the defendant's person); *Parrish v. Small*, 315 F.3d 1131, 1133-35 (9th Cir. 2003)

8    (based on the petitioner's prima facie showing that he had been restrained in "handcuffs . . .

9    visible to the jury," an evidentiary hearing was warranted to develop "additional information

10    about what was visible in the court-room, what jurors could actually see, and what the trial

11    participants recall" in order enable petitioner to prove his entitlement to relief); *Castillo v.

12    Stainer*, 983 F.2d 145, 149 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d 669

13    (9th Cir. 1993) (denying relief on shackling claim because the record demonstrated that "[t]he

14    restraint in the courtroom was so worn by [defendant] that the jury could not see it"); *see also

15    Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (holding counsel ineffective in failing to object

16    to use of restraints where "a witness recounted that during her testimony at trial, she could see

17    [defendant's] shackles from the witness box . . . [and m]ost importantly, the jury box was directly

18    next to the witness box, and therefore, [defendant's] shackles were 'readily visible' to the jury");

19    *Fountain v. United States*, 211 F.3d 429, 434-35 & n.8 (7th Cir. 2000) (rejecting claim on basis

20    that no showing had been made that the defendant's ankle shackles had been visible to the jury,

21    where there was evidence that "due to the arrangement of the tables, counsel, individuals at the

22    tables, as well as the raised position of the witness chair in front of the jury box, it was unlikely

23    that the jury even saw [the defendant's] legs during trial"). Here, the record does not suffice to

24    establish that any juror actually saw Bernard Gordon's and Michael Caputo's restraints during the

25    in limine hearing.

26        Similarly, although the presence of an exceptional number of security personnel may

27    violate the defendant's due process rights, this too hinges on the particular facts. For instance,

28    four additional officers sitting quietly in the first row of the courtroom causes no due process

1    violation.  *Holbrook*, 475 U.S. at 570-71; *see also Brown v. Davenport*, 596 U.S. 118, 142-43

2    (2022).  Here, the record does not establish what any juror actually observed of the security

3    personnel in the courtroom during the in limine hearing.  *See* 40 RT 6133-51.  As such, petitioner

4    fails to establish that he suffered a violation of his due process rights.

5          Additionally, even if the court were to treat defense counsel's representations as

6    establishing that a member of petitioner's jury saw Bernard Gordon and Michael Caputo

7    restrained or surrounded by extra security personnel during the in limine hearing, petitioner fails

8    to show that this violated his rights to a fair trial.  In cases where courts have found that a

9    defendant's due process rights may have been imperiled by jurors seeing his co-defendants

10   restrained, the circumstances were such that the jurors knew the restrained persons to be the

11   defendant's co-defendants.  For instance, in *Jarvis*, the defendants were tried jointly and jurors

12   encountered some of the co-defendants, whom they had seen with the defendant in the courtroom,

13   at the elevator as they were being transported.  *Jarvis*, 792 F.2d at 768.  Here, even if a juror

14   viewed Bernard Gordon and Michael Caputo restrained or accompanied by extra security in the

15   courtroom during the in limine hearing, there is nothing to indicate that that juror would have

16   been able to deduce who the men were or that they were petitioner's alleged co-perpetrators.  *See*

17   *generally* 40 RT 6153 (court does not inform jury of reason for hearing from which they were

18   excluded from the in limine hearing).  For this additional reason, petitioner fails to demonstrate

19   that his due process rights were violated.

20         **3.  Testimony Concerning Petitioner's Restraints**

21         Petitioner lastly argues that his due process rights were violated by testimony elicited by

22   the prosecutor from witness Billy Colbert describing petitioner's restraints during transport.  ECF

23   No. 421 at 256.  Mr. Colbert testified that he encountered petitioner while they were being

24   transported to the courthouse from the jail, stating they were "handcuffed coming to court

25   together."  48 RT 7850.  He further stated:

26

27              Well, we all come to court.  We goes down to a holding cell, a court
              holding cell for people coming to court, and they call us, the names;

28

1
2
3

> If you dressed out, they call the guys who were dressed out for jury trials, and we all go inside of a tank and we wait until the chain come and we all handcuffed together and put on with a group of guys of 40 or 50 mens (*sic*) and all in a little truck, and we come on to the courtroom.

4    *Id*.  Shortly thereafter, the prosecutor referenced in one of his direct examination questions

5    petitioner and Mr. Colbert having been "chained together" during transport.  48 RT 7851.  Later

6    in Mr. Colbert's testimony, the prosecutor again referenced Mr. Colbert and petitioner having

7    been "chained together" during their interaction, and Mr. Colbert's reply included testimony that

8    he and petitioner "were chained together going in" the holding cell and were "hooked together."

9    48 RT 7901.

10        This testimony was error under *Holbrook*, 475 U.S. 560, and *Allen*, 397 U.S. 337.

11    Although these cases arose from the jurors having seen or otherwise personally observed the

12    restraints themselves, *see Deck*, 544 U.S. at 626; *Dixon*, 932 F.3d at 809-11, the same underlying

13    harm occurred here, in that the jury was made aware of the restraints and could draw a negative

14    inference about the defendant from that awareness, undermining the presumption of innocence.

15    By Mr. Colbert's descriptive testimony, as well as the prosecutor's repeated references to that

16    testimony in his subsequent questions, the jury learned of the restraints' existence and their use on

17    petitioner, thereby subjecting petitioner to the same possibility of bias and prejudice in the jury

18    that jurors' direct observation of the restraints would have engendered.  *See generally Holbrook*,

19    475 U.S. at 567.  Although there may be a more pronounced prejudicial effect from the jury

20    having seen the restraints themselves, *see Allen*, 397 U.S. at 370, the elicitation of descriptions of

21    the restraints was improper and violative of the petitioner's due process rights under the Supreme

22    Court's precedents.

23        Nonetheless, respondent has shown that any error was harmless beyond a reasonable

24    doubt.  *See Deck*, 544 U.S. at 635; *Chapman*, 386 U.S. at 24.  The Court of Appeals has

25    repeatedly held there is little to no prejudicial effect from jurors briefly seeing a criminal

26    defendant restrained while transported to or from the courtroom.  *See Williams v. Woodford*, 384

27    F.3d 567, 593 (9th Cir. 2004) (collecting cases).  Here, Mr. Colbert's testimony was the

28

functional equivalent of such glimpses, as it conveyed, essentially, that during one day of trial petitioner was restrained with handcuffs and a chain during his transport to the courthouse, along with 40 or 50 others.  48 RT 7850-51, 7901.  This carried with it minimal, if any, intrinsic prejudice.  *See Williams*, 384 F.3d at 593.  Moreover, any de minimus prejudice was presumptively cured by the trial court's special instruction, which it gave on the defense's request, that the jurors were "not to draw any inference adverse to the defendant from the fact that he has been incarcerated during this trial.  Such fact is no evidence whatsoever that he is any more likely to be guilty than not guilty of the charges herein."  4 CT 837; 53 RT 8942; *see Frye*, 115 F.4th at 1165.  In the context of the totality of evidence that the jury heard establishing petitioner's culpability of the charged offenses, respondent has shown beyond a reasonable doubt that Mr. Colbert's testimony did not contribute to the verdicts.  *See Deck*, 544 U.S. at 635; *Chapman*, 386 U.S. at 24.

For these reasons, petitioner has not shown his entitlement to relief on claim R and the undersigned recommends that it be denied.

**Claim U**

In claim U, petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's rulings on the scope of cross-examination at the penalty phase, which, per petitioner, prevented him from testifying on his own behalf.  ECF No. 203 at 98-100.  Petitioner alleges that these rulings amounted to a denial of his right to testify and, as such, are structural errors that are reversible per se or, alternatively, were not harmless beyond a reasonable doubt.  *Id.* at 99-100.  The court recommends that this claim be denied.

**1. Background**

After the jury returned the guilty verdict and before the penalty phase commenced, the trial court addressed the defense's penalty phase in limine motions, including the defense's request that the prosecutor be precluded from arguing that petitioner lacked remorse for the capital homicide.  Defense counsel argued that petitioner had been hamstrung in expressing remorse through testimony in the guilt phase out of concern for the possibility of being cross-examined on the facts of the Riverside case, which was still pending during the guilt phase and at

1   the time the penalty phase commenced.  53 RT 9024.  The court took the issue under submission.

2   53 RT 9036.

3        Defense counsel then raised the question of, if in the penalty phase, petitioner "elects to

4   take the stand and does not testify as to anything concerning either the crimes that he has just

5   been convicted of, or anything with respect to Riverside, whether or not the District Attorney . . .

6   will be able to go into the circumstances of the crimes," during cross-examination, pursuant to

7   Penal Code section 190.3(a).  53 RT 9036-37.  The court and parties then discussed, briefly, the

8   hypothetical topics of petitioner's testimony on direct examination under the Penal Code and

9   what questions on cross-examination those topics might suggest.  53 RT 9037-38.  The court

10  stated that, if petitioner did not testify on direct about the circumstance of the Stockton or

11  Riverside crimes, "he could do that without opening himself up for cross-examination on the

12  details of the crime."  53 RT 9038.

13       The court and counsel then concluded,

14

15  THE COURT:          Let's just assume that he can say something that doesn't
                        have anything to do with the details of the Stockton
16                      murder, or the details of the Riverside murder.

17  MR. VAN OSS:        Well, I think that we run into possibly the same situation
                        that we've already ruled on, that was with regard to his
18                      attempt to, or his desire to testify with regard to the
                        statement of Mr. Colbert.
19

20                      The court already ruled on—with regard to that, that he
                        could take the stand and testify with regard to only that
21                      statement, but that he would have to be very, very careful
                        because if—certainly if he opens himself up—
22

23  THE COURT:          That's right.

24  MR. VAN OSS:        —to cross-examination in the least way that it would be—
                        he would be deemed to have waived it—
25

26  THE COURT:          I would think that perhaps counsel have had time to think
                        about this, and have in mind the areas that they want the
27                      defendant to testify about, and that they're mindful of the
                        problems that might arise if he got into some area that
28                      somehow opened himself up to questioning about the

140

1                        circumstances of the crimes.

2                        I can't—I can't make a rule ahead of time on each question.

3       MS. FIALKOWSKI:  No, we understand that, your Honor.

4       THE COURT:      But it would seem to me that he could testify and limit his
5                        cross-examination by the scope of his direct.

6                        And that would be up to counsel for the defense, and that's
7                        about all I could say on that.

8                        We will have to take it one step at a time—I think before—

9       MR. JACOBSON:   Certainly the court can't make an advance ruling in
10                       advance of the testimony.

11      THE COURT:      I think if a question arises, and Mr. Van Oss feels that he
12                       has gone over the line, I think we should deal with that
                         outside of the presence of the jury.

13      MR. VAN OSS:    That's the only way I can think to do it, unless the defense
14                       wishes to indicate what sort of testimony that he wants to
                         give, then we can make some kind of ruling.  But absent
15                       that I think we're just going to have to take it one step at a
                         time.

16      MR. JACOBSON:   The only ruling we wanted, and I think the ruling we have
17                       from the court is that by his mere taking the stand and
                         saying anything, he subjects himself and only himself up to
18                       cross-examination concerning any and all the facts in either
19                       case.

20      MR. VAN OSS:    We've already had a ruling that that isn't necessarily true.

21      THE COURT:      Okay, and it's still my ruling.

22  53 RT 9039-41.  Defense counsel made no further argument and sought no further ruling on the

23  issue.  *See* 53 RT 9041-85, 9158-71; 54 RT 9172-9215, 9338-64; 56 RT 9473A-9482.  Later in

24  the penalty phase, petitioner informed the court that he would not testify, and counsel stated that

25  the decision was made due to "the court's ruling on the 1101 motion regarding the Riverside

26  evidence," out of concern for the effect any such testimony may have had on the charges

27  petitioner was facing in Riverside.  56 RT 9474-75.  Petitioner did not testify at the penalty phase.

28

1    *See* 53 RT 9093-9157; 54 RT 9215-9337; 55 RT 9365-75.

2        **2. Discussion**

3        Petitioner fails to prove his entitlement to relief on the merits.  First, petitioner argues that

4    his constitutional rights to testify under the Fifth Amendment and to a reliable sentencing

5    determination under the Eighth Amendment were violated by the trial court's refusal to rule on

6    the scope of permissible cross-examination.  ECF Nos. 421 at 315, 454 at 83.  He further argues,

7    in his reply brief, that not only did the trial court fail to rule on the issue, but it indicated it would

8    allow "anything [to] come in" on cross-examination if petitioner testified.  ECF No. 454 at 84-85.

9    The record, however, does not align with petitioner's characterization of it.

10       The record does not show that the court failed to rule on the scope of cross-examination,

11   or that it indicated that anything would be a fair topic of cross-examination if petitioner testified.

12   Rather, the record shows that the court ruled that cross-examination could be within the scope of

13   direct examination.  53 RT 9039-41.  This ruling is axiomatic and was not error.  *See Brown v.*

14   *United States*, 356 U.S. 148, 154-56 (1958) (holding that "by taking the stand and testifying in

15   her own behalf [the defendant] did . . . forego the right to invoke on cross-examination the

16   privilege against self-incrimination regarding matters made relevant by her direct examination");

17   *see also United States v. Black*, 767 F.2d 1334, 1341 (9th Cir. 1985), *cert. denied*, 474 U.S. 1022

18   (1985) (relying on *Brown*, holding, "[a] defendant who testifies at trial waives his Fifth

19   Amendment privilege and may be cross-examined on matters made relevant by his direct

20   testimony," where "[t]he scope of the defendant's waiver is coextensive with the scope of

21   relevant cross-examination).  It also does not reflect the lack of a ruling.  *See Luce*, 469 U.S. at

22   39-42 (describing as an "in limine ruling" the trial court's denial of petitioner's request to order

23   the prosecution precluded a priori from offering certain evidence to impeach the defendant if he

24   testified).  Instead, the trial court's ruling was precisely the ruling the defense sought, viz., that, if

25   petitioner "elect[ed] to take the stand [at the penalty phase] and d[id] not testify as to anything

26   concerning either the crimes that he has just been convicted of, or anything with respect to

27   Riverside," then the prosecutor could not cross-examine him on the circumstances of those

28   crimes.  *See* 53 RT 9036-37.  Petitioner fails to show that the trial court committed error.

1        Petitioner further argues that he "should have been allowed to testify regarding matters

2    such as his childhood upbringing that did not touch on any aggravating factors or the

3    circumstances of the crime, and therefore would not have subjected him to cross-examination on

4    other topics." ECF No. 421 at 315. The trial court's ruling did not exclude such testimony,

5    however. Rather, the court simply ruled that, to the extent petitioner's testimony on direct

6    examination was impeachable with evidence of his conduct during the Riverside and Stockton

7    crimes, the prosecutor could cross-examine him on those areas. This ruling therefore did not

8    function to deprive petitioner of his right to present available mitigation evidence. *See generally*

9    *Lockett*, 438 U.S. at 604.

10        Petitioner also fails to prove that he was prejudiced by the court's ruling. *See Luce*, 469

11    U.S. at 42 (holding that, to obtain relief on this claim, petitioner must prove error not harmless).

12    Petitioner argues that, as a result of the court's ruling, he elected not to testify[25] and, because of

13    that, the jury did not hear valuable mitigation evidence about his life and upbringing. ECF Nos.

14    421 at 315-18, 454 at 85-86. Petitioner's argument fails to persuade. The premise of his

15    prejudice argument is that his testimony was necessary for the jury to fully understand his

16    difficult, traumatic childhood and the effect it may have had on him. This premise is

17    unsupported, however, as petitioner cites no authority suggesting that a capital defendant's

18    testimony is, for whatever reason, the only or preferred method for placing such evidence before

19    the jury. *See* ECF No. 421 at 316-18. In fact, petitioner's argument appears at odds with

20    numerous cases where the defense presented similar mitigation themes without relying on the

21    defendant's own testimony, instead relying on the testimonies of family members and other

22    percipient witnesses of the defendant's life, expert witnesses who learned about the defendant's

23

24        [25] The record substantiates this assertion. During a hearing in the penalty phase, defense
counsel informed the court that they did not intend to call petitioner to testify out of concern that
25    the scope of cross-examination would include matters that could prejudice petitioner in his case in
Riverside County. 56 RT 9473-74. The court then held a colloquy with petitioner, who
26    confirmed that he would not testify and explained, "it's not necessarily that I don't want to testify,
it's I felt I couldn't testify because the circumstances of the other case." 56 RT 9474. When the
27    court inquired if petitioner agreed with the decision that he not be called to testify, petitioner
responded, "Yes, Your Honor, I'm forced to agree with it, I have no choice." 56 RT 9475.

28

1    life and could communicate about it to the jury, and documents memorializing various aspects of

2    the defendant's life and development.  *See Deere*, 41 Cal. 3d at 367 (describing a reasonable

3    penalty phase mitigation presentation as including testimony from the defendant's "family

4    members . . . [and] others whose lives or activities have been favorably touched by the person on

5    trial: coworkers, employers, teachers, neighbors, or friends"); *People v. Frierson*, 25 Cal. 3d 142,

6    165 (1979) (holding defense counsel was unreasonable in failing to call at the penalty phase

7    available "relatives, friends and acquaintances of defendant" the testify in mitigation about capital

8    defendant's life and upbringing); *see also* Sean D. O'Brien, *Death Penalty Stories: Lessons in*

9    *Life-Saving Narratives*, 77 UMKC L. Rev. 831, 843 (2009) (describing cases where defense

10   secured a life sentence without defendant testifying at the penalty phase); Sean D. O'Brien, *When*

11   *Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in*

12   *Death Penalty Cases*, 36 Hofstra L. Rev. 693, 724 (2008) (same); Russell Stetler, *The Mystery of*

13   *Mitigation: What Jurors Need to Make A Reasoned Moral Response in Capital Sentencing*, 11 U.

14   Pa. J.L. & Soc. Change 237 (2008) (same); Welsh S. White, *A Deadly Dilemma: Choices by*

15   *Attorneys Representing "Innocent" Capital Defendants*, 102 Mich. L. Rev. 2001, 2012 (2004)

16   (same).[26]  Petitioner therefore fails to prove that, if the trial court's ruling was error, he was

17   prejudiced by it.  *See Luce*, 469 U.S. at 42.

18       For these reasons, petitioner has not proven his entitlement to relief on claim U, and the

19   undersigned recommends that the claim be denied.

20   **Claim V**

21       In claim V, petitioner alleges that the trial court violated his Eighth and Fourteenth

22   Amendment rights by excluding certain defense evidence at the penalty phase.  ECF No. 203 at

23   100-02.  The undersigned has recommended that subclaim 2 of this claim be denied out of

24   deference to the state court's denial of that subclaim on independent and adequate state law

---

25       [26] Petitioner also cites to the transcript in his brother's trial to demonstrate what was
26   presented in the latter's case, in support of his argument that he was prejudiced by being
     precluded from presenting the same evidence in his case.  *See* ECF Nos. 421 at 317-18, 454 at 85-
27   86.  That transcript is not part of the record before the court in this case, however, *see generally*
     ECF Nos. 5, 7, 36, 421 & Exhibits; 442 & Exhibits, and therefore the court has no way of
28   assessing whether or how it supports petitioner's prejudice argument.

1  grounds. Petitioner offers no argument in support of his subclaim 3 of this claim, thus

2  abandoning it. *See* ECF No. 421 at 318-37; ECF No. 454 at 87-92; *Kates*, 776 F.2d at 1397.

3        The undersigned recommends denial of subclaim 1 of this claim on the merits. In

4  subclaim 1, petitioner argues that the trial court erred in excluding evidence of the process of

5  execution in California. ECF No. 203 at 100-01. At the penalty phase of a capital trial, a

6  defendant has a right under the Eighth Amendment to present evidence relating to "any aspect of

7  [his] character or record and any of the circumstances of the offense," to urge the jury to return a

8  life sentence. *Skipper*, 476 U.S. at 4. The trial court, however, did not err in concluding that

9  evidence of the manner of execution was irrelevant to the jury's penalty-phase determination. As

10  our sister court has explained:

11        At its heart, the penalty phase of the trial is designed to separate those
12  defendants who deserve the death penalty, and those who, because
   of the nature of the crime, their background, and the circumstances
13  of their actions during the crime, are less deserving of the death
   penalty. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct.
14  2978, 49 L.Ed.2d 944 (1976). Evidence regarding the manner in
   which the death penalty is carried out does not help the jury decide
15  whether a particular defendant is more or less deserving of the
   ultimate punishment. Every person sentenced to death in California
16  at the time of petitioner's trial faced the same method of execution.
   Details of the execution are not relevant to the appropriate sentence
17  and the state court could properly exclude the proffered evidence.

18  *Williams v. Calderon*, 48 F. Supp. 2d 979, 1029 (C.D. Cal. 1998), *aff'd sub nom. Williams v.*

19  *Woodford*, 306 F.3d 665 (9th Cir. 2002), and *aff'd sub nom. Williams v. Woodford*, 384 F.3d 567

20  (9th Cir. 2004). To the extent that petitioner argues that evidence of the method of execution was

21  relevant to the jury's full and complete appreciation of the seriousness of the decision

22  encompassed by their penalty verdict, there is no Supreme Court precedent supporting this

23  argument. *See* ECF No. 421 at 333-36; *see generally Caldwell*, 472 U.S. 320 (Eighth

24  Amendment satisfied where jury not affirmatively misled about the import of their penalty phase

25  verdict). Petitioner has not shown that the trial court committed constitutional error in excluding

26  his proffered evidence. The undersigned therefore recommends that claim V be denied.

**Claim W**

27

28        In claim W, petitioner alleges that the prosecutor committed prejudicial misconduct in his

145

1  closing argument at the penalty phase, violating his rights under the Fifth, Sixth, Eighth, and

2  Fourteenth Amendments. ECF No. 203 at 102-09. The undersigned has found that subclaim 1(c)

3  and a portion of subclaim 1(b) are procedurally defaulted. *See ante*. Additionally, petitioner has

4  abandoned several subclaims originally alleged in this claim, by making no argument to advance

5  them in his briefing pending before the court. *See* ECF No. 421 at 337-50; ECF No. 454 at 92-

6  96; *Kates*, 776 F.2d at 1397. The undersigned recommends dismissal of subclaims 1(a), 1(e),

7  1(g), 1(h), 2, 3(a)-(g), 4(f), 4(g), 5, 6, and 7 of claim W due to petitioner's abandonment.

8      Thus, pending for merits consideration are subclaims 1(b) (in part), 1(d), 1(f), 1(i), 3(h),

9  4(a)-(e), and 8 of claim W. The undersigned considers each in turn.

10     **1.  Subclaim 1(b)**

11     In subclaim 1(b), petitioner alleges that the prosecutor committed misconduct by

12  improperly arguing that petitioner's post-crime lack of remorse was aggravating. ECF No. 203 at

13  103. The undersigned has concluded that, to the extent this subclaim contains an allegation that

14  petitioner's conduct shortly after the crime indicated a lack of remorse, that allegation has been

15  defaulted. In the non-defaulted portion of this subclaim, petitioner argues that the prosecutor

16  improperly urged the jury to return a death verdict based on an improper aggravating factor, viz,

17  petitioner's lack of remorse evidenced in the jail note attributed to him. ECF No. 203 at 103.

18  The undersigned concludes that petitioner has not shown that the prosecutor committed

19  misconduct.

20     Prior to closing arguments and on the defense's motion, the trial court ruled that the

21  prosecutor could not argue that the jail note attributed to petitioner indicated a lack of petitioner's

22  remorse, either as aggravating in and of itself or as "an enhancement of an aggravating factor."

23  53 RT 9024-36; 54 RT 9212-14, 9343-47. During closing argument, the prosecutor described

24  evidence of petitioner's post-crime conduct, including evidence that he and his co-conspirators

25  may have been planning additional crimes. 56 RT 9492-95. He then argued, "[a]nd finally what

26  happened after [petitioner] was arrested in this case? In the note that he wrote his only concern,

27  the only thing that he was thinking about as evidenced by his own handwriting is concern for

28  himself. All he was—," at which point defense counsel objected, which the court overruled. 56

1    RT 9494.  After the objection, the prosecutor continued, "[t]he point about the note is that the

2    only thing that the defendant indicated in that note, the only thing was how to beat the case, how

3    to beat the rap.  That was his only concern."  56 RT 9495.  Later, the court allowed defense

4    counsel to argue the objection more expansively outside the presence of the jury, and the court

5    confirmed its prior ruling, explaining that the prosecutor's argument was a proper comment on

6    the evidence.  56 RT 9516-17.

7         Petitioner argues that the prosecutor's argument violated the trial court's prior ruling and

8    was unlawful, since it urged the jury to consider petitioner's post-crime lack of remorse as its own

9    aggravating factor.  ECF No. 421 at 340-42.  To be sure, lack of remorse is not a statutory

10   aggravator under the California capital sentencing scheme, and thus it would violate state law for

11   the jury to consider it as a reason to impose death.  *See People v. Keenan*, 46 Cal. 3d 478, 510

12   (1988), *as modified* (Sept. 22, 1988), *as modified* (Oct. 31, 1988); *see generally Barclay v. Fla.*,

13   463 U.S. 939, 957 (1983) (holding that there is "no constitutional defect in a sentence based on

14   both statutory and nonstatutory aggravating circumstances").  At the same time, California law

15   did permit the jury to consider the defendant's expressions of remorse as mitigation, and it was

16   not improper for a prosecutor to argue the absence of this mitigating factor, so long as he did not

17   "affirmatively advance[e] defendant's lack of remorse as an aggravating circumstance."  *People*

18   *v. Walker*, 47 Cal. 3d 605, 650 (1988); *see also People v. Proctor*, 4 Cal. 4th 499, 545 (1992);

19   *People v. Carrera*, 49 Cal. 3d 291, 339 (1989), *as modified on denial of reh'g* (Nov. 21, 1989).

20        Viewing the prosecutor's argument as a whole, petitioner has not shown that the

21   prosecutor committed misconduct.  The portion of the argument at issue did not urge the jury to

22   find that petitioner's remorselessness about the capital crime was aggravating as such; rather, this

23   portion was part of a much lengthier argument by the prosecutor that petitioner and his co-

24   conspirators had engaged in a cold-blooded, elaborately-planned, lethal crime spree, of which the

25   capital homicide was a part and which included petitioner taking measures to avoid detection, a

26   concern that he continued to act on even after his arrest.  *See* 56 RT 9486-95.  There was no error

27   in the trial court's overruling petitioner's objection to this portion of the prosecutor's argument,

28   either as violative of California law or of the trial court's prior ruling.  Petitioner has not shown

147

1   that this argument constituted misconduct, let alone that it violated his constitutional rights, and

2   the undersigned recommends that this subclaim be denied.

3   **2.  Subclaim 1(d)**

4   In subclaim 1(d) of claim W, petitioner alleges that the prosecutor "provided the jury with

5   a misleading and fundamentally incorrect view of its sentencing responsibilities and urged the

6   sentencing jury to return a death verdict based on [the] constitutionally prohibited and improper

7   sentencing factor" of "nonstatutory aggravation—the planning of other crimes."  ECF No. 203 at

8   103-04.  The undersigned concludes that petitioner has not shown that the prosecutor's argument

9   was misconduct.

10   As noted *ante*, during his penalty phase closing argument, the prosecutor described some

11   of the guilt-phase evidence that the jury had heard of petitioner's actions before and after the

12   capital homicide.  In the course of this argument, the prosecutor stated,

13   What did they do as soon as they finished the killing in Stockton on
     December the 18th?

14   A few days later they began making their plans for the next one.

15   Michael Caputo, as the representative of the group, using Bernard
     Gordon's telephone, ordered four more barrels from the Sherwood
     Arms Company.

18   I'm not going to belabor again the point over why they needed four
     barrels and so forth.

19   I think you have already decided those issues, but we know they
     ordered the barrels.

21   We know they had a map of Phoenix.

22   We know the defendant had a map of Tucson.

23   They had all the material ready again to commit at least four more
     crimes of the same nature, and they were ready to use the gun in each
     one of those.

24   56 RT 9493-94.  Petitioner argues that this argument was misconduct, as "[p]lanning crimes that

25   do not occur is not aggravating evidence, and not a subject for jury consideration in determining

26   the sentence under" the California statute.  ECF No. 421 at 345.

27   Petitioner fails to show that the prosecutor's argument was misconduct.  Under California

28

1    law, all evidence that is properly admitted at the guilt phase of a capital trial comprises

2    "circumstances of the crime" that the jury may consider and to which it may give aggravating

3    weight at the penalty phase, pursuant to Penal Code section 190.3(a).  *People v. Champion*, 9 Cal.

4    4th 879, 946 (1995), *as modified on denial of reh'g* (June 1, 1995).  This is true even where the

5    evidence at issue includes evidence of other crimes or possible crimes.  *See People v. Anderson*, 5

6    Cal. 5th 372, 384, 393 (2018) (jury could properly consider in the penalty phase under § 190.3(a)

7    guilt-phase evidence that petitioner had been found with counterfeiting materials upon arrest and,

8    while in custody later, materials for escaping jail); *People v. Cordova*, 62 Cal. 4th 104, 140

9    (2015) (evidence of defendant's other crimes, which had been introduced in the guilt phase as

10    prosecution rebuttal evidence to defense character evidence, could be lawfully considered by the

11    jury in the penalty phase under § 190.3(a)).

12        Here, the evidence referenced in the portion of the prosecutor's argument at issue was all

13    properly admitted in the guilt phase, *see generally Gordon*, 50 Cal. 3d at 1238-57, and thus under

14    California law it was not improper for the prosecutor to urge the jury to consider it as a

15    circumstance of the capital crime at the penalty phase.  *See Champion*, 9 Cal. 4th at 946.

16    Petitioner therefore fails to show that this argument was misconduct or that it violated his federal

17    constitutional rights.

18        **3.  Subclaim 1(f)**

19        In subclaim 1(f) of claim W, petitioner alleges that the prosecutor improperly argued that

20    the jury should consider as aggravation the fact that petitioner was intelligent and not disabled

21    physically.  ECF No. 203 at 104.  Upon review of the record, the undersigned concludes that

22    petitioner has not shown the prosecutor committed misconduct.

23        During the course of the prosecutor's closing argument, he addressed factor (k) of Penal

24    Code section 190.3, which permits the jury to consider anything as mitigating, including

25    sympathy for the defendant due to his background or life circumstances.  56 RT 9495-96; *see*

26    *generally In re Gay*, 19 Cal. 4th 771, 814 (1998).  The prosecutor argued that the defense

27    evidence suggested that petitioner had not had a particularly difficult life nor an especially

28    challenging hand dealt to him.  56 RT 9496-98.  He then made the statements with which

149

petitioner takes issue:

> He was not lacking in intelligence.

>> He had at least average or above average intelligence. There is nothing particularly physically wrong with him either.

>> The defendant in this case was not cheated by nature in any way of any of the necessary qualities to make it in this society, to be a success in this society.

>> He was able the get good grades in elementary school finally, and ultimately, according to Linda Gordon, he was able to graduate from high school with average to above average grades.

ECF No. 421 at 346 (quoting 56 RT 9498).  The prosecutor continued that the evidence had shown that petitioner had a "pretty average normal upbringing" during his adolescence, 56 RT 9499, culminating in his argument that "it's not a person's upbringing that decides what a person is going to do.  It's a person's free choice.  And that's what these three people did, including this defendant, of their own free will.  They decided to kill other persons in order to get what they wanted."  56 RT 9500.

The prosecutor's argument was not misconduct.  While it is true that a capital defendant's difficult life experience is quintessentially mitigating, *see, e.g.*, *Wiggins*, 539 U.S. 510, and the absence of mitigation evidence is not itself aggravating, *see Allen v. Woodford*, 395 F.3d 979, 1018 (9th Cir. 2005), it is proper for a prosecutor to argue that there is no evidence to indicate that a certain mitigating factor is present.  *See Tuilaepa v. California*, 512 U.S. 967, 975-78 (1994).  Here, the record indicates that was precisely the nature of the prosecutor's argument here, as the totality of this portion of the argument urged the jury to conclude, based on the evidence they had heard, that petitioner had not had a particularly challenging life and thus this evidence carried minimal mitigating weight.  Petitioner has not shown that the prosecutor's argument was improper, and the undersigned recommends that this subclaim be denied.

### 4.  Subclaim 1(i)

In subclaim 1(i) of claim W, petitioner alleges that the prosecutor committed misconduct by urging the jury to disregard their instructions when he argued, "What I am here to do is to ask you for basically a just decision, no matter what the consequences may be in this case."  ECF No.

203 at 104-05 (citing 56 RT 9483); ECF No. 421 at 349-50.  The undersigned concludes that

petitioner has not met his burden to show that the state committed misconduct.

The record does not support petitioner's position that the prosecutor argued that the jury

should disregard the judge's instructions and instead return a "just" result, which would be,

implicitly, a death verdict.  Rather, the prosecutor opened his summation acknowledging that the

jury had a difficult task before them, then he stated, "I am not here to advocate for the death

penalty as such.  What I am here to do is to ask you for basically a just decision, no matter what

the consequences may be in this case."  56 RT 9483.  The prosecutor then reminded the jury that

he had not presented any additional evidence in aggravation, and that the voters and legislature

had already decided the propriety of the death penalty in the abstract.  56 RT 9484.  The

prosecutor then explained that the jury would receive some additional instructions in this phase

and argued at length about what the evidence in aggravation and mitigation had shown.  56 RT

9485-9501.  Viewing the statement at issue in the context in which it was made, therefore, the

prosecutor's argument did not mislead the jury as to their responsibilities at the penalty phase, did

not urge them to disregard the instructions they would receive, and did not suggest that a death

sentence was de facto the correct verdict.  Petitioner has not shown that it was not misconduct, or

that it infected the trial with unfairness so as to violate his due process rights.  *See Darden*, 477

U.S. at 181.  The undersigned recommends that this subclaim be denied.

**5.  Subclaim 3(h)**

In subclaim 3(h) of claim W, petitioner alleges that the prosecutor committed misconduct

by arguing that the jury should balance the victim's death against the opportunities that could be

available to the defendant in prison, when considering the propriety of the death penalty.  ECF

No. 203 at 106; ECF No. 421 at 343-44.  The undersigned concludes petitioner has not shown

constitutional error.

In the course of discussing the aggravation and mitigation evidence in his closing

argument, the prosecutor addressed some of the evidence that the defense had presented of the

life the petitioner might experience if sentenced to a life sentence in a California prison.  The

prosecutor then argued,

151

1    That's what [the defense witness] feels is appropriate for people like
     Charlie Manson.

2    And that's what you have to weigh here.

3    What is the victim left with?

4    Remember him, William Wiley?

5    What is he left with?

6    What makes that fair?

7    What is there to weigh on his side?

8    Is the defendant really punished by going to state prison?

9    Can we really go out to the community, if the defendant is placed in
     prison for the rest of his life, and say that, well, the defendant got
10   what he deserved?

11   He's going to be forced to go to this prison system that provides all
12   of these activities for him.

13   Of course prison isn't nice.

14   Of course it isn't . . . .

15   And I think that any right thinking person in weighing those two
     alternatives between what happened to William Wiley and what this
16   defendant has to look forward to would say that it isn't fair, and it
     simply does not balance out, and that's your job is to balance these
17   things.

18

19   56 RT 9502-9503; *see* ECF No. 421 at 343-44.

20        This argument was misconduct in that is misstated the law and the instructions that the

21   jury would receive.  The jury was charged with weighing the aggravating and mitigating factors,

22   5 CT 980, not to "weigh" what the homicide victim was "left with" as a measure of what may be

23   owed to the defendant.  *See* 56 RT 9502.  Moreover, the jury would not be charged with

24   "balanc[ing] . . . things," 56 RT 9503, between the victim's fate and the defendant's; such a

25   characterization is not only contrary to the instructions the jury would receive, *see* 5 CT 951-52,

26   980, but also strays dangerously towards suggesting that death is the presumed punishment in

27   homicide cases.

28        Petitioner argues that this misconduct reflected an unlawful reliance on nonstatutory

152

1    aggravating factors, which violated his due process rights by injecting irrelevant matters into the

2    jury's deliberations.  ECF No. 421 at 343-44; *see* ECF No. 454 at 94.  The Supreme Court has

3    held, however, that the sentencer's consideration of nonstatutory aggravating factors does not

4    necessarily violate the defendant's due process rights.  *Barclay*, 463 U.S. 939.  Rather, even if the

5    sentencer has improperly considered a nonstatutory aggravating factor, constitutional error arises

6    only where the jury could not have given aggravating weight to the same facts and circumstances

7    under some other sentencing factor.  *Brown v. Sanders*, 546 U.S. 212 (2006).  Petitioner does not

8    address this, *see* ECF No. 421 at 343-44; ECF No. 454 at 94, and the evidence underlying the

9    prosecutor's argument, concerning the activities incarcerated people might experience, was

10   properly before the jury.  *See generally Gordon*, 50 Cal. 3d at 1238, 1270.  Thus, although the

11   specific comparison urged by the prosecutor was not included as an aggravating factor in the

12   statute, the jury was free to consider the fact of the victim's senseless, sudden death as

13   aggravating under § 190.3(a) and was also free to consider, and give as little or as much

14   mitigating weight as they chose to, the evidence of prison life that the defense had presented

15   under § 190.3(k).  In light of this record, petitioner fails to show that the prosecutor's argument

16   reflected a violation of his due process rights.  The undersigned therefore recommends that it be

17   denied.

18        **6.  Subclaims 4(a)-(e)**

19        In subclaim 4 of claim W, petitioner alleges that the prosecutor committed misconduct by

20   making arguments based on matters not in evidence before the jury, specifying several particular

21   instances.  ECF No. 203 at 106-07.  In his briefing, he only makes arguments advancing those

22   allegations contained in subsections a, b, c, d, and e of subclaim 4.  ECF No. 421 at 348-49; ECF

23   No. 454 at 95.  He argues that these instances rendered his trial fundamentally unfair in violation

24   of his right to due process.  ECF No. 421 at 348-49.  The undersigned finds that petitioner has not

25   shown constitutional error.

26        In a criminal case, a prosecutor may argue reasonable inferences from the evidence

27   presented.  *United States v. Young*, 470 U.S. 1, 8 & n. 5 (1985); *Menendez v. Terhune*, 422 F.3d

28   1012, 1037 (9th Cir. 2005).  Where the prosecutor misstates the evidence, the defendant's due

1    process rights are violated if statements infected the trial with unfairness. *Darden*, 477 U.S. at

2    181.  In making that determination, the reviewing court considers the nature of the comments,

3    including whether they misstated the evidence; whether the comments implicated the defendant's

4    fundamental rights, such as the right to remain silent; whether the jury received countervailing or

5    curative instructions on the issue; and the weight of the evidence against the defendant. *Id.* at

6    181-82; *see Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005).

7          Here, petitioner has not shown that the prosecutor's comments violated his due process

8    rights.  Preliminarily, petitioner has neither argued that any of the comments at issue related to

9    petitioner's exercise of his fundamental rights, ECF No. 421 at 348-49, nor does the record

10   appear to support such an interpretation.  All of the comments at issue were made in the

11   prosecutor's closing argument, before the defense gave its summation, thus providing an

12   opportunity for the defense to respond. *See Darden*, 477 U.S. at 182.  The trial court also

13   instructed the jury that the arguments of counsel were not evidence and that they should render

14   their verdicts based on the evidence alone, not based on conjecture or the arguments of counsel.

15   *Id.*; 56 RT 9547-49, 9552; 5 CT 949, 954-55.  These facts all cut against the finding of a due

16   process violation. *See Darden*, 477 U.S. at 181-82.

17         The comments also did not misstate or misrepresent the record, but were reasonable

18   inferences based on the evidence that the jury heard.  Two of the comments with which petitioner

19   takes issue, reflected in subclaims 4(a) and 4(d), urged the jury to draw an inference that

20   petitioner would continue to be a danger to others in prison, but, contrary to petitioner's

21   argument, that urging was based on specific evidence that the jury had heard.  After describing

22   some of the evidence of petitioner's actions during and immediately after the Riverside events,

23   the prosecutor argued,

24                The fact that that experience did not deter the defendant suggest that
                 there is nothing that will deter the defendant, because of his particular
25               make up, whatever it is that makes him what he is, there is nothing
                 that will deter him.  And the evidence in this case shows that the
26               defendants themselves, or the defense counsel themselves, put on the
                 evidence from the California state prisons show that if this particular
27               defendant is of a character, for whatever reason, the he insists on
                 killing to achieve whatever his goals are, there is no way that he can
28               be stopped in prison either, because of the numerous assaults that are

                                                   154

1
2
3

> committed by prisoners with prison-made weapons, weapons obtained inside the prison and made in the prison if somebody wants to do it, and this defendant is of such a particular character that nothing seems to stop him.

4

56 RT 9489-90.  This argument did not refer to matters not in evidence, but simply argued that

5

the jury should make particular inferences about the defendant based on the evidence that the

6

jurors did hear.  As such, it was not improper, *see Menendez*, 422 F.3d at 1037, and petitioner has

7

not shown that it violated his due process rights.  *See Darden*, 477 U.S. at 181-82.

8

The remaining three comments that petitioner argues violated his due process rights

9

occurred shortly after those at issue above.  The prosecutor argued that the entirety of evidence

10

the jury had heard in the guilt phase of the course of events in Riverside, in Stockton, and after

11

the capital crime, indicated that the capital crime had been "carefully, cold-bloodedly planned"

12

and that the defendant evinced no concern for the loss of human life.  56 RT 9491-92.  He then

13

wondered what the mood had been in the car among petitioner and his co-defendants as they fled

14

from the capital crime and speculated that they felt "elation" and that "[t]hey had a good time."

15

56 RT 9493.  He grounded this speculation in a photograph that had been entered into by the

16

defense, which the prosecutor described as having been taken around the time of the capital

17

homicide, and which showed petitioner and his co-defendants "ha[ving] a great time."  56 RT

18

9394.  The prosecutor also based his rhetorical conjecture on evidence that petitioner and his co-

19

defendants appeared to have been planning other, similar crimes after the capital homicide.  56

20

RT 9394-94.  Petitioner takes issue with this portion of the argument as well, ECF No. 421 at

21

348, ECF No. 203 at 106, but this part of the prosecutor's argument was premised on specific

22

evidence that the jury had properly heard in the guilt phase—including maps and weapons found

23

in the petitioner's and his co-perpetrators' possessions—and from which it could be inferred that

24

petitioner and his co-defendants were planning additional crimes at the time of his arrest.  *See*

25

*Gordon*, 50 Cal. 3d at 1236.  Petitioner has failed to show that any of the three portions of the

26

prosecutor's arguments at issue in subclaims 4(b), (c), or (e) argued matters not in evidence or

27

that they violated his due process rights.  *See Darden*, 477 U.S. at 181-82.

28

For these reasons, the undersigned recommends that subclaims 4(a), 4(b), 4(c), 4(d), and

1    4(e) of claim W be denied.

2        **7.  Subclaim 8**

3        In subclaim 8 of claim W, petitioner alleges that the prosecutor committed misconduct by

4    wrongly telling the jury that "they had already found the circumstances of the Riverside killing

5    true beyond a reasonable doubt."  ECF No. 203 at 109 (citing 56 RT 9486).  In his briefing, he

6    clarifies that his allegation is that the prosecutor falsely told the jury that they had found

7    petitioner culpable beyond a reasonable doubt for having "murdered Mark Freed in Riverside on

8    November 15, 1982."  ECF No. 421 at 347.  Petitioner fails to show that the prosecutor

9    committed misconduct that violated his constitutional rights.

10        During the portion of the argument at issue, the prosecutor reminded the jury that they had

11    heard evidence of events in Riverside during the guilt phase, then stated, "[n]ow we come to a

12    different stage of the trial, and in this particular stage the court will instruct you that the evidence

13    with regard to the Riverside case is to be viewed now in a different light."  56 RT 9485-86.  He

14    explained that the jury would be instructed on aggravating and mitigating factors, and that

15    aggravating factors included any crimes of violence committed by the petitioner before the capital

16    crime, which the prosecutor argued would include the murder of Mr. Freed in Riverside.  56 RT

17    9486.  The prosecutor then explained,

18
19        The court will basically repeat most of the instructions that you
        received during the guilt phase in this stage of the trial.

20        The instructions relating to how you are to view the evidence of the
        facts, the instructions relating to the burden of proof beyond a
21        reasonable doubt and so forth.

22        The reason those instructions will be *repeated to you* is because *you
        now have to decide what you obviously have already*, but you are to
23        decide whether or not [petitioner] did in fact murder Mark Freed in
        Riverside on November 15th, 1982 beyond a reasonable doubt.

24        Now, I'm not going to belabor that point, because I think that you
        have either made up your minds about that or you haven't, you either
25        believe that he did in fact participate in the killing of Mark Freed or
        he didn't beyond a reasonable doubt.
26
        So I'm not going to go over all of the evidence that proves that he
27        did, was involved in that particular crime.

28    56 RT 9486.  Petitioner argues that both of the italicized portions are misconduct.  The first

1    portion is not.  This portion does not, as petitioner argues, suggest that the jury had previously

2    been instructed to find petitioner's culpability for the murder of Mr. Freed beyond a reasonable

3    doubt, but instead simply informs the jury that in the penalty phase they would again hear

4    instructions explaining the concept of "beyond a reasonable doubt" as a burden of proof.  This

5    was accurate and not misleading.

6            Petitioner also has not shown that the second italicized portion reflects constitutional

7    error.  To be sure, the prosecutor was incorrect when he argued to the jury that the jury had

8    previously found, beyond a reasonable doubt, that petitioner murdered Mr. Freed in Riverside on

9    November 15, 1982.  Rather, the jury had been instructed in the guilt phase that they could

10   consider evidence of "other offenses" if they believed that evidence.  5 CT 829.  Additionally,

11   although the Riverside evidence was important to the prosecution's guilt-phase case, *see Gordon*,

12   50 Cal. 3d at 1234-38, none of the guilt-phase verdicts contained within them an implicit finding

13   that petitioner's culpability for the murder of Mr. Freed had been proven beyond a reasonable

14   doubt.  *See generally* 4 CT 841-69.  Thus, when the prosecutor told the jury that they had

15   "obviously ha[d] already" found petitioner guilty of the murder of Mr. Freed beyond a reasonable

16   doubt, that was not true.

17           Nonetheless, petitioner fails to show that this comment so infected the trial with

18   unfairness as to have violated his due process rights.  *See Darden*, 477 U.S. at 181-82.  This

19   portion of the argument was exceedingly brief, not inflammatory in character, did not malign

20   petitioner's exercise of his fundamental rights, and occurred prior to the defense's argument, all

21   of which lessen the likelihood that petitioner's due process rights were violated.  *See id.*

22   Additionally, the court's instructions at the conclusion of the penalty phase addressed in detail the

23   jury's responsibility to find beyond a reasonable doubt that petitioner was legally responsible for

24   the homicide of Mr. Freed if they were to consider it in aggravation, including instructions about

25   aider and abettor liability.  56 RT 9564-69; 5 CT 951, 972; *see also* 5 CT 956-79.  Finally,

26   although the prosecutor's comment misstated the jury's guilt-phase findings, it was tempered by

27   his additional comment that the jury would have to find petitioner guilty beyond a reasonable

28   doubt of murder of Mr. Freed in order to consider it a fact in aggravation.  56 RT 9486.

1    Considering the record as a whole, petitioner fails to show that the prosecutor's comment was so

2    misleading as to have deprived petitioner of a fundamentally fair trial. *See Darden*, 477 U.S. at

3    181-82. The undersigned recommends that this subclaim be denied.

4        Accordingly, for all of the reasons set forth herein, the undersigned recommends that

5    claim W be denied.

6    **Claim X**

7        In claim X, petitioner alleges multiple errors in the trial court's instruction of the jury at

8    the penalty phase. ECF No. 203 at 109-18. The court has found that certain of these claims of

9    error—that the trial court should have given a clarifying instruction on the "minor participant"

10    factor, that the trial court improperly deleted sentencing factors from instruction 8.84.1, and that

11    the trial court erred in its instructions concerning petitioner's failure to testify—are procedurally

12    barred. *See ante*. In his merits briefing, petitioner abandons several additional subclaims by

13    making no argument concerning them. *See* ECF Nos. 421 at 351-63, 454 at 97-100; *Kates*, 776

14    F.2d at 1397. The undersigned therefore recommends dismissal of subclaims 1, 2, 7, 9, 10, 11,

15    12, 13, 14, 15, 16, 18, 19, 20, 21, 22, and 23 of claim X due to petitioner's abandonment.

16        Remaining before the court for merits determination, therefore, are subclaims 4, 5, 6, and

17    8 of claim X. The undersigned concludes that all of these subclaims should be denied on the

18    merits.

19        **1. Double-Counting of Riverside Evidence**

20        In subclaims 4 and 6 of claim X, petitioner alleges that the instructions "allowed the jury

21    to 'double count' the circumstances of the Riverside robbery" because the jury could "count" this

22    evidence under factor (a) (the circumstance of the capital crime), factor (b) (prior acts of

23    violence), and factor (c) (prior felony convictions) of CALJIC No. 8.84.1. ECF No. 203 at 111-

24    12. Per petitioner, this construction of the jury instructions in light of the evidence presented

25    would have "'push[ed] the jury towards a death sentence,'" ECF No. 421 at 356, quoting *Daniels*

26    *v. Woodford*, 428 F.3d 1181, 1213-14 (9th Cir. 2005), violating petitioner's rights under the Fifth,

27    Sixth, Eighth, and Fourteenth Amendments. ECF No. 203 at 109.

28        Petitioner has not shown that the instructions at issue violated his constitutional rights. A

jury instruction violates the defendant's due process or other constitutional rights "only if 'there is a reasonable likelihood' that the jury . . . interpreted the instruction" in a manner contrary to law. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (quoting *Boyde*, 494 U.S. at 380); *see also McGuire*, 502 U.S. at 72 (reviewing court must determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution").  In making this evaluation, the reviewing court considers the instructions as a whole, in light of "all that has taken place at the trial" and through the lens of common sense. *Johnson v. Texas*, 509 U.S. 350, 368 (1993) (quoting *Boyde*, 494 U.S. at 381).

The Supreme Court has rejected the argument that, as a blanket matter, if evidence relied on in aggravation implicates multiple sentencing factors described in the jury's instructions, then the instruction unconstitutionally skews the verdict towards death.  In *Jones v. United States*, 527 U.S. 373, 398 (1999), the Court explained,

> We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in *McCullah*[13] and the Fifth Circuit appears to have followed here.  What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor.  *See Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).  Petitioner's argument (and the reasoning of the Fifth and Tenth Circuits) would have us reach a quite different proposition—that if two aggravating factors are "duplicative," then the weighing process necessarily is skewed, and the factors are therefore invalid.

Rather, the Court explained, the reviewing court must consider the particular record in the petitioner's case to determine whether the totality of evidence, argument, and other instructions that the jury heard created a reasonable likelihood that their verdict was skewed in favor of death. *Jones*, 527 U.S. at 398-400.  Similarly, the Court of Appeals has held that any error engendered by the duplicative nature of the sentencing factors in the instructions is subject to a harmless error analysis, and harmlessness or prejudice is shown by the totality of the record before the jury: the evidence, argument, and other instructions they received.  *Allen v. Woodford*, 395 F.3d 979, 1013 (9th Cir. 2005).

Here, the jury was instructed at the close of the penalty phase on the statutory aggravating and mitigating factors to consider when rendering sentence, including the three factors at issue here, and then instructed,

> It is not intended that you should decide the issue by the simple process of counting the factors that may tend to point in the direction of aggravation or mitigation, and then decide the question by choosing the side with the greatest number of factors. You may decide that a certain factor or factors are entitled to greater weight than others. The weight to be given to any or all of the considered factors is entirely within the province of the jury.

> The final test is not in the relative number of factors, but in the relative weight to which you feel they are entitled.5 CT 952; 56 RT 9550-52. The jury is presumed to have followed these instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and nothing in the instructions suggested the contrary view that forms the premise of petitioner's argument here. *See generally* 5 CT 948-88; 56 RT 9547-77. The prosecutor's closing argument did not encourage the jury to engage in double-counting or, generally, to give exceptional weight to the Riverside evidence because it implicated multiple sentencing factors. *See* 56 RT 9483-9513. On this record, petitioner has not shown that the trial court perpetrated any constitutional error in its instructions, *see Jones*, 527 U.S. at 398-400, or, if any error did occur, that he suffered prejudice from it. *See Allen*, 395 F.3d at 1013. This subclaim therefore should be denied.

## 2. Failure to Give Proposed Instruction About Aggravating Factors

In subclaim 5 of claim X, petitioner alleges that the trial court erred by rejecting the following proposed instruction at the penalty phase:

> I have just read to you the ONLY aggravating factors that the law permits you to consider if you find them established by the evidence. You may not take into account any other facts or circumstances as a basis for deciding that the death penalty would be the appropriate punishment in this case.

5 CT 1037. Petitioner argues that, absent the instruction, the jury "was free to consider anything in aggravation," particularly in light of the prosecutor's allegedly improper closing argument, thereby violating his constitutional rights and prejudicing him. ECF No. 421 at 357. The undersigned finds that petitioner has not proven his entitlement to relief on this subclaim.

As with other claims of instructional error, when confronted with a claim that a trial court erroneously failed to give a requested instruction, the crux of the habeas court's constitutional

1    inquiry is whether the instructions as a whole were so misleading or incomplete as to have

2    infected the trial with unfairness. *Estelle*, 502 U.S. at 72; *Murtishaw v. Woodford*, 255 F.3d 926,

3    971, 973 (9th Cir. 2001). Although the "defendant is entitled to adequate instructions on the

4    defense theory of the case[,]" provided the theory is supported by law and there is some

5    foundation in the evidence, *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999), "it is not error to

6    refuse a proposed instruction so long as the other instructions in their entirety cover that theory."

7    *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir. 1981); *see United States v. Bonanno*, 852

8    F.2d 434, 440 (9th Cir. 1988) ("A defendant is not entitled to a separate good faith instruction

9    when the court adequately instructs on specific intent."). The petitioner bears the burden of

10   showing that the trial court's erroneous failure to give the requested instruction prejudiced him,

11   *see Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997), although "[a]n omission, or an

12   incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*

13   *v. Kibbe*, 431 U.S. 145, 155 (1977).

14           Here, petitioner has failed to show that the trial court erred in failing to give the requested

15   instruction. The jury instructions as a whole communicated to the jury that they could only

16   "consider[,] take into account and be guided by" the enumerated sentencing factors when

17   determining penalty, 56 RT 9649, 9574, and the Supreme Court has held that this instruction

18   gives sufficient guidance to the sentencing jury. *See Tuilaepa v. California*, 512 U.S. 967, 977

19   (1994); *cf. Brown v. Sanders*, 546 U.S. 212, 217 (2006); *Boyde v. California*, 494 U.S. 370

20   (1990). Petitioner has not shown that the absence of the requested, additional instruction violated

21   his constitutional rights.

22           **3. Aiding and Abetting Instruction**

23           In subclaim 8 of claim X, petitioner alleges that the trial court erred in its instructions on

24   aiding and abetting, as the jury could have understood them to conflict with CALJIC No. 8.84.1,

25   factor (j), which instructs the jury to consider, as mitigation, whether the defendant's participation

26   in the capital offense was relatively minor.[27] ECF No. 203 at 113; ECF No. 421 at 359-60; ECF

27   _____

28           [27] "Whether or not the defendant was an accomplice to the offense and his participation in
     the commission of the offense was relatively minor" is codified as a sentencing factor in

1    No. 454 at 99-100.  The undersigned has previously found that, to the extent this subclaim alleges

2    that the court erred in not giving an additional "explanatory instruction" on factor (j), *see* ECF

3    No. 421 at 359, that grounds for relief is defaulted.  *See ante*.  To the extent that petitioner alleges

4    that the trial court erred in the contents of its aiding and abetting instruction at the penalty phase,

5    *see* ECF No. 421 at 359-60; 55 RT 9405-06, those allegations fail on the merits.

6        At the conclusion of the penalty phase, the jury was instructed on the sentencing factors to

7    consider, including "whether or not the defendant was an aider and abettor in the present offenses

8    and his participation in the offenses was relatively minor" and "any other circumstance which

9    mitigates the gravity of the crime even though it is not a legal excuse for the crime."  56 RT 9550.

10   The jury was subsequently instructed,

11          The burden is on the State to prove beyond a reasonable doubt that
12          the defendant is the person who committed the offenses in Riverside
             which are alleged to be an aggravating factor in this phase of the trial.

13          If after considering the circumstances of the identification (and any
14          other evidence in this case), you have a reasonable doubt whether
             defendant was the person who committed the Riverside offenses, you
15          must give the defendant the benefit of that doubt and find him not
             guilty of those offenses.

16          The persons concerned in the commission of a crime who are
17          regarded by law as principals in the crime thus committed and
             equally guilty thereof include:

18          1.  Those who directly and actively commit the act constituting the crime,
19              or

20          2.  Those who aid and abet the commission of the crime.

21   5 CT 972-73; 56 RT 9565-67.  The instructions then defined aiding and abetting, including the

22   mental state necessary for it to be found.  56 RT 9567; 5 CT 974.

23        Petitioner has not shown that the instructions, as a whole, were so misleading or confusing

24   as to stymie the jury's consideration of mitigation evidence.  *See* ECF No. 421 at 359-60.  The

25   _____

26   subsection (j) of California Penal Code § 190.3, and is listed as factor (j) in the standard
     instruction 8.84.1 of the California Jury Instructions, Criminal (CALJIC).  Here, the trial court
27   deleted some of the sentencing factors in CALJIC No. 8.84.1 and renumbered the remaining ones;
     thus, the factor at issue here was referred to as factor "(e)" in the written copy of the jury
28   instructions that the jury received.  *See* 5 CT 951.

1    overall content and construction of the instructions make clear that the instructions concerning

2    aiding and abetting liability related to the question of whether the prosecution had proven beyond

3    a reasonable doubt that petitioner was legally culpable of the Riverside crimes offered in

4    aggravation.  The language that the court used in instructing the jury on the sentencing factors,

5    including factor (j), related to the "present offenses," which, as a matter of California law, refers

6    only to the capital offenses, not other-acts evidence.  *See People v. Spencer*, 5 Cal. 5th 642, 691

7    (2018), *as modified on denial of reh'g* (Sept. 12, 2018).  Moreover, even if the instructions could

8    have been understood as suggesting factor (j) related to both the capital homicide (Stockton

9    offenses) and the evidence offered in aggravation (Riverside offenses), *see* 56 RT 9550 (referring

10   only to "present offenses"), the instructions made explicit to the jury that they could find

11   petitioner's relatively minor participation to be mitigating, even if they also concluded that

12   petitioner was nevertheless legally culpable for the acts for which he was an aider and abettor.  5

13   CT 951; 56 RT 9550.  Petitioner has not shown that the trial court committed constitutional error

14   in its aiding and abetting instructions at the penalty phase.

15          For these reasons and those set forth *ante*, the undersigned recommends that claim X be

16   denied.

17   **Claim Y**

18          In claim Y, petitioner alleges that his rights under the Fifth, Sixth, Eighth and Fourteenth

19   Amendments were violated by the trial court's "failure to give full effect and consideration to

20   Petitioner's evidence of mitigating circumstances and its reliance on unconstitutional information

21   in denying Petitioner's motion" to modify the verdict under California Penal Code § 190.4(e).

22   ECF No. 203 at 118-21.  In his briefing, he specifies that his theory is two-fold: that the trial court

23   violated state statute, thereby violating petitioner's due process rights under *Hicks* and related

24   authority, and that the trial court's errors violated his rights under the Eighth Amendment to

25   heightened reliability in capital sentencing, including fully considering all mitigation evidence.[28]

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27          [28] Petitioner also briefly argues that the trial court's errors deprived him of meaningful
     appellate review in violation of the Eighth and Fourteenth Amendments.  ECF No. 421 at 372.
     Petitioner fails to explain the cognizability of such a subclaim nor under what authority it would

28   entitle him to penalty-phase relief.  *See id*.  In any event, these concerns are irrelevant, as

1    ECF No. 421 at 364-65.  The undersigned finds that petitioner has not proven constitutional error.

2    **1.  Legal Standard**

3    California statute provides that, in every case where a death verdict is returned, the

4    defendant is deemed to have made a motion to modify the verdict to the trial court.  Cal. Pen.

5    Code § 190.4(e).  In adjudicating the motion, "the trial court is obligated to review the evidence,

6    independently reweigh any aggravating and mitigating circumstances [in § 190.3], and determine

7    whether the weight of the evidence supports the verdict."  *People v. Landry*, 2 Cal. 5th 52, 123-24

8    (2016).  This provision is part of the California statutory scheme that the Supreme Court

9    approved in *Pulley*, 465 U.S. at 53, as compliant with the Eighth Amendment.

10    **2.  Failure to Consider Mitigation Evidence**

11    Petitioner argues that the trial court failed to consider relevant mitigation evidence, in

12    violation of state statute and the Eighth Amendment.  This argument fails.  Petitioner first argues

13    that the trial court failed to consider orphanage records that the defense had sought to introduce,

14    but which were not admitted.  ECF No. 421 at 366.  The trial court's approach was not error,

15    however, as under California law, the trial court may only consider the evidence actually

16    presented to the jury.  *See People v. Mickel*, 2 Cal. 5th 181, 202 (2016).  Moreover, on direct

17    appeal the California Supreme Court held, in the alternative to its application of a procedural bar,

18    that these records were properly excluded under state law, *see Gordon*, 50 Cal. 3d at 1264-65, a

19    determination to which this court must defer.  *See Bradshaw*, 546 U.S. at 76.  Accordingly,

20    petitioner fails to show that the trial court erred in this regard.

21    Petitioner next argues that the trial court erred when it found no evidence that petitioner

22    acted under the substantial domination of another during the capital crime, which would be

23    mitigating under § 190.3(g).  *See* 56 RT 9639-40.  Petitioner points to testimony at trial that he

24    was submissive to his brother, Bernard, when they were children; some evidence indicating that,

25    around the time of the capital crime, Bernard had influence on petitioner's major life decisions,

26    like where to live and whether to reenlist in the Marines; and the fact that Bernard had a criminal

27

28    petitioner's fails to demonstrate that the trial court erred in its adjudication of the motion at issue.

1    record himself.  ECF No. 421 at 366-69.  The trial court's finding was reasonable given the

2    evidence.  Based on the minimal evidence presented, the trial court may have reasonably found

3    that there was insufficient evidence that Bernard dominated petitioner during the latter's

4    involvement in the capital crime or that, if he did, such domination was "substantial."  *See*

5    *generally Black's Law Dictionary* (6th ed. 1990) (defining "substantial" as "[s]ynonymous with

6    material"); *People v. Arias*, 13 Cal. 4th 92, 189 (1996) (holding "substantial" in this context

7    should be understood by its "commonplace meaning[]").

8         Petitioner also argues that the trial court erred in not finding mitigating the fact that

9    petitioner was an accomplice in the capital crime and his participation in that crime was relatively

10   minor.  ECF No. 421 at 369; *see* Cal. Penal Code § 190.3(j).  The trial court found,

> As discussed in detail and from all the evidence presented, the court
> concludes beyond a reasonable doubt that while the defendant was
> an aider and abetter, his participation was most certainly not
> relatively minor.
>
> He was an active participant, and clearly participated in an intent that
> the guard be killed during the commission of the robbery.
>
> This is also inferred grom the evidence of the Riverside killing in
> which he personally shot the guard.
>
> Therefore, the court does not find this to be a factor in mitigation.

18   56 RT 9641.  Petitioner argues that these findings were unreasonable, as the evidence showed that

19   petitioner was "at most only a getaway driver," and speculates that it is "not inconceivable" that

20   petitioner had no desire to participate in the capital homicide.  ECF No. 421 at 369.  The trial

21   court's findings, however, stemmed from a reasonable perception of the evidence which, as

22   detailed herein and by the California Supreme Court, demonstrated that petitioner had been far

23   more involved in the capital crime than being "at most only a getaway driver," including evidence

24   that he had planned for and expected the victim to be killed during the capital crime.  *See*

25   *generally Gordon*, 50 Cal. 3d at 1233-37.  Petitioner fails therefore to show that this aspect of the

26   trial court's ruling was error, given the evidentiary record before it.

27        Finally, petitioner alleges error in the trial court's discussion of Penal Code § 190.3(k),

28   which permits the sentencer to consider "any other circumstance which extenuates the gravity of

1  the crime, even though it is not a legal excuse for the crime." 56 RT 9641. The trial court

2  described that, in considering this factor, it considered numerous items of evidence that the

3  defense had presented in the penalty phase. 56 RT 9642. Petitioner argues that this was error,

4  since the trial court did not also consider guilt-phase evidence and did not consider non-statutory

5  mitigation. ECF No. 421 at 370-71. Petitioner fails to identify, however, what specific evidence

6  from the guilt phase the court should have considered as mitigating that it did not, or how

7  consideration of non-statutory mitigation would have altered the trial court's analysis. Indeed, to

8  the latter point, petitioner posits that the trial court's failure to consider non-statutory mitigation

9  meant that it had failed to fully consider petitioner's "background and character" in mitigation,

10  ECF No. 421 at 370, but the trial court had specifically, expressly stated that it had considered

11  petitioner's "background" and "good character" when discussing the evidence it considered under

12  § 190.3(k). 56 RT 9652. Petitioner therefore fails to show that the trial court's ruling

13  transgressed state law or the Eighth Amendment.

14      For all of these reasons, petitioner fails to show that his due process rights or Eighth

15  Amendment rights were violated by the trial court's failure to consider mitigating evidence in

16  ruling on petitioner's automatic motion to modify the verdict.

17      **3.  Consideration of Matters Not In Evidence**

18      Petitioner also argues that the trial court violated his rights under the Fifth, Eighth, and

19  Fourteenth Amendments by denying the motion to modify the verdict on the basis of, in part,

20  information that had not been entered into evidence. ECF No. 421 at 371-72. Specifically,

21  petitioner argues that the trial court improperly considered the contents of a probation report

22  when ruling on the motion to modify the verdict. The undersigned finds that petitioner has not

23  proven that the trial court committed error, let alone constitutional error.

24      As noted above, in adjudicating a motion to modify the verdict, the trial court is confined

25  to the evidence that the jury heard. *See Mickel*, 2 Cal. 5th at 202. Here, petitioner points to

26  nothing in the record to indicate that the trial court considered the probation report in ruling on

27  the motion to modify. *See* ECF No. 421 at 371-72. The trial record indicates that, in a single

28  proceeding, the trial court ruled on defendant's motion for a new trial and his motion to modify

166

1    the verdict; heard the probation report; and imposed sentence.  56 RT 9599-9642.  There is

2    nothing in the record, however, showing that the trial court considered the contents of the

3    probation report when denying the motion to modify.  At the hearing, the court first heard, then

4    denied, the motion for new trial.  56 RT 9600-21.  It turned then to the motion to modify the

5    verdict, and the court acknowledged that it had read and received the probation report but

6    repeatedly stated that it would be guided by the evidence that had been presented to the jury when

7    ruling on the merits of the motion to modify.  56 RT 9629-30; *see also* 56 RT 9642.  The court

8    then detailed its findings as to the aggravating and mitigating evidence and denied the motion; in

9    so doing, it did not reference any facts that had appeared only in the probation report.  *See* 56 RT

10   9630-42.  On this record, therefore, petitioner has not shown that the trial court transgressed state

11   statute or his constitutional rights in its adjudication of his motion to modify the verdict by

12   considering extraneous materials.  *See generally Jones*, 66 F.3d at 204-05 (allegations not

13   supported by facts are insufficient to justify habeas corpus relief).

14         For all of these reasons, the undersigned recommends that claim Y be denied.

15   **Claim AA**

16         In claim AA, petitioner alleges that his appellate counsel performed deficiently,

17   prejudicing him.  ECF No. 203 at 124.  In his briefing, he specifies that counsel was deficient in

18   failing to raise as assignments of error on appeal the claims raised in the instant petition as claims

19   L, M, R, and W.  ECF No. 421 at 378-80; *see* ECF No. 454 at 108.  The undersigned concludes

20   that petitioner has not shown his entitlement to relief on this claim and recommends that it be

21   denied.

22         A criminal defendant has a Sixth Amendment right to the effective assistance of counsel

23   on appeal as well as at trial.  *Evitts v. Lucey*, 469 U.S. 387, 391 (1985).  Claims of appellate

24   ineffectiveness are evaluated under the *Strickland* framework.  *Smith v. Robbins*, 528 U.S. 259,

25   285 (2000).  To prove deficient performance, the petitioner must "show that his counsel was

26   objectively unreasonable . . . in failing to find arguable issues to appeal—that is, that counsel

27   unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Id.*

28   (citing *Strickland*, 466 U.S. at 687-91).  To demonstrate prejudice, petitioner must show a

1    reasonable probability that he would have prevailed on appeal absent counsel's alleged errors.

2    *Smith*, 528 U.S. at 285-86.

3        The undersigned finds that petitioner has failed to demonstrate that his Sixth Amendment

4    rights were violated by appellate counsel's choices.  In arguing deficient performance, petitioner

5    incorporates and relies solely on his theories that each of the underlying claims at issue—claims

6    L, M, R, and W of the petition in this court—reflect prejudicial, constitutional error, which he

7    argues appellate counsel unreasonably failed to raise as errors on direct appeal.  *See* ECF No. 421

8    at 378-80; *see* ECF No. 454 at 108.  As described *ante*, however, petitioner has not shown that

9    prejudicial constitutional error occurred in the events described in claims L, M, R, or W.[29]  An

10   appellate counsel is not deficient for omitting non-meritorious arguments from an appellate brief.

11   *Jones v. Barnes*, 463 U.S. 745, 753-54 (1983); *see also Smith*, 528 U.S. at 287-88.  For the same

12   reason, petitioner fails to demonstrate that there was a reasonable probability that, had appellate

13   counsel raised these allegations of error on direct appeal, the California Supreme Court would

14   have altered in his favor the judgments or sentences.  *See Smith*, 528 U.S. at 288 & n.16.  For

15   these reasons, the undersigned recommends that claim AA be denied.

16   **Claim BB**

17       In claim BB, petitioner alleges that the cumulative impact of all the constitutional errors

18   alleged in his petition deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth

19   Amendments.  ECF Nos. 203 at 125, 421 at 380-82.  Because the undersigned concludes that

20   petitioner has not shown any constitutional errors occurred in any of his claims—save the

21   possibility of showing error in claim S after an evidentiary hearing—thus, there are no errors

22   whose cumulative effect may have deprived petitioner of a fair trial.  *See McDowell v. Calderon*,

23   107 F.3d 1351 (9th Cir. 1997).  The undersigned therefore recommends that this claim be denied.

24   **Claim CC**

25       In claim CC, petitioner alleges that he was deprived of his rights under the Fifth, Sixth,

26   _____

27       [29] Relative to claim W, petitioner makes no argument addressing why or under what
     authority the state court would have reached the merits of those portions of that claim that were
     defaulted at trial per California's contemporaneous objection rule.  *See ante* (discussion of default
28   of subclaims 1(c) and portion of 1(b)); *see generally* ECF Nos. 421 at 378-80, 454 at 108.

1   Eighth, and Fourteenth Amendments because his death sentence is disproportionate, arbitrary,

2   and unfair, because petitioner was "the alleged driver of a getaway car who [was] not physically

3   present and who [did] not otherwise participate in a robbery."  ECF No. 203 at 125; *see* ECF No.

4   421 at 394-95; ECF No. 454 at 111-12.  Petitioner has not shown his entitlement to relief on this

5   claim.

6       Petitioner has neither made any argument nor identified any precedent entitling him to

7   relief under the Fifth, Sixth, or Fourteenth Amendments.  *See* ECF No. 421 at 394-95; ECF No.

8   454 at 111-12.  His argument under the Eighth Amendment appears foreclosed under *Tison v.*

9   *Arizona*, 481 U.S. 137 (1987).  There, the Supreme Court rejected an Eighth Amendment

10  challenge to two petitioners' death sentences, where both were convicted on a felony-murder

11  theory and the prosecution's evidence indicated that it was their co-participants, not petitioners,

12  who had fired the lethal gunshots.  *Tison*, 481 U.S. at 139-44.  Nonetheless, the evidence

13  demonstrated that the petitioners had participated in the planning of the underlying felonies, acted

14  in a way that demonstrated knowledge of the likelihood of the loss of human life, were present

15  during the felony-murders, and assisted in the shooters' flight from the homicide scene.  *Id.* at

16  151-52.  As such, they had each been a "major participa[nt] in the felony committed" and

17  exhibited "reckless indifference to human life" so that their respective death sentences accorded

18  with the Eighth Amendment.  *Id.* at 158.

19      Here, petitioner makes no argument that the evidence adduced at trial failed to show his

20  "major participation in the felony committed, combined with reckless indifference to human life,"

21  *see Tison*, 481 U.S. at 158, and the court's own review of the record indicates that petitioner's

22  death sentence does not fail under *Tison*.  Despite petitioner's characterization, the jury did not

23  find that petitioner was the mere getaway driver for the capital robbery-homicide, *see* ECF No.

24  421 at 394-95; ECF No. 454 at 111-12, but that he also participated in the conspiracy that

25  encompassed the capital homicide, including that, based on the events that had occurred

26  previously in Riverside and other evidence, he possessed an intent to commit homicide during the

27  Stockton homicide.  *Gordon*, 50 Cal. 3d at 1233-37, 1238-40.  The jury also specifically found, in

28  rendering their special circumstance finding, that while petitioner engaged in or aided and abetted

1    the commission of a robbery, he "personally intended that the co-defendants kill the victim or

2    knew that the co-defendants intended to kill the victim and intentionally aided and abetted,

3    counselled, commanded, induced, solicited, requested, encouraged or assisted in the killing."  4

4    CT 924; 53 RT 9001-02.  On the record in this case, petitioner has not shown that his death

5    sentence should be set aside as violative of the Eighth Amendment.  The undersigned

6    recommends that claim CC be denied.

7    **Claim DD**

8            In claim DD, petitioner alleges that the California death penalty scheme fails to

9    adequately narrow the class of individuals eligible for the death penalty and creates a substantial

10   likelihood that the death penalty will be imposed in an arbitrary or capricious fashion, in violation

11   of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  ECF No. 203 at 126.

12   The undersigned concludes that petitioner has not proven his entitlement to relief on this claim.

13           **1.  Legal Standard**

14           The Eighth Amendment forbids the "wanton[] and freakish[]" imposition of the death

15   penalty.  *Gregg*, 428 U.S. at 206-07.  At the time of petitioner's trial, the Supreme Court had

16   established that, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely

17   narrow the class of persons eligible for the death penalty and must reasonably justify the

18   imposition of a more severe sentence on the defendant compared to others found guilty of

19   murder.'"  *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S.

20   862, 877 (1983)); *cf. Gregg*, 428 U.S. 153.  This may be accomplished by a sentencing scheme

21   that, for example, requires the jury to find at least one aggravating circumstance before it may

22   impose death at the penalty phase.  *Lowenfield*, 484 U.S. at 244 (citing *Gregg*, 428 U.S. at 162-

23   64, and *Proffitt v. Florida*, 428 U.S. 242, 247-50 (1976); *Zant*, 462 U.S. at 878; *see also Arave v.

24   Creech*, 507 U.S. 463, 747 (1993).  States have considerable leeway in establishing and defining

25   aggravating factors, *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006)—for instance, they "may be

26   contained in the definition of the crime or in a separate sentencing factor (or in both)," *Tuilaepa v.

27   California*, 512 U.S. 967, 971-72 (1994)—so long as the aggravators are not vague.  *See id.* at

28

1    973-74; *Walton v. Arizona*, 497 U.S. 639, 654 (1990); *Arave*, 507 U.S. at 471; *Godfrey v.*

2    *Georgia*, 446 U.S. 420, 428 (1980).

3          **2.  Discussion**

4          Petitioner fails to demonstrate that he is entitled to relief on this claim.  To the extent that

5    petitioner argues that the statutory scheme facially fails to narrow the class of death-eligible

6    offenders sufficiently under the Eighth Amendment, *see* ECF No. 421 at 403-13, that argument

7    is foreclosed by *Pulley v. Harris*, 465 U.S. 37, 53 (1984).  In *Pulley*, the respondent argued that

8    the California capital sentencing scheme failed under the Eighth Amendment because the

9    relevant statutes failed to narrow the cohort of death-eligible offenders, such that additional

10   safeguards, such as a reviewing court conducting intercase proportionality reviews of death

11   sentences, were necessary to ensure that the death penalty was being imposed non-arbitrarily.

12   *See Pulley*, 465 U.S. at 45, 51.  The Supreme Court rejected this.  The Court acknowledged that

13   there might, hypothetically, "be a capital sentencing system so lacking in other checks on

14   arbitrariness that it would not pass constitutional muster without comparative proportionality

15   review," but the "California statute is not of that sort."  *Pulley*, 465 U.S. at 51.  Rather, because

16   the law required "the jury to find at least one special circumstance beyond a reasonable doubt,

17   the statute limits the death sentence to a small sub-class of capital-eligible cases," and then

18   allowed the jury, in the penalty phase, to consider a list of relevant aggravating and mitigating

19   factors, the statute minimizes the risk of arbitrary application of the death penalty.  *Id.* at 53.

20   This goal was further effectuated by California statute providing that death verdicts are reviewed

21   automatically by the trial court and by the Supreme Court.  *See id.*  Based on all of these factors,

22   the Court concluded that "on its face, this system, without any requirement or practice of

23   comparative proportionality review, cannot be successfully challenged under *Furman* and our

24   subsequent cases."  *Id.*  Since *Pulley*, the Court of Appeals has repeatedly rejected facial

25   challenges to California's statutory scheme, holding that the scheme on the whole adequately

26   narrows the class of persons eligible for the death penalty so as to comport with the Eighth

27   Amendment.  *See Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002) (rejecting a

28   narrowing challenge to California's capital sentencing scheme, concluding, "California has

1    identified a subclass of defendants deserving of death and by doing so, it has 'narrowed in a

2    meaningful way the category of defendants upon whom capital punishment may be imposed'");

3    *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001) (holding that, based on the features of

4    California's death penalty scheme described herein, "[a] reasonable jurist could not debate,

5    therefore, that the . . . California statute . . . narrowed the class of death-eligible defendants at

6    both the guilt and penalty phases, [and therefore] was constitutional").  Petitioner has not shown

7    that any of these precedents are distinguishable from his case or the statutory challenges he

8    raises.

9           Petitioner, however, asserts not only a facial challenge but also relies on evidence

10   admitted in other cases to show that California's statutory scheme empirically does not narrow

11   the class of death-eligible offenders.  ECF No. 421 at 402-03, ECF No. 442, Exs. DD 1-17.

12   Specifically, he relies on several declarations, testimonies, and other evidence submitted in

13   *Ashmus v. Ayers*, 3:93-cv-00594-TEH (ND Cal.), ECF No. 421 at 402-03, ECF No. 442, Exs. DD

14   1, 1A, 2, 4, 5, 5A, 6, 7, 8, 9, 13, 14, 15, 16, 17; interrogatory responses submitted in *Frye v.*

15   *Warden*, 2:99-cv-00628-LKK-EFB, ECF No. 421 at 402-03, ECF No. 442, Exs. DD 11-12; the

16   legislative history of California's capital sentencing scheme, ECF No. 421 at 402-03, ECF No.

17   442, Ex. DD-10; and a declaration from the drafter of the 1978 initiative that amended the

18   California death penalty scheme.  ECF No. 421 at 402-03, ECF No. 442, Ex. DD-3.[30]  Petitioner

19   makes no specific arguments, however, as to how these items of evidence, either singly or in

20   aggregate, demonstrate California's statutory scheme is infirm under the Eighth Amendment.  *See*

21   ECF No. 421 at 402-13.  For instance, although one of petitioner's exhibits indicates that, during

22   a particular time period, only a certain percentage of eligible offenders were sentenced to death in

23

24          [30] Petitioner also represents that he relies on evidence submitted in *Webster v. Ornoski*,
25   2:93-cv-0306-LKK-DAD (E.D. Cal.) in support of this claim, although none of his cited exhibits
     appear to relate to that case.  *See* ECF No. 421 at 402-03; ECF No. 442, Exs. DD 1-17.  In any
26   event, in *Webster*, the court considered evidence similar to what petitioner has presented here and
     concluded that the petitioner had not shown that the California statute fails in its narrowing
27   function so as to violate the Eighth Amendment.  Findings and Recommendations (ECF No. 480),
     *Webster v. Ornoski*, 2:93-cv-0306-LKK-DAD (E.D. Cal. June 4, 2014), *adopted by* Order (ECF
28   No. 492), *Webster v. Ornoski*, 2:93-cv-0306-LKK-DAD (E.D. Cal. Aug. 26, 2014).

California, petitioner makes no argument as to why that percentage indicates a lack of narrowing or, more generally, what numerical threshold is established by Supreme Court precedent. *See id.*; *see Furman*, 408 U.S. at 387 & n.11 (Burger, C.J., dissenting) (suggesting that imposition of death penalty in 15-20% of murder cases indicates it is sparingly used but not "freakishly rare"). Similarly, petitioner fails to make any argument as to how some of the evidence he proffers, such as the legislative history of the relevant California statutes, ECF No. 442, Ex. DD-10, or the declaration of the initiative's drafter, ECF No. 442, Ex. DD-3, are relevant to petitioner's argument that the statute, as an empirical matter, fails to narrow adequately. *See generally* ECF No. 421 at 402-13. Simply put, this evidence assists petitioner little, if at all, in meeting his burden to prove a constitutional violation.

Petitioner further supports his claim by arguing that the broad discretion given to California prosecutors to make charging decisions and in seeking the death penalty, including to the prosecutor in this case, which results in the arbitrary application of the death penalty. ECF No. 421 at 382-88, 398-402; ECF No. 454 at 109-13. This argument "has been explicitly rejected by the Supreme Court." *Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir. 1987), citing *Gregg*, 428 U.S. at 199; *Proffitt*, 428 U.S. at 254; *Jurek*, 428 U.S. at 274; *see also McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987) (holding prosecutorial discretion in decision to seek death penalty was not evidence that it was applied in violation of Eighth Amendment, due process, or equal protection). Instead, the Constitution forbids only "purposeful discrimination" in the exercise of prosecutorial discretion, *McCleskey*, 481 U.S. at 292-93, and in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297. Specifically, the petitioner must show both that the prosecutor labored under a discriminatory animus and that his decisions had a discriminatory effect. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Although statistical analyses may be utilized in making this showing, such analyses must be probative to "the record of the decisionmakers in [petitioner]'s case." *United States v. Bass*, 536 U.S. 862 (2002); *see also Belmontes v. Woodford*, 350 F.3d 861, 894 (9th Cir. 2003), *judgment vacated on other grounds sub nom. Brown v. Belmontes*, 544 U.S. 945, (2005); *see generally McCleskey*, 481 U.S. at 294-

96.

Petitioner argues he has made that showing here, relying largely on evidence discussed by the court in *Belmontes v. Brown*, 414 F.3d 1094, 1125 (9th Cir. 2005), *rev'd on other grounds sub nom. Ayers v. Belmontes*, 549 U.S. 7 (2006).  There, petitioner had been prosecuted for capital murder in San Joaquin County from 1981 to 1982 and was sentenced to death.  *See Ayers*, 549 U.S. at 9, 11.  In habeas corpus, he presented evidence in the form of an expert report prepared by "a well-respected professor of sociology and statistics" who "analyzed prosecutors' charging decisions in 122 death-eligible homicides committed in San Joaquin County from August 1977 through 1986" and "[a]fter running numerous logistic regression tests, [the expert] concluded that . . . [a] defendant who killed a white person was five times more likely to be charged with special circumstances than a defendant who killed an African American and twenty times more likely to be charged than if the victim were Latino."  *Belmontes*, 414 F.3d at 1125.  This showing, the Court of Appeals held, sufficed to demonstrate that during that time period the San Joaquin County District Attorney's capital charging practices had a discriminatory effect, as well as made a prima facie showing of discriminatory animus.  *Id.* at 1127-28.  Respondent defeated this showing, however, by offering the deposition testimony of the trial prosecutor who testified that he had decided to seek the death penalty against the defendant because he had believed the defendant had also been culpable of a prior homicide, and the court noted that evidence in the record supported this belief being held in good faith.  *Id.* at 1128-29.  This sufficed to show that the prosecutor had a legitimate, non-discriminatory purpose in seeking the death penalty against the defendant such that the latter was not entitled to habeas corpus relief on the theory of discriminatory charging practices by the District Attorney.  *Id.* at 1129.

Here, petitioner relies on the findings in *Belmontes* as evidence that the prosecutor in his case sought the death penalty against him due to the race of the victim.  ECF No. 421 at 389-91.  He also argues that the prosecutor's capital charging decision was driven by animus against defendants who were male, relying on the declaration of one of his attorneys, who stated that he reviewed "all homicide files in the clerk's office for the San Joaquin Superior Court that were filed between 1979 and 1981" and concluded that in that time period "there were nine female

174

1    homicide defendants, three of whom were capitally eligible, and zero (0%) who were capitally

2    charged.  During the same period, there were 110 male homicide defendants, 58 of whom were

3    capitally eligible, and seventeen (29%) of whom were capitally charged."  ECF No. 421 at 392-

4    93; ECF No. 421-16 at ¶¶ 3-7.  Even assuming arguendo that these suffice to make a prima facie

5    showing of discrimination in the District Attorney's charging decisions against petitioner, the

6    record here, as in *Belmontes*, rebuts any such showing by providing a legitimate, non-

7    discriminatory reason for the prosecutor to have sought the death penalty against petitioner.  As in

8    *Belmontes*, the record contains the deposition testimony of the trial prosecutor, who testified that

9    he had sought the death penalty against petitioner, despite knowing of some of the evidence of

10   petitioner's difficult early life and despite believing petitioner's brother had been the ringleader of

11   their crimes, because he viewed petitioner's and his co-defendants' actions as those of "cold-

12   blooded, ruthless killers."  ECF No. 441-5 at 64-66; *cf.* ECF No. 441-5 at 203-04 (testifying

13   petitioner "clearly met the qualifications, the requirements for the death penalty," because, like

14   his co-participants, petitioner "also did not have a high regard for other people's lives, or he

15   wouldn't have done what he did, and he wouldn't have been the getaway car driver again.  He

16   knew exactly—after what happened in Riverside, he knew exactly what he was getting into in

17   Stockton.").  Like *Belmontes*, here the record contained evidence consistent with the prosecutor's

18   deposition testimony, providing a good faith basis for his asserted beliefs.  *See Belmontes*, 414

19   F.3d at 1128-29; *see* 56 RT 9489-95, 9510 (prosecutor arguing same themes in penalty phase

20   closing argument).  Accordingly, precedent commands the conclusion that petitioner has not

21   borne his burden to show that his rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments

22   were violated by the capital charging decisions made in his case.  *See McCleskey*, 481 U.S. at

23   292-93, 297-98; *Armstrong*, 517 U.S. 456, 465; *Belmontes*, 414 F.3d at 1125-29.

24        For all of these reasons, petitioner has failed to prove that he is entitled to relief on claim

25   DD.  The undersigned recommends that it be denied.

26   **Claim EE**

27        In claim EE, petitioner alleges that defects in the California capital sentencing scheme

28   violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, specifically, the

1    relevant statute's failure to specify and enumerate mitigating and aggravating factors; failure to

2    foreclose nonstatutory, unspecified aggravating factors from being considered; failure to require

3    proof of existence of aggravating factors beyond a reasonable doubt; failure to require jury

4    unanimity on aggravating factors; and failure to require the California Supreme Court to conduct

5    a proportionality review on direct appeal.  ECF No. 203 at 126-28.  In his briefing, petitioner

6    makes no argument specific to any of these allegations, save his allegation that a proportionality

7    review on appeal is required by the Eighth Amendment.  ECF No. 421 at 396-98; ECF No. 454 at

8    112.  As explained *ante*, however, the Supreme Court in *Pulley*, 465 U.S. 37, rejected the

9    proposition that the Eighth Amendment mandates a post-sentencing proportionality review either

10   generally or as part of the California statutory scheme specifically, given the state scheme's other

11   features.  Petitioner's argument that an appellate court must conduct an intracase, rather than

12   intercase, proportionality review in cases with multiple co-defendants appears to have no

13   grounding in precedent.  *See generally Standefer v. United States*, 447 U.S. 10 (1980) (holding

14   that "[w]hile symmetry of results [among co-defendants] may be intellectually satisfying, it is not

15   required" under the common law).  Thus, relief on this basis is barred under *Teague*, 489 U.S.

16   288.  Petitioner has not shown his entitlement to relief on this claim, and the undersigned

17   recommends that it be denied.

18   **Claim FF**

19        In claim FF, petitioner alleges that his execution after a lengthy period of confinement

20   violates his rights under international law and, as such, under the Supremacy Clause of the

21   Constitution.  ECF No. 203 at 128-29; *see* ECF Nos. 421 at 413-21, 454 at 114-16.  The

22   undersigned recommends that the claim be denied.

23        Petitioner argues that his claim arises under international law but neither cites precedent

24   establishing that violations of international law may, as a general matter, give rise to habeas

25   corpus relief in the federal courts, nor does he establish that a violation of international law

26   occurred.  In fact, the Supreme Court has held that violations of international law are not

27   cognizable as habeas corpus claims.  *Medellin v. Texas*, 552 U.S. 491 (2008); *see also Medellin v.*

28   *Dretke*, 544 U.S. 660, 664 (2005); *see generally Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475

1    (9th Cir. 1994) ("International law does not require any particular reaction to violations of law . . .

2    . Whether and how the United States wishes to react to such violations are domestic questions.");

3    *Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012) (holding that the,

4    "[p]etitioner cannot demonstrate that any claim of a violation of international law is even

5    cognizable on federal habeas review, given that such review is designed to address claims that a

6    petitioner is in custody in violation of the Constitution or laws or treaties of the United States").

7    Even if such a violation were cognizable on habeas corpus, petitioner fails both to identify what

8    international law was violated, and to meet his burden of showing that any such violation entitles

9    him to have his death sentence set aside.  *See* ECF Nos. 421 at 413-21, 454 at 114-16.

10       To the extent that petitioner urges that his lengthy confinement prior to execution violates

11   the Eighth and Fourteenth Amendments, *see* ECF No. 421 at 414-21, his relief on this claim

12   would reflect application of a new rule of constitutional law, since the Supreme Court has never

13   recognized that an extraordinarily lengthy confinement before execution constitutes a heightened

14   punishment, additional punishment, or is otherwise unauthorized under the Eighth Amendment,

15   Fourteenth Amendment, or other constitutional law.  *See Jones v. Davis*, 806 F.3d 538, 548-53

16   (9th Cir. 2015); *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010); *Allen v. Ornoski*, 435 F.3d

17   946, 956-59 (9th Cir. 2006); *see generally Knight v. Fla.*, 528 U.S. 990 (1999) (opn. of Thomas,

18   J., concurring with the denial of certiorari) (rejecting theory that delay in post-trial review violates

19   a capitally sentenced person's Eighth Amendment rights); *Lackey v. Texas*, 514 U.S. 1045 (1995)

20   (opn. of Stevens, J., dissenting from the denial of certiorari) (describing this theory as "novel"

21   under Eighth Amendment jurisprudence); *Coleman v. Balkcom*, 451 U.S. 949 (1981) (opn. of

22   Stevens, J., concurring in the denial of certiorari) (explaining that some delay in judicial review of

23   capital cases is inevitable and serves the function of ensuring reliability).  As such, the federal

24   courts are barred under *Teague* from granting habeas corpus relief on this basis.  *Jones*, 806 F.3d

25   at 548-53; *Smith*, 611 F.3d at 998-99.  Petitioner neither offers any argument distinguishing his

26   claim from those apparently substantively identical claims that the Court of Appeals has held to

27   be *Teague*-barred, nor makes any argument that *Teague*'s exceptions apply to his claim.  *See* ECF

28   Nos. 421 at 413-21, 454 at 114-16.

For these reasons, the undersigned recommends Claim FF of the Amended Petition be denied.

Accordingly, IT IS HEREBY ORDERED:

1. That Petitioner's motion for evidentiary hearing, ECF No. 421, is GRANTED on subclaims 2, 5, 6, 9, 10, 16, 24, 26, and 30 of claim S of the Third Amended Petition, ECF No. 203. The motion is DENIED in all other respects.

2. The Clerk is directed to substitute Eric Mejia as Respondent.

Further, IT IS HEREBY RECOMMENDED that all remaining claims and subclaims of petitioner's Third Amended Petition, ECF No. 203, be DISMISSED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within thirty days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    September 29, 2025    

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE